Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

---------------------------

WILLIAM BEAUREGARD,                :
as Personal Representative
of the ESTATE OF SARAH DAWN        :
BEAUREGARD,                        :  Case No.
        Plaintiff  : 3:08-cv-37-J-32HTS

    VS.                            :

CONTINENTAL TIRE                   :
NORTH AMERICA, INC.,               :
a foreign corporation,
        Defendant  :

---------------------------

    DEPOSITION OF CHRISTOPHER GUY SHAPLEY,
taken on behalf of the Plaintiff, pursuant to the
applicable provisions of the Federal Rules of Civil
Procedure, before Linda J. Modano, CSR No. 121093, a
Registered Professional Reporter and Notary Public in
and for the Commonwealth of Massachusetts, at the
Hyatt Harborside Hotel, 101 Harborside Drive, Boston,
Massachusetts, on Friday, March 20, 2009, commencing
at 9:46 a.m.

APPEARANCES:
NORWOOD S. WILNER AND JAY PLOTKIN, ESQS., of
Wilner Block, P.A., 444 East Duval Street, 3rd Floor,
Jacksonville, Florida, 32202, for the Plaintiff.

FREDERICK J. FEIN, ESQ., of Thornton, Davis & Fein,
P.A., Brickell Bayview Centre, 80 S.W. 8th Street,
Suite 2900, Miami, Florida, 33130, for the Defendant.

Page 2

              I N D E X

Witness              Direct  Cross  Redirect
Christopher Shapley       3


              E X H I B I T S

NO.                        ID.

Page 3

1           P R O C E E D I N G S
2           CHRISTOPHER GUY SHAPLEY, having been
3   satisfactorily identified and duly sworn by the
4   Notary Public, was examined and testified as follows:
5               Direct Examination
6       Q.  (by Mr. Wilner) Just give us your name and
7   your professional address please.
8       A.  I am Christopher Guy Shapley and I live at
9   number 46 Pilgrim Drive, Bedford, New Hampshire.
10      Q.  Are you affiliated with any colleges or
11  universities?
12      A.  I don't have any working relationship
13  currently with any colleges or universities, no.
14      Q.  Do you have an office at 46 Pilgrim Drive?
15      A.  I have an office in my house, yes.
16      Q.  Okay.  So you have like -- How many rooms are
17  devoted to what you do?
18      A.  Well, my office occupies one room but I have
19  sort of stuff stored in various other places.
20      Q.  Okay.  And what equipment do you have in that
21  room?
22      A.  Oh, the usual office things; computers,
23  copying machines.  You know, usual office stuff.

Page 4

1   Filing cabinets.
2       Q.  Thank you.  Do you have any employees?
3       A.  No, I do not.
4       Q.  How long have you operated out of your
5   one-room office in Bedford, New Hampshire?
6       A.  I have lived in Bedford since 1980.
7       Q.  Does that mean you've operated out of that
8   one-room office since 1980?
9       A.  I don't think I've used any of the other
10  rooms as an office.  Oh, hang on.  No, wait a minute.
11  I did move briefly to Tennessee.  Then I moved back
12  again.
13      Q.  What year was that?
14      A.  Oh, gosh.  We came back about five years ago
15  so that would have been 2004.  I think it was between
16  about 2003, 2004.
17      Q.  And that was for how long a time?
18      A.  We lived down there for about six months.
19      Q.  Why did you move to Tennessee?
20      A.  It was warmer.
21      Q.  Well, what did you attempt to do in
22  Tennessee?
23      A.  Same thing.

1  (Pages 1 to 4)

Page 5

1    Q. Well, why did you go back in six months?
2    A. Because at that time the housing market in
3  New Hampshire wasn't doing well and the house we had
4  in New Hampshire had not sold. So we returned to
5  that one, sold the house in Tennessee.
6    Q. I see. And we being you and your family?
7    A. My wife and I, yes.
8    Q. So do you have any equipment in your office
9  that would be sufficient to test tires or anything
10 like that?
11   A. I would not claim to have the equipment
12 necessary to test tires, no. I have some measuring
13 devices but I wouldn't say they were specific or
14 appropriate for testing tires.
15   Q. What professional journals do you subscribe
16 to, if any?
17   A. Oh, I get the house journals for the Society
18 of Automotive Engineers and the American Society of
19 Mechanical Engineers.
20   Q. And the house journals are called what?
21   A. I've forgotten what the titles -- I'm not
22 sure they have a specific title. You know, I can't
23 tell you exactly.

Page 6

1       The Society of Automotive engineers has a
2  monthly and I've forgotten what they call it.
3  Obviously it's about automotive engineering.
4    Q. Okay. What was in the last issue?
5    A. Oh, they were discussing some new designs of
6  engine parts and support components. It was, you
7  know, a general review piece.
8    Q. Where is the Cranfield Institute of
9  Technology?
10   A. It was 50 miles north of London. It's been
11 renamed. It's now Cranfield University, so the
12 institute as such doesn't exist. It's now a
13 university.
14   Q. You have indicated on your curriculum vitae
15 that you were something called a Pirelli Scholar?
16   A. That's true.
17   Q. What is a Pirelli Scholar?
18   A. Pirelli is the Italian tire company. They
19 had made money available for the study of vehicle
20 dynamics. And it was the Pirelli Scholarship, and
21 the person whose education was funded by the
22 scholarship was the Pirelli Scholar and that was me
23 at that time.

Page 7

1    Q. Did you report to Pirelli any of your
2  experiences while having their scholarship?
3    A. I don't believe I ever met anybody from
4  Pirelli. I was merely in receipt of their
5  scholarship.
6    Q. Have you met anybody from any tire company?
7    A. Over the years, yes, I have. Yes.
8    Q. And have you met people from Continental?
9    A. Probably.
10   Q. Do you remember who they were?
11   A. No.
12   Q. Have you ever visited any Continental plants?
13   A. Don't think so.
14   Q. Prior to this case were you ever employed,
15 either directly or indirectly, by a tire company in
16 connection with giving an opinion on litigation?
17   A. Well, I have been an employee of a tire
18 company, yes.
19   Q. Okay. Explain to me when you were an
20 employee of a tire company.
21   A. I was an employee of the Firestone Tire
22 & Rubber Company back around about 74 through 79 I
23 think it was. 74 through 79.

Page 8

1    Q. I didn't notice that on your resume or maybe
2  I didn't read it right.
3    A. It should be there.
4    Q. Okay. All right. Under Experience, I'm
5  sorry. So March 74 to 79 research scientist at
6  Central Research Laboratory -- oh, okay -- of
7  Firestone Tire & Rubber Company -- okay -- assigned
8  to the study of vehicle/tire interaction as well as
9  consultation with other departments including
10 analysis and reconstruction of car and truck
11 accidents for the company as well as privately.
12 What do you mean as well as privately by that?
13   A. Well, I had the opportunity to do some of
14 that type of work for other people, not Firestone,
15 during that period. Took days off to do a little
16 consulting.
17   Q. Now, were you ever asked to render an opinion
18 whether a Firestone tire was defective?
19   A. No. That's not the sort of opinion -- At
20 least -- People may have asked but I would not have
21 given an opinion.
22   Q. Because really the question of the technical
23 aspects of the tire, that's not really where your

2  (Pages 5 to 8)

1  expertise lies, correct?
2      A.  For tire, quotes, defect issues, I would
3  defer to people more familiar with the chemistry and
4  construction processes of tires for that sort of
5  issue.
6      Q.  Okay.  So when you were at Firestone, your
7  interests were to consider the effects of vehicle --
8  or the interaction of tires with vehicles and the
9  resultant handling characteristic, is that fair?
10     A.  Yes.  The mechanical properties of the tires,
11  their specifications, and the effect that these
12  things have on vehicles under various conditions.
13     Q.  This mishap in question involved a 1987 Jeep
14  Grand Wagoneer, I believe.  Did you verify that to be
15  the case?
16     A.  I think you're right.  Jeep Grand Wagoneer,
17  yes.
18     Q.  And did you -- What source of information did
19  you seek or find, rather, that told you any of the
20  specifications, mechanical specifications, of that
21  vehicle?
22     A.  The information I have specific to the
23  vehicle actually comes from the owner's manual.  It

1  contains some information about this particular
2  vehicle.
3      Q.  Anything else?
4      A.  I don't recall any other particular
5  reference, no.  I can't think of anything that I had
6  to specifically go and look up.
7      Q.  Where did you get the owner's manual?
8      A.  I believe it was forwarded to me from
9  Mr. Fein's office.
10     Q.  Okay.  What in the owner's manual did you
11  find relevant to this analysis?
12     A.  Well, of interest -- of some relevance, on
13  page I think it's 112, there's a section labeled Tire
14  Warnings.
15          And one of the things the manufacturer
16  of the vehicle says is that certain combinations of
17  after-market tires and wheels may change tread
18  measurements resulting in changes of steering and
19  suspension geometry.
20          This can cause unpredictable handling and
21  stress to the steering and suspension components.
22  Therefore, only use tires and wheel sizes approved
23  for your vehicle.

1      Q.  That's it?
2      A.  That's as -- the only point that I would draw
3  your attention to.
4      Q.  Now, where would you go to find any testing
5  that might have occurred on the subject vehicle --
6  not the individual vehicle but the model vehicle,
7  1987 Grand Wagoneer, to determine its handling
8  characteristics?
9      A.  Well, the -- quite a few road tests of
10  vehicles exist in which subjective handling tests are
11  reported.  You can go to the internet and look up
12  various road tests.  They tend to be subjective.
13          I would look through, you know, material
14  that's been published, you know, say in the SAE or
15  has come to light from the manufacturer to see if any
16  handling test data was available.
17     Q.  You said you would do it.  You have not done
18  it?
19     A.  I don't recall doing it.  I do know I didn't
20  find -- I have not come across any.  I don't recall
21  the extent of the search but I did not come across
22  any specific handling test data for this vehicle.
23     Q.  So in its configuration leaving the factory

1  would you expect this vehicle would understeer or
2  oversteer?
3      A.  Oh, I would expect it to understeer.
4      Q.  What would be its understeer gradient?
5      A.  Well, I would -- Jeep -- For those Jeep
6  products for which test data is available, they
7  appear to be manufacturing fairly high understeered
8  vehicles, so I would expect it to be on the high end,
9  you know, of 5, 6, 7 degrees per g.  Something on
10  that order.
11     Q.  What is the effect of having a solid axle in
12  the front?
13     A.  Well, there are lots of effects.  There are,
14  you know, consequences.  I mean, if you put a solid
15  axle in the front, for example, it requires a vehicle
16  design so that all of the engine and transmission
17  components can pass above the axle.
18          So you tend to end up with relatively
19  high vehicles such as the Ford Explorer where that
20  had some of those -- not Explorers -- the -- What's
21  the one I'm thinking of.  Some of the Ford pick-ups,
22  the 150's and things, the front.
23          The Ford Explorer came with a front swing

3  (Pages 9 to 12)

1   axle which was a derivative of an earlier model, but
2   it tends to lead to designs that are somewhat higher
3   because you can't drop the engine down between the
4   front suspension components.
5           Also, beam axles have various properties
6   associated with shimmy.  Because the two wheels are
7   connected together, if you bounce one wheel
8   vertically, it tends to tilt the other one and the
9   wheels behave like gyroscopes.
10          And so when you tilt it, it wants to
11  steer.  So a beam axle front end is very prone to
12  shimmy and or tramp effects which are very
13  undesirable from the point of view of ride and
14  smoothness.
15          The beam axle does a good job, in the
16  ordinary course of events, of keeping the two tires
17  at right angles to the pavement.  You don't get large
18  camber changes on beam axles because, being coupled
19  wheel to wheel, the axle holds the two wheels
20  parallel to each other and substantially at right
21  angles to the pavement which is good.
22          They tend to be mounted on leaf springs
23  and the nature of the beam axle is such that you

1   usually end up with a steering linkage that passes
2   across the vehicle, the result being that the
3   steering of beam axle front ends tends to be strongly
4   influenced by the rigidity of the mounting of the
5   axle on the side-to-side sense.
6           The springs that carry the weight also --
7   say in the case of a heavy truck, are also the only
8   element limiting the side-to-side movement of the
9   axle.
10          And when the side-to-side movement of the
11  axle happens to be such that it directly steers the
12  wheels, this can be a problem and requires that the
13  axle be braced by some sort of horizontal linkage to
14  stop it from essentially flopping about under the
15  vehicle and compromising the steering of the vehicle.
16          So the choice of a beam affects all sorts
17  of issues from the overall design of the vehicle, the
18  ride quality, the shimmy properties, the tramp
19  properties, and the steering properties, depending on
20  what other components are installed.  So it affects a
21  little bit of everything.
22  Q.  And explain the -- You used the word axle
23  tramp, T R A M P, and explain that if you would for

1   the jury.
2   A.  Well, an axle tramp -- If I go over a big
3   bump and I cause one wheel to rise, what you
4   sometimes find, depending on the weight distribution
5   across the axle itself, is that obviously -- Suppose
6   one wheel goes up six inches and other wheel doesn't
7   rise at all, it's sitting on pavement.
8           This will also raise the axle casing
9   itself and the center point of the axle and in fact
10  the differential will go up three inches.  Then the
11  spring will start to push the wheel back down towards
12  the pavement.
13          And what can happen is if the machinery
14  in the middle of the axle is heavy enough and the
15  spring is stiff enough, as the wheel that went
16  upwards is now propelled downwards, because of the
17  inertia of the center of the axle it will actually
18  raise the other tire off the ground.
19          And so you get into a situation
20  potentially where one wheel bounces off the pavement
21  and although the wheel on the other side is not on a
22  rough surface, then it may also leave the pavement on
23  the rebound.

1           And if this process, for example, is
2   being driven by forces say from the engine due to
3   wind-up on the springs, you can actually sustain a
4   bouncing, first of the left wheel, then the right
5   wheel, then the left wheel.
6           And as the two rear wheels alternatively
7   bounce off the ground, it breaks contact with the
8   pavement and can induce a condition called skate.
9           So tramp is an axle motion.  It's very,
10  very vehicle-specific.  Some vehicles do it, some
11  don't.  And that can lead to issues of control if it
12  gets to the point of causing skate.
13  Q.  And what is skate?
14  A.  Skate is a situation where the rear of the
15  vehicle essentially loses firm contact with the
16  pavement and it starts sliding around as if it were
17  skating and it can lead to control problems in the
18  vehicle.
19  Q.  And this axle tramp, now, does that only
20  occur or mostly occur with a solid axle?
21  A.  I hate to say it never occurs without there
22  being a solid axle, but I have not seen any reference
23  to it other than with a solid axle.

1          There may be ways of generating it
2   without there being a solid axle, but usually it's
3   something you see with solid axles.
4          Q.  Now, has there ever been any research or
5   investigation as to whether tread separation of a
6   tire can induce axle tramp?
7          A.  There have been reports -- I don't know what
8   you mean when you talk about research.  There have
9   been investigations of tire issues in which tramp has
10  been encountered or skate has been encountered, yes.
11         Q.  Who has done those?
12         A.  Renfroe did some and I believe Arndt also.
13  There may be some more but I believe I've come across
14  references to skate or tramp both from Renfroe and
15  Arndt.
16         Q.  And who is Renfroe and who is Arndt?
17         A.  Ren -- I've forgotten his first name.
18         Q.  David.
19         A.  David, okay.  He runs a business somewhere in
20  Arkansas.  He has a position at a college there, and
21  he did some testing -- I think actually he simulated
22  it.  He found himself gluing blocks onto tires.  It
23  didn't actually work very well.

1          I think he published some work.
2   Unfortunately, in the report that he published -- I
3   forget how it ended up, but one of his technicians
4   let him down, if you will.
5          And although he published the report that
6   had the data in it, he came to realize that the tires
7   in his experiments were not what he thought they
8   were.
9          He thought he was testing tires that had
10  been unbelted and in fact he wasn't, and it was all I
11  think a bit embarrassing.
12         Q.  Did you talk to him about it?
13         A.  I've not talked to him about it, no.
14         Q.  As to whether he was embarrassed or not?
15         A.  Well, it would be very embarrassing to me.  I
16  mean, in his paper he said that he had unbelted the
17  tires and in reality his technician had not.
18         Q.  How do you know that?
19         A.  Because, A, he amended it and, B, if you read
20  his report carefully, in the appendices were the
21  notes of the technician if you read it carefully.
22         And also, in his test data he found that,
23  according to him, unbelting the tire had absolutely

1   no effect on vehicle understeer, and he was the only
2   person ever to come to that conclusion and it was
3   apparent he had not in fact unbelted the tire.
4          Q.  It was apparent to whom?
5          A.  Well, careful reading of the paper, if you
6   read the appendix, it was -- and the notes from the
7   technician, it's apparent he had not unbelted the
8   tire.  He had merely ground off the tread.
9          Q.  Okay.  You mentioned that Doctor Renfroe runs
10  a business in Arkansas.
11         A.  Yes, he does.
12         Q.  Is he also a Ph.D. mechanical engineer?
13         A.  I believe so.  Yes.
14         Q.  Okay.  You just wanted to talk about running
15  a business.  I mean, you run a business, too, right?
16         A.  Yes, but he has quite a big business.  He has
17  a building, he has quite a large staff.  It's quite a
18  substantial enterprise.
19         Q.  I guess I was just kind of curious -- I mean,
20  you refer to yourself as a Ph.D. in mechanical
21  engineering.
22         A.  On my resume, yes.
23         Q.  The fact that you run a business, I mean, if

1   somebody else referred to you and said, Oh, that guy
2   just runs a business, you would feel, well, you know,
3   that isn't really what your credentials are, right?
4          A.  Well, I hope I'm running a business.
5          Q.  You wouldn't introduce yourself as merely
6   having run a business if you had a Ph.D. in
7   mechanical engineering.  Do you understand what I'm
8   saying or not?
9          A.  No.  I have no idea where you're going with
10  that.
11         Q.  Okay, fine.  All right.  He runs a business.
12  Now, what about Arndt, A R N D T?
13         A.  Just trying to remember what his testing was.
14  He -- In some testing he was doing of Ford Explorers,
15  his brother was driving and they rolled the vehicle.
16         And I believe that he subsequently came
17  to the conclusion, on inspecting the video, that the
18  Explorer had encountered rear-end skate which
19  accounted for the loss of control.
20         And then subsequently I think he also
21  did some simulated partial tread-peel testing and
22  measured the bouncing motion of the back end.
23         I think once again he was -- I'm trying

Page 21

1 to remember if he was grinding it or bonding it. He
2 tried to induce skate by a simulated peel in which he
3 removed portions of the tire to make the axle bounce.
4     And he found that if he had two lumps
5 going around the tire it would bounce at half the
6 forward speed than if he only had one lump, which is
7 not surprising.
8     Q. Well, let me ask you then, does tread
9 delaminat -- or tread separation, can that induce
10 axle tramp?
11     MR. FEIN: Objection to the form of the
12 question.
13     A. Well, depends what you mean by can it. In
14 some vehicles it can't. It depends. It depends on
15 the design of the vehicle.
16     Some vehicles are vulnerable to axle
17 tramp and a variety of things can induce it. One of
18 those is probably, you know, losing portions of the
19 tread.
20     Q. Losing portions of the tread being one effect
21 of tread separation?
22     A. No. Losing a portion -- I mean, if you lose
23 all 360 degrees of the tread so the tire is still

Page 22

1 substantially round, that is not as likely to produce
2 tramp.
3     If you lose a fraction of the tread, say
4 90 degrees of it or, you know, just a big chunk, in
5 some vehicles that may induce tramp.
6     Q. Well, what about while it's coming off?
7     A. During the -- You're likely to get some
8 bouncing. If nothing else you have to roll the
9 vehicle over the tire fragments, but tramp is a
10 sustained oscillation.
11     I mean, coming off -- it might be like
12 going through a pothole. It's not going to keep it
13 bouncing. Tramp is something that keeps going.
14     Q. How long does it take a separated tread to
15 throw the tread all the way off?
16     MR. FEIN: Object to the form of the
17 question.
18     A. It's variable. The experiments that have
19 been performed vary. There have been some tests
20 where clearly the tread came off more or less
21 spontaneously in a single revolution or less.
22     And there are some tests where it never
23 fully comes off. So it's very, very variable. I

Page 23

1 mean, I don't think that there is a universal and
2 simple figure for the time it takes a tread to come
3 off.
4     Q. And do you know the time it took the tread to
5 come off in this case?
6     A. Well, based on the testimony, assuming that
7 the witnesses are accurate in their recollection,
8 there is no repeated sound or vibration.
9     I mean, they were asked if there was any
10 sort of sustained noise or vibration and everybody
11 said no, that there was reference to a bang, a pop,
12 or an explosion.
13     So in this case it would appear that the
14 tread came off in a single event, you know, one
15 revolution.
16     Q. And that's based solely on the witnesses
17 saying how much vibration there was?
18     A. No. It's based on them denying that there
19 was any sustained vibration, that there was a bang,
20 not several bangs.
21     I mean, if it was -- if it came off over,
22 say, ten revolutions, you'd expect to hear, you know,
23 ten bangs or you'd expect the vehicle to be shaken

Page 24

1 ten times.
2     But the testimony uniformly is of a
3 single noise and a single event, which suggests that
4 this particular tread, assuming that the noise is
5 associated with the tread coming off, assuming that,
6 and assuming that the testimony of the witnesses is
7 accurate, this tread appears to have come off more or
8 less spontaneously.
9     Q. And where in the vehicle did it wrap itself
10 around?
11     MR. FEIN: Object to the form of the
12 question.
13     A. When you say wrapping it around, that assumes
14 something which is patently not true. The tread that
15 was recovered became lodged in the sheet metal and
16 components of the front fender well. It didn't wrap
17 around anything.
18     Q. Okay. It was just stuck on the front fender?
19     MR. FEIN: Object to the form of the
20 question.
21     A. I think lodged is a better way of putting it.
22 It's not stuck. It's sort of --
23     Q. What's keeping it there?

6 (Pages 21 to 24)

Page 25

1      A. It's -- The photographs show that it is sort
2  of interleaved with parts of the sheet metal and the
3  plastic liner of the front fender. It's just there.
4      Q. It's just there.
5      A. Right.
6      Q. Meaning it would just flop out?
7      A. No. It was there well enough not to flop
8  out, but it wasn't, you know, specifically stuck on
9  any one component or wrapped around anything.
10     Q. Okay. But it hit this fender with enough
11 force to be lodged. That's the word you used?
12 Lodged?
13        MR. FEIN: Object to the form of the
14 question.
15     A. It ends up being lodged which doesn't
16 necessarily require any particular level of force.
17 It's just there and, you know, the geometry is such
18 that it stayed there.
19     Q. Now, did you inspect the vehicle with the
20 tread in there?
21     A. The tread had been removed before I saw the
22 vehicle.
23     Q. How did you know exactly where it was?

Page 26

1      A. Because the police photographed it for us.
2      Q. As far as how stuck it was, how did you know
3  that?
4        MR. FEIN: Object to the form of the
5  question.
6      A. Well, examination of the photographs
7  indicates the location of the tread after the
8  accident and the fact that it is merely in the area
9  of the fender. It's not wrapped around anything.
10 It's not touching the tire.
11     Q. Well, you know, the inside of the wheel
12 well -- the tire -- The tread separates from the
13 tire. It's now in that space that the tire -- inside
14 the wheel well. Where does it go to get in the
15 position that it ended up?
16        MR. FEIN: Object to the form of the
17 question.
18     A. I have no idea what you're trying to say.
19     Q. Well, how did it get to where it ended up?
20     A. Well, it came away --
21        MR. FEIN: Object to the form of the
22 question.
23     A. As it came away from the tire, the

Page 27

1  centrifugal action of leaving the tire merely carried
2  it there and it stayed there.
3      Q. And what caused it to stick there?
4        MR. FEIN: Object to the form of the
5  question.
6      A. It is not stuck in the sense of being bonded
7  or adhered. It's merely sort of amongst various
8  objects or hung up on, you know, bits of the fender
9  liner, bits of the frame. It's just sort of lodged
10 there.
11     Q. Now --
12     A. And it's clear of the tire. I mean, there's
13 no contact between the belt and the tire given where
14 it's placed.
15     Q. Now, how much does the separated part of the
16 tire in this case weigh?
17     A. I don't know. I haven't weighed it.
18     Q. Well, what would be an estimate?
19     A. It's not the whole tread. It's going to be
20 quite a few pounds. It's -- I would expect that the
21 fragment that we see here is going to weigh -- very,
22 very roughly -- about ten pounds. Perhaps a bit
23 more, perhaps a bit less.

Page 28

1      Q. What does the whole tire weigh?
2      A. I don't know offhand. I have to look it up.
3      Q. Well, I mean, what's an estimate?
4      A. Don't know. I mean, I've not had much to do
5  with this particular tire. I'd be reluctant to give
6  you a figure for the whole assembly.
7      Q. Well, tires are an integral part of the
8  handling of the vehicle, aren't they?
9      A. Of course.
10     Q. You're giving us opinions on that, aren't
11 you?
12     A. That's true.
13     Q. So what does the tire weigh and, you know,
14 what is its --
15        MR. FEIN: Don't guess. If you don't
16 know --
17     A. I don't know.
18     Q. Don't have any idea?
19     A. Well, your question assumes something that's
20 simply not true. I mean, you're assuming that the
21 handling of the vehicle is contingent on the weight
22 of the tire. That's simply not true.
23     Q. Well, I didn't ask you to assume anything

1    like that. I just asked you for the weight of the
2    tire. You can't give it to me?
3        A. I don't know what the weight of this
4    particular tire is.
5        Q. You can't even estimate it?
6            MR. FEIN: How many times do you want to
7    ask?
8        A. I'm reluctant to guess.
9            MR. WILNER: I won't go into a discussion
10   with you at all, so you just put your objections on
11   the record or don't, because I don't even talk to you
12   during depositions.
13           MR. FEIN: Well, whether you want to talk
14   to me or not, stop harassing my witness with the same
15   question. You've asked it six times in the last 60
16   seconds.
17           MR. WILNER: I don't talk to you, sir.
18       Q. Go ahead. Can you answer?
19       A. I'm reluctant to guess. If it matters we can
20   probably find out.
21       Q. Okay. If it matters we can find out? All I
22   asked for was an estimate and I want you to tell me,
23   you can't estimate or you can?

1        A. It would be a guess and I'm reluctant to
2    guess.
3        Q. What about the wheel? How much did the wheel
4    weigh?
5        A. Same for the weight of this particular rim.
6    I mean, it's something that could be weighed but I --
7    it would be a guess if I didn't weigh it.
8        Q. What kind of wheel is it?
9        A. I forget. It shows in the photograph
10   somewhere but I don't know who made it.
11       Q. What's it made of?
12       A. As I sit here I don't recall what it's made
13   of.
14       Q. What's the bolt circle?
15       A. That is not something that I've looked into.
16       Q. How many bolts attach it?
17       A. Once again, it's not something I've looked
18   into.
19       Q. What's the width of the rim?
20       A. The width of the rim itself -- Same thing. I
21   don't have the specifications for the rim.
22       Q. Who made the suspension upgrade that was
23   installed by the driver?

1        A. Well, your question assumes that it's an
2    upgrade. It's a modification. The driver said he
3    bought the parts I think from Skyjacker. I think
4    that's -- It's in his deposition who he bought it
5    from.
6        Q. Who is Skyjacker?
7        A. They make kits for the modification of
8    vehicles. They supply components for changing
9    suspensions and lifting bodies.
10       Q. And what is the purpose of these components?
11       A. Well, primarily cosmetic. Change the
12   appearance of the vehicle.
13       Q. Okay. And what is -- Have you corresponded
14   with Skyjacker?
15       A. I have not contacted Skyjacker in connection
16   with this case, no.
17       Q. Which kit did he install?
18       A. I don't think he was specific. I think he
19   merely identified Skyjacker as the source of the
20   components.
21       Q. What are the various kits that Skyjacker
22   makes?
23       A. They make a wide range of kits for different

1    vehicles. I couldn't give you their catalog.
2        Q. What was involved in this kit?
3        A. In this case he obtained new springs, new
4    shocks. He obtained spacers for between the body and
5    the frame and spacers for the wheels.
6        Q. What was the spring rate of the new springs?
7        A. I don't know.
8        Q. What was the spring rate of the old springs?
9        A. Similarly, I don't know what they are.
10       Q. How did the new shocks compare with the old
11   shocks?
12       A. They were longer was the main difference.
13       Q. What was the bore or caliber?
14       A. Caliber. I don't know what the diameter of
15   the shocks that were installed on this vehicle was --
16       Q. What was the diameter -- Go ahead.
17       A. I was going to say what it was compared to
18   the previous ones.
19       Q. You just gave an opinion that they were
20   longer and that that was the only difference. I
21   thought that's what you meant to say.
22       A. That's the primary difference.
23       Q. If you don't know the diameter of these

1 versus the other ones, how can you say that?
2    A. The length and diameter are different.
3    Q. That's my point. You just said the only
4 difference is they were longer.
5       MR. FEIN: Object to the form of the
6 question.
7    Q. Do you know whether they were a different
8 diameter, too?
9       MR. FEIN: Object to the form of the
10 question.
11    A. I think --
12       MR. FEIN: He didn't say that was the
13 only --
14    A. I think you're misspeaking. An essential
15 difference is they're longer because the vehicle's
16 been raised and they need to be longer. They may or
17 may not be of different diameter.
18    Q. Okay, thank you. Now, what about their
19 damping characteristics with respect to the ones that
20 were on the vehicle before?
21    A. Similarly, the ones that were taken off,
22 either their original damping properties or their
23 condition at the time of removal, is something I

1 don't know.
2       I mean, they -- whether they were
3 effective at the time of removal, there's no way of
4 knowing because they've been discarded.
5    Q. Well, what would be the damping
6 characteristics of the vehicle when it left the
7 factory?
8    A. I would expect essentially the thing would be
9 critically damped.
10    Q. What would be your reference for that?
11    A. Well, normal practice, you know, the damping
12 characteristics are selected so that the vehicle --
13 you know, in the event it contacts, say, a pothole,
14 you know, moves but does not continue to bounce.
15 That requires at least critical damping.
16    Q. We got a little off of the subject I was
17 earlier on, so let me see if I can get back to this
18 and then I'll continue.
19       I just wasn't sure. Are you saying that
20 tread -- I want to see if I get this straight -- that
21 tread delamination can or cannot cause what you
22 described as skate?
23    A. What I said was that in some vehicles,

1 specific to the vehicle, that under some situations
2 of partial tread loss you may encounter tramp and
3 skate.
4    Q. All right. Let me so if I get that straight.
5 So only in partial tread loss -- Well, let me see if
6 I can take that apart. Are you saying that you don't
7 get skate without tramp?
8       MR. FEIN: Object to the form of the
9 question.
10    Q. Is that your testimony?
11       MR. FEIN: Object to the form of the
12 question.
13    A. Skate is the effect of tramp on the handling.
14    Q. So that would be a yes to my question.
15    A. Tramp is one way of inducing skate, yes.
16    Q. No, that would be a little different. Are
17 there other ways of inducing skate other than tramp?
18    A. Yes.
19    Q. How?
20    A. Well, tramp is the vertical movement of the
21 axle causing loss of contact. An alternative way
22 would be to have the axle stay essentially still but
23 there's a very rough surface where the axle doesn't

1 move but the pavement does.
2       Skate is the motion induced by loss of
3 contact between the rear tires and the pavement. And
4 one way of doing is it to move the tires vertically.
5       The other way to do it is to have the
6 pavement be rough and have the pavement pull away
7 from the tires, but the effect would be the same.
8    Q. Now, you -- Strike that. So you're familiar
9 I think -- or are you -- with the investigation that
10 was carried out by the federal government involving
11 the tread separations of Firestone tires on --
12 predominantly on Ford Explorer vehicles, are you not?
13    A. I'm somewhat familiar with it, yes.
14    Q. I'm just curious if you feel that that -- the
15 question of whether skate occurs in total tread loss
16 was covered -- was part of the analysis and
17 discussion that occurred in the DOT's investigation.
18       MR. FEIN: Object to the form of the
19 question.
20    A. It's been a while since I looked at it. And
21 as I sit here I can't tell you the extent to which
22 they may or may not have gone into that.
23    Q. Well, do you know if Firestone took the

Page 37

1  position that the tread separation that occurred on
2  their Firestone tires should not have caused any loss
3  of control in the vehicles?
4      A. I would imagine that at times, you know,
5  people have said that, you know, in a properly
6  designed well-maintained vehicle, tire disablement
7  should not cause loss of control. That strikes me as
8  a reasonable thing to say.
9      Q. Do you agree with that?
10     A. I believe that, yes.
11     Q. And what was the conclusion of the Department
12  of Transportation with respect to that contention?
13         MR. FEIN: Object to the form of the
14  question.
15     A. I'm not sure they addressed that specific
16  contention, so I'm not sure that they addressed that
17  in and of itself.
18     Q. Well, okay. Whether they considered it in
19  and of itself or not, did they consider that issue?
20     A. I think that it factored into their eventual
21  opinion but, you know, the way that their
22  investigation works, I don't think safety and control
23  were things that they, you know, considered in

Page 38

1  isolation.
2      I believe that the way they work, things
3  are only hazardous if the hazard is unique and not
4  found in other vehicles.
5      And I believe what they found was that
6  the loss of control that Firestone identified was
7  real but, at the same time, since Ford demonstrated
8  that it existed in several other vehicles, it was not
9  considered to be a defect for the purposes of the
10  act, but the government defines defect in the way
11  that most of us would find bizarre.
12     Q. All right.
13     A. A defect for the purpose of the federal
14  government is a dangerous condition unique to a
15  particular vehicle, result being that although your
16  vehicle might be very dangerous and fly out of
17  control, if several other similar vehicles do the
18  same thing, then according to the feds it's not
19  defective, which struck me as very odd.
20     Q. Did the feds, as you call them, conclude that
21  a tread separation reduces the ability of a driver to
22  control a vehicle?
23         MR. FEIN: Object to the form of the

Page 39

1  question.
2      A. I forget how they expressed it but eventually
3  they agreed that if you remove a tire, it affects the
4  handling and if it's a rear tire it will affect the
5  stability --
6      Q. Well --
7      A. -- potentially.
8      Q. -- let me be more clear in my question.
9  Specifically did they conclude that a tread
10  separation reduces the ability of a driver to control
11  the vehicle?
12         MR. FEIN: Object to the form of the
13  question.
14     A. I'm sure that there's some qualifications
15  that they would have said something like that. I
16  don't know that they did but I would expect them to
17  have said something like that.
18     Q. And do you disagree or agree?
19         MR. FEIN: Object to the form of the
20  question.
21     A. I would agree, you know, the loss of a rear
22  tire, whether by air loss or tread separation, will
23  reduce the stability of the vehicle and may even

Page 40

1  render it unstable.
2      Q. Only a rear tire?
3      A. Correct.
4      Q. Loss of a front tire does not reduce the
5  ability of the driver to control a vehicle?
6      A. It should not.
7      Q. And that includes air loss, too?
8      A. Yes. Loss of a front tire should increase
9  the understeer of the vehicle.
10     Q. Well, regardless of how -- I want to see if I
11  get it straight. If I make this statement, true or
12  false, loss of a front tire, either tread or air or
13  both, reduces the ability of a driver to control a
14  vehicle, you say false.
15         MR. FEIN: Object to the form of the
16  question.
17     A. No. I said that it would make it more
18  directionally stable. If you're going in a straight
19  line, it will stabilize it.
20     If you're coming down a twisting mountain
21  road where you need both front tires, you may not
22  have enough cornering to get around a tight hairpin
23  curve. I would agree with that.

Page 41

1     But for the purpose of driving down the
2 freeway, it's going to stabilize the vehicle.
3     Q.  It will stabilize it, okay.  So if you
4 lose -- Let's take an air loss, so you suddenly blow
5 out a front tire.  Your testimony is that makes your
6 car go straight.
7     A.  It makes it harder for the driver to get away
8 from going straight.  It makes it harder to go around
9 corners.
10     By removing a front tire, if you want to
11 make the car go left or right, since you only have
12 one tire and not two, you have to put in more
13 steering to get around the corner.
14     Q.  Let's not talk about corners.  You're just
15 going down the highway, you blow a tire.  What you're
16 saying is the car won't veer one way or the other.
17     MR. FEIN:  Object to the form of the
18 question.
19     A.  If the vehicle's in good condition and is
20 properly designed, then loss of a front tire should
21 have no effect on the path of the vehicle.
22     Q.  So my question's right.  It won't veer one
23 way or the other.

Page 42

1     MR. FEIN:  Object to the form of the
2 question.
3     A.  It should not veer either way if the vehicle
4 is in good condition and properly designed.
5     Q.  Won't pull the steering wheel one way or the
6 other.
7     A.  Shouldn't.
8     Q.  Okay.  Now, let's talk about exactly where in
9 the literature do you find support for that
10 proposition.
11     A.  Well, couple of steps.  One is if you look at
12 the literature and going back to the 1930's about
13 vehicle handling, what you find is that reducing the
14 effectiveness of the front tires compared to the
15 rears will always drive the vehicle towards
16 understeer, make it increasingly understeering,
17 and understeering vehicles are stable, more --
18 Understeering vehicles are more stable.
19     So based on the handling literature going
20 back to Orly & Co., there's no controversy but
21 reducing the installed properties of the front tires
22 stabilizes the vehicle in that sense.
23     The effect of disabling the tire, some

Page 43

1 experiments were run by a Mr. Gardner and myself a
2 long time ago.  It is true that a flat tire has
3 higher rolling resistance than an inflated tire.
4 That's true.
5     An inflated tire will roll down the
6 hallway with a resistance equal to perhaps one
7 percent, a half percent, of the load that it's
8 carrying.
9     A flat tire, depending on size, may
10 display a rolling resistance of perhaps 15 percent.
11 This level of rolling resistance is small compared to
12 the forces that the brake system can generate.
13     And the suspension and the steering
14 linkage, where it gets back to condition and design,
15 assuming the front suspension is sufficiently robust
16 to handle the brakes being applied, then there is
17 ample capacity to maintain the alignment of the wheel
18 against the rolling resistance of the flat tire.
19     And since the additional rolling
20 resistance is a force backwards and forwards in the
21 vehicle, the rolling resistance has no sideways
22 component.
23     And since what you were referring to as

Page 44

1 veering is a lateral motion, a lateral motion
2 requires lateral forces and these cannot come from
3 the flat tire.
4     Q.  All right, so -- Is that all?  Were you done?
5     A.  For that, yes.
6     Q.  So first you said reducing the effectiveness
7 of the front tires compared with the rear increases
8 the understeer of the vehicle.
9     A.  That's true.
10     Q.  That's both front tires?
11     A.  It's true of either front tire, yes.
12     Q.  So reducing the effectiveness -- When you say
13 reducing the effectiveness, that includes tearing the
14 tread off and/or losing the air.
15     A.  Either way, yes.
16     Q.  So -- And that proposition that reducing the
17 effectiveness of -- Let's see if we can narrow that.
18 Reducing the effectiveness of a single tire -- let me
19 get back to the -- not call it reducing the
20 effectiveness.
21     Let's talk about actual events and I'm
22 going to follow up on what you told me about you did
23 some research.  Let's start there.  You said you did

11  (Pages 41 to 44)

1   research with somebody named -- What was his name?
2       A. Gardner.
3       Q. Gardner?
4       A. Yes. Jim Gardner.
5       Q. Jim Gardner. Who is that?
6       A. He was an engineer -- now retired -- used to
7   work for the Firestone Tire & Rubber Company. And we
8   ran some experiments on different size tires to see
9   what the rolling resistance was when there was no air
10  in them.
11      Q. That's all? That's the experiment? Okay.
12  All right.
13      A. Well, it was something that was unknown prior
14  to doing that.
15      Q. Okay. All right. So where's this published?
16      A. I think it was the ASME. Let's have a look.
17  It was the ASME winter meeting in 1987.
18      Q. In 1987, all right. Let's see where that is.
19  82, 08, 89 -- The role of blowouts in accident
20  causation?
21      A. Correct.
22      Q. That's it?
23      A. That's it.

1       Q. And he was a Firestone person employed by
2   Firestone?
3       A. Yes. I think this was before he retired.
4       Q. So had Firestone been charged with causing
5   accidents because their tires blew out?
6       A. Not charged -- I mean, it was an accusation
7   that arose from time to time.
8       Q. And you thought that this research you did
9   with this Firestone engineer took Firestone off the
10  hook basically, that it wouldn't matter if the tire
11  blew out. It shouldn't cause -- It's not going to
12  cause any problems.
13      MR. FEIN: Object to the form of the
14  question.
15      A. The purpose of the testing was to see what
16  the properties of the tire were when it was flat. I
17  mean, a lot of people talked about flat tires but
18  there was essentially no information about them.
19      People said -- speculated as to what
20  the properties of flat tires were, so it seemed
21  appropriate to go out and measure it.
22      Q. And I'm curious if anyone has ever, besides
23  this, you know, measuring the rolling resistance, if

1   anybody ever, to your knowledge, actually tested
2   vehicles and blew their tires or caused their tread
3   to come off and see what happens to the people trying
4   to drive them.
5       A. Well, there have been studies of the effect
6   of tire disablement on vehicles. There have been a
7   number of those; some real world, some track-
8   oriented. There is some literature about that.
9       Q. Where is it? Let's go through --
10      A. Well, one of the biggest studies was a
11  Stannard Baker study on the -- I want to say Illinois
12  Turnpike. It was a turnpike -- I think it was
13  Illinois, it might be Indiana -- in which they
14  surveyed the effect of tire disablement on cars on
15  high-speed highways.
16      And this was also back in the 70's, and
17  what they found, if I recall, was that of vehicles
18  that had blowouts whilst traveling at freeway
19  speeds -- and this would have been before the 55 mile
20  an hour limit -- only a minute fraction -- and I
21  think it was less than 1 in 2,000 -- had a control
22  problem following tire failure when traveling at
23  speed on the turnpike. That's my recollection.

1       There were two or three somewhat related
2   studies by Stannard Baker and his group. And that
3   was -- you know, if it was in the 70's it was using
4   obviously, you know, the type of cars that were
5   around then which would have been vehicles built
6   probably in the 60's and early 70's.
7       So it was sort of old technology.
8   Hopefully we're doing better now. I think there have
9   been some similar studies since but none on quite the
10  same scale.
11      There have been a number of studies
12  associated with flat tires on real vehicles under
13  certain conditions.
14      There are some SAE papers in which
15  there's some discussion on the effect of flat tires
16  but they don't have the, you know, the real world
17  setting the Stannard Baker study did, but there is
18  some literature on the subject.
19      Q. What is the citation for the Standard Baker
20  study?
21      A. Stannard.
22      Q. Stannard?
23      A. S T A N N A R D. I could look it up for you.

1    Q. Stannard Baker.
2    A. Yuh. I think it's Northwestern Traffic
3  Institute. I don't have it with me but I can
4  probably find it somewhere.
5    Q. Is that one person Ray Stannard Baker, born
6  -- no --
7    A. Stannard Baker.
8    Q. Stannard Baker is showing up as died in 1946.
9    A. No. He was alive after that. I think he is
10 dead but more recently than that. Try the
11 Northwestern Traffic --
12   Q. J. Stannard Baker, Northwestern University,
13 Center for Public --
14   A. Yes, that's him.
15   Q. Award for highway safety. But that isn't
16 telling me what this references, so let's see if I
17 can find it. Where would this have been published?
18   A. Oh, it would have been published probably
19 from the Northwestern Traffic Institute or
20 Northwestern University.
21   Q. Okay.
22   A. Probably reproduced in a number of journals.
23 I can't tell you who carried it.

1    Q. Okay. What other sources of information
2  would you rely on for these opinions?
3    A. Well, I forget. You know, I'm not sure why
4  you say I particularly rely on that for the opinions
5  in this case. I don't believe that I, you know --
6  That's something that you injected.
7    Q. Well, whether I injected it or not, can we
8  answer the question? Was there any other lit --
9    A. There are -- Other people have looked at
10 various aspects of flat tires but -- but as I say,
11 not in the breadth or the real-world relevance of the
12 Baker studies.
13   Q. Well, I mean, I'm just giving you an
14 opportunity to tell me any other that you know about.
15     MR. FEIN: You're just talking about
16 literature now?
17   A. In general?
18     MR. WILNER: Well, literature. Yuh, I
19 guess. Studies include literature. If he knows of
20 studies that were done that weren't published, I
21 suppose I'd like to know about those.
22     I mean, I don't know. Literature is a
23 specific term. I use it. I'm not sure you're using

1  it the same way, but I think I've said enough.
2    Q. Go ahead.
3    A. Well, I've forgotten what it was you were --
4    Q. What were the other studies?
5    A. There is a paper on the effect of vehicle
6  design on post-blowout control which discusses the
7  effect of front tire failure. That was by a
8  Professor Bernard and myself.
9    Q. Is that cited in your thing here?
10   A. My resume, yes.
11   Q. Oh, okay. What would that one be since you
12 don't give any reference to Bernard?
13   A. I do.
14   Q. Where?
15   A. It's the fifth one up.
16   Q. Fifth one up. What am I looking at now?
17   A. I have no idea what you're looking at.
18   Q. I'm looking at your publication.
19   A. Start at the bottom and go up to the fifth
20 one.
21   Q. The Effect of Vehicle Design on Post-Blowout
22 Controllability?
23   A. Yes.

1    Q. That's the one we just talked about.
2    A. No, it isn't.
3    Q. Okay. I thought that was the one that you
4  told me was Mr. Gardner.
5    A. No. That's the second one up.
6    Q. The Role of Blowouts in Accident Causation.
7  Okay. So the Effect of Vehicle Design on
8  Post-Blowout Controllability, SAE National Truck
9  Meeting; that was with this fellow Bernard?
10   A. Correct.
11   Q. Who is he?
12   A. He's a professor at the University of Iowa.
13 I think he's now retired.
14   Q. And what was that study about?
15   A. It was about the effect of a flat front tire
16 on the front axle of a heavy truck, as to why it
17 might affect the path of the vehicle, what it was
18 about the design of the truck that made it sensitive
19 to loss of air from one front tire.
20   Q. You mean some trucks were, like, getting into
21 accidents when their front tires blew?
22   A. Some semitrailer trucks, if they blew a front
23 tire, found themselves veering to left or right when

1  the front tire went flat.

2      Q. And why would that be?

3      A. Very simple. When the tire went flat, it

4  became somewhat more difficult to push down the road.

5  It was as if you had a very gentle brake application

6  on the side of the flat tire.

7      Q. Okay.

8      A. If the front of the truck -- if the ball

9  joints were loose or the steering was flexible, then

10  the very small drag created by the front tire would

11  make the steering go clunk to the side of the flat

12  tire through the angle permitted by the slop in the

13  ball joints or the looseness in the steering gear.

14         And this would enable the inflated tire

15  to change the path of the vehicle. The flat tire has

16  no ability to generate sideways forces.

17         So the movement of the truck to the left

18  or the right was the result of steering the inflated

19  tire.

20         So what we found was that in the event

21  that there were problems in the vehicle, you know,

22  sloppy steering, then any small drag on one side

23  could lead to a change in path of the truck.

1         And that the key issue -- We called it

2  compliance. It means looseness or flexibility. The

3  key issue is the flexibility of the front end of the

4  vehicle.

5      Q. So -- And this was either when you were

6  working for Firestone or right after?

7      A. Yes. It was -- I'm sure I was probably -- I

8  left Firestone in 79. This probably occurred after I

9  left the meeting but I probably worked on it while I

10  was there.

11      Q. And, again, Firestone was concerned that, you

12  know, if its tires blew out and the truck wrecked,

13  that it might be blamed for the wreck, right?

14      MR. FEIN: Object to the form of the

15  question.

16      A. I think that there was a concern as to why

17  loss of a front tire, which should be stabilizing,

18  was associated in some vehicles with, you know,

19  change of -- unexpected change of direction.

20         I mean, if you lose a front tire, the

21  vehicle should continue in a straight line, and

22  clearly some semitrailer trucks weren't.

23      Q. All right. Let me see if I can nail that one

1  down. Show me a reference in the literature that if

2  you lose a front tire, it should continue going

3  straight. Exactly that or words to that effect.

4      A. That simple phrase, I'm not sure that I can

5  find it expressed the way that you would put it.

6      Q. Words to that effect.

7      A. That would be expressed in terms of the

8  prediction of understeering in terms of tire

9  properties, and you would have to understand that the

10  change in front-tire coefficients would be associated

11  with the disablement of the tire.

12         I'm not sure in the traditional handling

13  literature you'd find that statement. I might be

14  able to find it somewhere but as I sit here I can't

15  think of where to go to look for it.

16      Q. Okay. Now, you said that when a -- let's say

17  a tire blows, it has increased rolling resistance,

18  you said, of 15 percent. Fair?

19      A. When it's flat, once the air is out, pushing

20  the tire down the road becomes somewhat more

21  difficult. Yes.

22      Q. And you said something like I think a hundred

23  pounds of difference in rolling resistance between a

1  flat tire and an inflated tire on an average car.

2      MR. FEIN: Object to the form of the

3  question.

4      A. I don't think I said that, but if you've got

5  a thousand -- if you take an SUV with a thousand

6  pounds on each wheel, you know, it's going to be a

7  hundred-poundish increase in drag, yes.

8      Q. How much force does it take to push an SUV

9  down the road at 60 miles an hour?

10      A. To overcome the rolling resistance of the

11  tires collectively, you know, depending on the tire,

12  one percent, two percent, spread between the four

13  tires.

14         But then you've also got the aerodynamic

15  drag and other things, so the drag has several

16  components. It would depend on the SUV. Some are

17  more aerodynamic than others.

18      Q. Well, give me a range.

19      A. Well, we could work it out. If we've got

20  some, you know, SUV dimensions you're interested in,

21  I could probably work it out for you.

22      Q. Okay. Let's work it out for this one.

23      A. Well, you know, it's not a trivial

1    calculation. It's not something that I can do as I
2    sit here, but I could go home and work it out for
3    you.
4        Q. I mean, we could do it another way, couldn't
5    we, and arrive at some kind of estimate based on the
6    fuel usage and the efficiency of the power plant?
7        A. I'd be delighted to have you show me how it's
8    done that way.
9        Q. Okay.
10       A. I think you are mistaken.
11       Q. Oh, you think I'm mistaken?
12       A. Oh, in fact --
13       Q. Okay. Maybe I'm not. I'll take a break.
14   I'll show you if you want, but let's take a break.
15       A. Please do.
16   (Whereupon at 10:52 a.m. the deposition recessed and
17   reconvened at 10:58 a.m.)
18       Q. Well, I'll show you how to do that in a
19   minute, but right now -- Oh, you're laughing at me?
20   Okay. I'll show you how to do it now, okay? Since
21   you laughed at me I'll show you.
22       A. Do, do.
23       Q. Let's start with a few things, see if you

1    know them, since you laughed at me. Okay?
2        A. Yes.
3        Q. What's the specific fuel consumption of
4    the typical gasoline engine like you find in this
5    in pounds per horsepower hour?
6        A. I'm not sure there is such a thing as
7    typical. I leave it to your best estimate.
8        Q. SFC, it's about .5 which is a half a pound of
9    fuel per horsepower hour. Does that sound
10   reasonable?
11       A. I think it varies too much. Why don't you do
12   your calculation and see how it comes out.
13       Q. You're not going to -- Come on.
14       A. I'm intrigued.
15       Q. You just want to laugh, don't you. Okay,
16   fine. I'll show it to you when we're done and then
17   you can have your fun.
18       MR. FEIN: Let's just let the record
19   reflect that Mr. Wilner was laughing at Doctor
20   Shapley before we took the break. So your suggestion
21   that he's laughing at you now --
22       MR. WILNER: Doesn't matter.
23       MR. FEIN: -- would be responsive to your

1    conduct prior to the break.
2        MR. WILNER: All right. No problem.
3        Q. Let's assume that the SUV is being driven
4    down the road by some force which you don't know.
5    Okay? Since you couldn't tell me how much force --
6        A. You mean --
7        Q. -- we'll just call it X?
8        A. You mean the magnitude of the force.
9        Q. Correct.
10       A. Okay, but it takes some force to push it down
11   the road. True.
12       Q. And you can't tell me what that is.
13       A. Not without a great deal of information.
14       Q. Well, the information I can give you?
15       A. I don't know.
16       Q. Well, what information do you need?
17       A. Well, what we want to know is what's the --
18   you know, the aerodynamic drag on this vehicle,
19   what's the efficiency of the transmission, what's the
20   rolling resistance of the chassis, what's the rolling
21   resistance of the tires. And we'll assume there's no
22   gradient.
23       And if you knew those things, then you

1    could estimate the force required to push it down the
2    road.
3        Q. That's fine. So then there is a force
4    pushing it down the road. Now, at the time that one
5    of these tires either separates or blowout or
6    whatever, you have said that one of these front tires
7    will now develop a hundred more pounds of drag than
8    it had before.
9        A. No, I didn't. I said if it went flat.
10       Q. Okay.
11       A. If the tire loses its tread, then there is no
12   increase in rolling resistance.
13       Q. Okay. I thought you said there was. During
14   the time it was losing its tread it would be to a
15   hundred pounds?
16       MR. FEIN: Object to the form of the
17   question.
18       Q. Reference 11 reports the forces associated
19   with the loss of a belt. Their experiments found
20   that for about three seconds there was a series of
21   rear repulses while the tread was separating after
22   which there was no further drag. The rearward forces
23   rose to about a hundred pounds.

1    A. But there is no sustained rolling resistance.
2 A flat tire has a constant rolling resistance. There
3 is a temporary rearward pulsing.
4        However, in this case, given the
5 testimony we now have, it would appear that there was
6 not repeated pulsing as the study modeled but merely
7 a single pulse.
8    Q. A single pulse.
9    A. There would have been a single -- Assuming
10 that the mechanism or the data employed by the NAD
11 study is relevant, then there would, for a fraction
12 of one rotation of a wheel, be a rearward force of a
13 hundred pounds or so.
14    Q. Okay.
15    A. But then it would go away, go down to zero.
16    Q. Good. So then now the force driving the car
17 down the road is considered to act on a center or
18 along the center line of the car, correct?
19    A. It can be.
20    Q. Can be.
21    A. Yes.
22    Q. Okay. Never mind. It can be.
23    A. Yes.

1    Q. All right. Your reference for the
2 hundred-pound thing that you just talked about was
3 this NADS testing study?
4    A. Correct.
5    Q. Now, has anyone else ever tested the amount
6 of force that is applied to a vehicle when tread
7 separates on a tire?
8    A. Other people have tried to do this, yes.
9    Q. Who?
10    A. Well, a Mr. Arndt tried to do it and
11 published a paper on the subject.
12    Q. Which paper are you talking about?
13    A. Oh, I forget what he called it but he did
14 some experiments where he towed a trailer on which he
15 had a tire where he'd loosened the tread and the
16 tread came off and he tried to measure the forces.
17        Unfortunately, as a result of calibration
18 errors, after the paper was published he discovered
19 that his measurements were a hundred percent out and
20 he sent out a supplement correcting it. They were
21 much smaller than he said in his original paper.
22    Q. So where is his supplement?
23    A. I don't know -- I have a copy but I don't

1 know if he sent it to everybody who bought the paper
2 or just sent -- He sent a letter to the SAE saying, I
3 was wrong, here's the new data.
4        I don't know if he sent copies to people
5 who had the paper. I don't know how he followed up
6 once he discovered he'd made a mistake.
7    Q. All right. So he sent you a copy?
8    A. No, I got it from somewhere else.
9    Q. Where did you get it?
10    A. I forget. I think -- I think it was in his
11 file material in connection with some other lawsuit I
12 was working on. It was simply something he produced
13 as an exhibit.
14    Q. In a lawsuit?
15    A. Yes. It was amongst his literature and
16 things. It was embedded in there. I didn't get it
17 from the SAE or the people that published his paper.
18 I just got it as something he produced.
19    Q. Why don't we start with what's published and
20 then we can go from there, okay? So you're familiar
21 with the paper called Force Response During Tire
22 Tread Detachment Event?
23    A. That may be the one. May I see it?

1    Q. Yes.
2    A. Yes, this is the one. I believe this is the
3 paper -- Yuh. This is the test equipment that he was
4 using. I believe this is the paper to which he sent
5 out a supplement with revised data reflecting a
6 failure to properly calibrate, yes.
7    Q. Let's start with what's published which is
8 what we just looked at, right?
9    A. It did get published.
10    Q. What?
11    A. It did get published, yes.
12    Q. 2004 -- It's published in SAE, 2004-01-1075,
13 right?
14    A. I'll take your word for that.
15    Q. Well, that's what I'm reading right off --
16    A. I can't read that --
17    Q. Did I read it okay?
18    A. I can't read that from here.
19    Q. All right.
20    A. Bring it a bit closer.
21    Q. Okay.
22    A. 2004-01-1075. Yes, that was the paper we
23 were talking about.

1    Q. Good. So then you say that he published --
2  or he sent out something that said it was wrong?
3    A. He created it. I don't know the extent to
4  which he distributed it.
5    Q. Well, you said that he sent it to the SAE and
6  now I'm not so sure that's what you're saying.
7    A. Well, the letter I got a copy of is
8  addressed to the SAE, but I did not get it from the
9  SAE. I'm assuming he sent it. I don't know that he
10 did.
11   Q. Where is that letter?
12   A. I have a copy of it at home.
13   Q. You don't have it here?
14   A. No.
15   Q. Really? You didn't think we'd be talking
16 about stuff like that?
17   A. Well, I didn't imagine that you'd rely on
18 that paper. I mean, bearing in mind the scale of the
19 errors in it, it's not a paper I would choose to rely
20 on.
21   Q. And the errors in it are because you found
22 some paper in a litigation file --
23   A. No. I had previously checked it and I found

1  that his test equipment -- I have a copy of the
2  original data for it and I found that, amongst other
3  things, his test trailer during the test, according
4  to his instruments, rose into the air several hundred
5  feet and came down again, which struck me as
6  unlikely.
7    Q. Well, show me exactly which you mean now.
8  Let's talk about specifics.
9    A. In his trailer --
10   Q. His trailer --
11   A. There's a picture of it. This is essentially
12 a trailer. This thing. Here's a poor copy of the
13 picture. And what he's trying to do, he's towing the
14 trailer behind a big pickup.
15         And what he's doing is on the trailer,
16 which is the back end of a Ford Explorer, he has two
17 tires, one of which he has weakened so that it will
18 throw the tread.
19         And what he wants to do is to measure the
20 forces created by the throwing of the tread. That's
21 what he's trying to do.
22         And the way he's trying to measure it is
23 by measuring the forces generated as he tries to tow

1  the trailer down the road.
2          He's also measuring the vibration
3  created by doing this, using instruments mounted on
4  the trailer.
5          If you look at just the instruments on
6  the trailer, the one that's measuring the vertical
7  vibration, for example, if I know how fast it's
8  accelerating upwards and for how long that
9  acceleration is applied, I can tell how much velocity
10 it built up vertically.
11         And if I know how long that velocity
12 persists for, I can calculate the change in height of
13 the trailer.
14         By examination of his inertial
15 instruments, the accelerometers on the trailer, you
16 find that his data suggests that even though he's on
17 a level test track, his trailer actually changes
18 altitude several hundred feet, which is obviously
19 wrong.
20   Q. You testified to that before but I want
21 specifics. Show me exactly what data you're talking
22 about.
23   A. He didn't present that data in his paper.

1    Q. Where did you get it?
2    A. I have the computer data -- I have disks of
3  his data. I have the raw data.
4    Q. Where did you get it from?
5    A. It was provided to me in connection with some
6  other lawsuit.
7    Q. Other lawsuits? You mean you got it from
8  lawyers?
9    A. I got it from him. It's a hard disk drive
10 that he prepared and supplied to his attorneys who
11 supplied it to my attorneys.
12   Q. Where is that disk?
13   A. It's been copied onto my disk and I have it
14 at home.
15   Q. So you say you ran some -- you looked at this
16 hard data and, according to you, his trailer bounced
17 up a hundred feet in the air which is not possible.
18 Okay.
19   A. Also -- There's more. The other thing is
20 that he provided the weight of the trailer and the
21 force necessary to pull the trailer down the road.
22         If you know the weight of something and
23 how hard you're pulling it, you can -- other things

17  (Pages 65 to 68)

1 being equal, you can tell the acceleration, in this
2 case, of the trailer.
3      So if you apply a certain amount of force
4 for a certain period of time -- the trailer should go
5 from zero to say 20 miles an hour, whatever -- and
6 this is before you get to the point where the tire
7 starts to unbelt -- what you found was that the speed
8 indicated by the force-measuring system combined with
9 the mass of the trailer, I think that speed was
10 double the speed recorded by the towed vehicle.
11      What you found was that the speed that
12 you would expect to find, having exerted a certain
13 amount of force on the trailer for a certain amount
14 of time, that speed was double the speed recorded,
15 which obviously meant that the force-measuring system
16 was recording forces that were twice as high as they
17 should be.
18    Q. So I assume that you, after you found this
19 out and did these analyses, wrote to the SAE or wrote
20 a paper?
21    A. I called the SAE, yes.
22    Q. Called them?
23    A. I spoke to them, yes.

1    Q. Did you write a letter or paper for other
2 people to read it?
3    A. I did not write to them about it. I
4 discussed it with them.
5    Q. Well, why didn't you write it so that other
6 people could read it and evaluate whether you're
7 right or not?
8    A. You know, I drew the -- My purpose in calling
9 the SAE was to draw attention to the fact that their
10 paper-reviewing process obviously didn't include any
11 consideration of the accuracy of the data.
12      My concern was more that this -- not so
13 much that that paper was patently wrong, but their
14 peer review process obviously didn't get into the
15 accuracy of the underlying data.
16      We had quite a long discussion about
17 that, and they explained to me that when they go to
18 peer-review a paper these days, they don't check the
19 data. They check it for presentation, for style, for
20 spelling. They don't check the data.
21    Q. So you recorded -- You did not write any
22 letters to anyone about all these findings you made.
23    A. I did not write to the SAE about it. I did

1 assemble my data for, you know, possible presentation
2 on behalf of my then client. And I forget who that
3 was.
4    Q. Well, which case was it? I mean, you got an
5 appearances --
6    A. I don't remember. Mr. Arndt turns up fairly
7 frequently in tire issues on the plaintiff side. It
8 could be any one of several.
9    Q. Well, which ones of several could it be?
10    A. Well, that's a good question. I've seen
11 Mr. Arndt in quite a lot of lawsuits, probably all of
12 the tire-related lawsuits. Let me look.
13    Q. We've got 04, 05, 06 -- It would have to be
14 after 04, right, because he published --
15    A. He did the work before 04. He might have
16 done the testing in 03. I don't remember which
17 lawsuit it was in which he was intending to present
18 this data and in which I got it. It may have been as
19 far back as 04.
20    Q. Well, I've got your appearances for trial or
21 deposition in 2004. First one --
22    A. I don't. I've only got five.
23    Q. What?

1    A. Mine starts at five now.
2    Q. Well, here's your four.
3    A. Okay.
4    Q. Tell me.
5    A. Is it any of these? None of them rings a
6 bell. Where there were tires involved he might have
7 been involved, but in looking at them I can't tell
8 you.
9    Q. Well, how many times have you appeared as a
10 witness by deposition or trial in a lawsuit where you
11 were hired by lawyers for the tire company?
12    A. Over the years it's happened quite a few
13 times. In the last -- You can count them in the last
14 five years, but it's happened a number of times.
15    Q. Let me follow up on that, I'm sorry. You
16 said it's happened in the last five years. I guess
17 we have the numbers down because --
18    A. We can count them.
19    Q. We can count them, but you're saying before
20 that it happened many more times.
21    A. Well, I've been doing it for 30 years and we
22 only have five years of it here, so I'm assuming
23 that, you know, tire companies and tire issues have

18  (Pages 69 to 72)

1 occurred pretty steadily for the last 30 years.
2     Q. All right. And so have they increased in
3 number or decreased in number over the years?
4     A. They probably went down in the middle
5 actually. There were quite a few -- Back in 79 there
6 were quite a few tire cases, especially heavy truck
7 cases.
8     Q. Can I have that back?
9     A. Of course, yuh.
10     Q. I'll follow up on that in a minute.
11     A. Then I think it's gone back up again.
12     Q. How many have you been -- How many have you
13 testified in either by deposition or trial?
14     A. It would be a guess. We can go through the
15 list and see what it is for the last five years.
16 That would be --
17     Q. I've got -- In the last five years -- In 2004
18 here I've got Snell versus Mack Truck. I've got --
19     A. Let's have a look. I can't read it from
20 here.
21     Q. Okay.
22     A. Snell -- No. That wasn't a tire case, no. I
23 remember that one because my client actually was

1 Bostrom. They made the bouncy seat, so that wasn't a
2 tire case.
3     Q. Okay.
4     A. Let's have a look. Some of these I can be
5 fairly sure weren't tire cases. I'm sure that Vaine
6 was not a tire case. Some of these other ones
7 probably were tire cases.
8         Let's see if I can recognize them. You
9 mean tires of all sorts? There's one here that's,
10 for example, a skidding tire issue.
11     Q. Really what I was interested in is where you
12 did all this work supposedly to criticize Mr. Arndt
13 or Doctor Arndt, whatever he is --
14     A. It's Mr. Arndt. As I said, I can't tell you
15 which of these cases Mr. Arndt appeared in. I'm
16 confident he appeared in quite a few of them because
17 I've got quite a few of his depositions and quite a
18 lot of his test data. I believe I have all of his
19 test data.
20     Q. And it was a tread separation case?
21     A. As opposed to a blowout? It was probably a
22 tread separation case of some sort.
23     Q. And the charge was that the tire tread -- the

1 tread separated from the tire and caused a mishap or
2 a rollover?
3     A. I'm sure that would have been -- If it was a
4 tread sep case the plaintiff's allegation would have
5 been that the tread sep led to loss of control.
6     Q. And your testimony was that it was the
7 vehicle's fault or the driver's fault.
8     A. Well, in the event that I testified, there
9 would have been obvious indication that there was a
10 contribution, say, from the design of the vehicle.
11         And in some of the cases there would have
12 been maintenance, and in some of the cases in which I
13 testified there would have been issues with respect
14 to the conduct of the driver.
15     Q. Well, a contribution is one thing but, you
16 know, the sole cause is another, so which was it?
17     A. It would have varied from case to case. I'm
18 not sure that they all had a single sole cause. I'm
19 sure there are some where there were a couple of
20 things came together.
21         You know, you get a situation, a
22 skidding, a driver overreaction, sometimes ice and
23 stuff. I mean, it's probably not true to say that

1 each case had a single cause.
2     Q. Well, let's ask it this way. Has tread
3 separation -- Have you ever testified that tread
4 separation was a contributing cause to any loss of
5 control in any case that you've been involved in?
6     A. I have never been put up to testify in a
7 situation where it was my opinion that the tread
8 separation -- How did you phrase that? I forget
9 exactly how you phrased it.
10         MR. WILNER: She can read it back.
11     Q. (The question was read by the Court
12 Reporter.)
13     A. I can't recall that I've ever had a client
14 that has put me forward to testify for that purpose.
15 It's not to say I haven't come to that conclusion.
16 It's just that my clients, in the event I've come to
17 that conclusion, have not put me up to testify.
18     Q. Okay. So you have come to the conclusion
19 that tread separation can be a contributing cause to
20 loss of control?
21     A. I'm -- I don't recall specifically coming to
22 that but if I had, it would have been as a consultant
23 which is not something that I feel free to discuss.

Page 77

1    Q. Well, are you refusing to answer then?  I
2  mean, I guess I can get this straight --
3        MR. FEIN:  Well, let me try -- To the
4  extent, Doctor, that you are -- you were serving as a
5  consultant to someone that would have involved
6  privileged communications that would be work product,
7  which I think is what your acknowledging, then don't
8  divulge anything that would be privileged and violate
9  some confidentiality.
10   A. As a consultant it's my understanding I'm not
11 free to discuss what my findings might have been in
12 any particular case, unless I'm invited to testify.
13   Q. Well, let's see if we can get over any
14 problems.  First of all, we're not asking you to
15 identify any specific case.
16       We're just asking you if it's been your
17 mental impression over -- for any case that you've
18 ever looked at, that tire delamination has
19 contributed to loss of control.  We're not asking for
20 any identification of any specific case at all.
21   A. It's hard to know how far to go but there
22 have been some very unusual cases in which following,
23 you know, the separation of the tread, things

Page 78

1  happened where the tread, after it came away, you
2  know, was involved in limiting the control of the
3  vehicle.
4    Q. Okay.  Did you consult with any -- or on any
5  cases involving Firestone tires and tread
6  delaminations in Explorers?
7    A. I have testified about the properties of
8  Explorers in cases involving Firestone, yes.
9    Q. And you've testified for Firestone?
10   A. I have testified on -- you know --
11   Q. On behalf --
12   A. -- as a, you know, consultant to Firestone,
13 yes.
14   Q. Okay, so you were -- Are any of those cases
15 listed here?
16   A. Probably.
17   Q. Why don't you find them?
18   A. We'd look for Bridgestone Firestone.  Those
19 were probably Explorer cases.
20       (Brief interruption.)
21   Q. Did you find it?
22   A. Find what?
23   Q. I was waiting for you to find the case

Page 79

1  where --
2    A. No.  I said that of these cases, several of
3  them were probably Explorer cases, but just looking
4  at them I couldn't tell you which one but certainly
5  quite a few of them probably were Explorer cases.
6    Q. And whether they're Explorer cases or not,
7  you're saying the ones that list Firestone were cases
8  where you testified on behalf of Firestone on a case
9  involving a Firestone tire failure, right?
10   A. Not in all of them.  I think in the most
11 recent one there are one or two where there's no tire
12 failure at all.
13   Q. That's why I asked you to look.  What I'd
14 like you to do is to tell me --
15   A. Mine's the more recent one.  Where's my copy?
16 Oh, here.
17   Q. I'd like you to tell me which cases you have
18 testified -- and you can limit it to 2004 per the
19 federal rules for now --
20   A. 5.
21   Q. Well, I'm not going to quibble with you.  Can
22 we just move on?
23   A. Yes.

Page 80

1    Q. I want you to tell me which cases you
2  testified for Firestone that involved a tread
3  separation of a Firestone tire.  Okay?
4    A. Well, there are certainly some that don't.
5  In the more recent ones, there's one case in
6  particular I just testified there certainly was not a
7  failure, but going back this far, to the year 2004,
8  it's probably true that these Firestone cases are
9  Ford Explorers and --
10   Q. Which ones?  Identify them.
11   A. If Firestone is named --
12   Q. Go ahead and identify them.
13   A. I'm looking now.  Can we pull it out because
14 -- I'll use mine.  Hang on.  2004 we're talking.  I
15 don't have 2004, do I?  Okay.  I've got one here that
16 says Fullerton.
17   Q. Okay.
18   A. That's against Firestone.  That's probably an
19 Explorer and a tire disablement, probably a tread
20 peel.
21   Q. A tread peel?  Is that the same as a tread
22 separation?
23   A. Yes.

20   (Pages 77 to 80)

Page 81

1    Q. Now --
2    A. As opposed to a blowout.
3    Q. So how many times did you testify for
4  Firestone in your career on tread separation issues?
5    A. At deposition there were several. We can
6  count them. Do you want to count them?
7    Q. Well, yes. I wanted you to pull them out of
8  there. I mean, that's what I've asked you several
9  times.
10    A. From the folder?
11    Q. I don't care if you physically remove it. I
12  just want you to identify them.
13    A. Okay. It's easier to read them. I'll remove
14  what you have as tab 3 which is stuff from me
15  including my list of prior testimony. I'll put your
16  folder back together.
17    Q. Okay.
18    A. I'll put it back together for you.
19    Q. Okay.
20    A. In the year 2004 -- I don't know -- Yes, I
21  do. Lundgren appears to be a Firestone case. That
22  was probably a tread peel.
23    Q. What was the name?

Page 82

1    A. It says Lundgren. That's that one. That's
2  the only Firestone case I can see there. Oh, hang
3  on. 2005, I don't see a Firestone case here.
4    2006, I don't see a Firestone case there.
5  Yuh, there's Underwood. Underwood is actually a big
6  heavy truck case. Can't remember if he blew out or
7  peeled the tire. That's Underwood.
8    Let's have a look. I have a case here
9  called Fullerton in the year 2007. Fullerton was a
10  front tire failure on an F-250 pickup truck as I
11  recall. And there was an accident. I remember that
12  one.
13    Q. Okay.
14    A. Porras, P O R R A S, also in 07. I forget
15  what the facts of that one were. I don't think that
16  was an Explorer. I think that was the pickup that's
17  the equivalent of the Explorer which would be the
18  Ranger.
19    Q. Okay.
20    A. Choi; I believe that's a 15-passenger Ford
21  van case, I think. I can't remember if he lost air
22  or the tread but it was a rear tire disablement on a
23  Ford van.

Page 83

1    Q. Okay.
2    A. I don't remember what Cabrales was about.
3  Oh, Lozano. No, doesn't ring a bell. And there's --
4  I haven't dated it but there should be a couple more.
5  May be out of order.
6    There was recently a Firestone case
7  called Lutke, L U T K E. There was no tire failure
8  involved in that at all.
9    Q. Okay.
10    A. That I think is the -- Unless I've missed
11  them, those are the only Firestone cases I see.
12    Q. On this list?
13    A. In 2004 onwards, yes.
14    Q. You did testify before then?
15    A. Oh, yuh. Yuh.
16    Q. Okay. And in this Fullerton case, this was a
17  front tire tread separation --
18    A. Fullerton.
19    Q. -- on an F-250, right?
20    A. Yuh.
21    Q. F-250 has a solid front axle, right?
22    A. It can. I think this one probably did. More
23  importantly, it was a diesel.

Page 84

1    Q. What were the contributing causes of that?
2    A. Well, in the design of the Ford diesel pickup
3  the power steering component also doubles as the
4  energy source for the power assist to the brakes, the
5  result being that heavy braking can lock up the
6  steering.
7    There's quite a history to it. The
8  diesel engine has no manifold vacuum so you can't
9  have a vacuum brake booster on a diesel unless you
10  have a separate vacuum pump.
11    Ford elected not to do that. They
12  decided the power steering pump was where they would
13  go to get the power assist for the brakes.
14    So they had a single hydraulic circuit
15  passing from the pump to the steering to the brakes,
16  or the other way around, the result being that if you
17  really stomped on the brakes, that you could stop the
18  circulation of fluid around the system.
19    Not only would you not have power assist
20  to the steering, you would actually lock it in place,
21  the result being that if you put the brakes on hard
22  you just couldn't steer it, which is a problem. And
23  that was -- I think that was what the problem was in

Gwendolyn Parker and Associates, Inc.
214-747-8007

Page 85

1   the Fullerton case.
2      Q. So it was a vehicle problem.
3      A. Yes. If you put the brakes on, you couldn't
4   steer it, which I would regard as a substantial
5   defect. You had to brake fairly hard, but heavy
6   braking would paralyze the steering on the diesel
7   pickups.
8      Q. What should a driver do if they experience a
9   tread separation on the front tires assuming they
10  know that's what it is?
11     A. Well, any time that you have -- you know,
12  something unexpected mechanical happens, the first
13  thing of course is to stay calm, and the second one
14  is to ensure that the vehicle, you know, stays in its
15  lane of travel, make what adjustments are necessary
16  to stay in the lane of travel, let the speed decline
17  and then once you've got the speed down a bit, move
18  the vehicle to the shoulder or somewhere where you
19  can safely stop the vehicle.
20     Q. Well, didn't we earlier talk, though, about
21  your belief is that when a front tire either tread-
22  separates or blows, that the vehicle will not veer to
23  one side or the other?

Page 86

1      A. It shouldn't. If the vehicle is properly
2   designed, if the steering mechanism is robust enough
3   and it hasn't been compromised by modification or
4   wear, the small drag associated with a front-tire
5   disablement should not affect the path of the
6   vehicle.
7      Q. What about the rear? Same answer?
8      A. Same thing. In and of itself it should not
9   affect the path of the vehicle.
10     Q. And so if it does affect the path of the
11  vehicle, then there's something wrong with the
12  vehicle.
13     A. Yes. You know, if in the event of a
14  front-tire failure you get a change of direction,
15  then this clearly indicates a problem with the
16  vehicle.
17     Q. And those problems can be the design of the
18  vehicle, right?
19     A. There are some situations where it's the
20  design, yes.
21     Q. How would the driver know about that?
22     A. The way the driver would eventually realize
23  it is -- assuming that the vehicle is new enough that you

Page 87

1   know it isn't worn out, you'd be holding the steering
2   wheel straight ahead and the vehicle would be moving
3   significantly to the left or the right.
4      The vehicle isn't going the way you're
5   steering it. There's a discrepancy between where the
6   steering wheel is and the direction the vehicle's
7   headed.
8      Q. But you wouldn't know it until it happened.
9   You wouldn't know --
10     A. It would have to be very severe to be
11  apparent before that, yes.
12     Q. So to your knowledge do the tire companies
13  identify which vehicles have these problems that they
14  shouldn't put their tires on them?
15        MR. FEIN: Object to the form of the
16  question.
17     A. I think you're assuming that the tire
18  companies are in a position to test every vehicle on
19  which their tires might be installed. I would be
20  surprised if that was true. I think they rely on the
21  vehicle builders' expertise to design the vehicles.
22     Q. Do vehicle designers test their vehicles for
23  tread sep, for response to tread separation?

Page 88

1      A. I don't know about tread separation but
2   certainly flat tires.
3      Q. I asked specifically about tread separation.
4      A. I don't know the extent to which they
5   specifically test for tread separation of all
6   vehicles. I don't know that.
7      Q. Have you ever seen a manufacture test for
8   tread separation?
9      A. I've seen a lot of tests by manufacturers for
10  tread separations, yes.
11     Q. Can you identify them?
12     A. Mainly Ford Motor Company testing Explorers
13  and E-350's. I've seen a lot of videos and data
14  generated from them doing that.
15     Q. Litigation-oriented stuff?
16     A. Yes.
17     Q. Not tests of their products that are in the
18  midst of design?
19     A. Correct. I've not seen any data from any
20  manufacturer with respect to testing for loss of
21  tread as a part of the design process.
22     Q. Okay. Now, when you testified for Firestone
23  in the various cases that you did, were you given

22  (Pages 85 to 88)

Page 89

1   access to the Firestone claims database?
2        A. No. It would not be relevant to my
3   testimony.
4        Q. Let me start -- Let me just -- The answer is
5   no, you were not given access?
6        A. I don't recall ever asking for access so I
7   was never denied access, but I never asked for it.
8        Q. Well, according to NHTSA when they looked at
9   this, the Firestone claims database in 2001 had 260
10  crashes, 367 injuries, and 74 fatalities, all coming
11  out of this ATX tire. Wilderness AT they called it.
12  Were you aware of that?
13       MR. FEIN: Object to the form of the
14  question.
15       A. I knew there were allegations. I wasn't
16  aware of the specific numbers. I knew people were
17  alleging that there had been crashes caused by these
18  tires. I was aware of that.
19       Q. Now, would your testimony be then that all of
20  those would be due to some defect in the vehicle?
21       MR. FEIN: Object to the form of the
22  question.
23       A. For those vehicles that were merely traveling

Page 90

1   down the freeway in a straight line, that lost a rear
2   tire, it would have been my testimony -- you know, if
3   those were the facts it would have been my testimony
4   that the loss of control was associated with the
5   design defect in the vehicle.
6        Q. And you said rear tires. What about front
7   tires?
8        A. Front tires should not cause loss of control.
9   They improve the understeer and the directional
10  stability of the vehicle which, for straight-line
11  running, makes it more difficult to drive the vehicle
12  left or right which will -- Freeway work is not a
13  problem. Twisting mountain roads, it's a problem.
14       Q. So when vehicles experience tread separation
15  or blow tires and go off the road, what is that due
16  to?
17       MR. FEIN: Object to the form of the
18  question.
19       A. Well, you need a few more facts. I mean,
20  what sort of vehicle, what conditions.
21       Q. But my question earlier you limited to rear
22  tires. Would you say that's true for front tires,
23  too? If there's front tire -- If these -- all or

Page 91

1   part of these 260 crashes, 367 injuries, and 74
2   fatalities involve front tires, your answer would be
3   the same, as I understand it, that it's due to
4   defects in the vehicle.
5        MR. FEIN: Object to the form of the
6   question.
7        A. Well, it would be due to conditions in the
8   vehicle. I'm not -- I don't think I've come across a
9   Ford Explorer where there was an allegation of
10  control arising out of a front tire.
11       Q. Well, I wasn't limiting it necessarily to
12  Explorers. As you said, you testified that was an
13  F-250, right?
14       A. Yes. That was an F-250.
15       Q. And you said that was because of the vehicle.
16       A. If you put the brakes on, you couldn't
17  steer it.
18       Q. Well, whatever that is, is it your
19  understanding then that there should be no causes of
20  leaving the roadway either because of front-tire
21  blowouts or front-tire tread separations that are not
22  related to and solely to a defect in the vehicle?
23       MR. FEIN: Object to the form of the

Page 92

1   question.
2        A. You may recall, I admitted it to vehicles
3   traveling in straight lines down the freeway.
4   Obviously on a very twisting mountain road you'd
5   probably need the grip of both front tires to get
6   around hairpin bends.
7        As long as we're talking about vehicles
8   that are just driving along straight and level, I
9   would suggest that if loss of a front tire causes you
10  to leave the road, there's something wrong with the
11  vehicle.
12       Q. Okay. In the instant case do you find fault
13  with the driver?
14       A. Well --
15       MR. FEIN: Object to the form of the
16  question.
17       A. -- there's two parts to the driver. He's
18  also the modifier of the vehicle.
19       Q. I'm going to stick first with driver.
20       A. The driving.
21       Q. Yes. Try to be clear. The driver, right.
22  The driving. Let's not quibble. Go on.
23       MR. FEIN: I'm going to make an objection

23  (Pages 89 to 92)

Page 93

1    if that's okay with you.
2          MR. WILNER:  Please do.
3          MR. FEIN:  Object to the form of the
4    question.
5          MR. WILNER:  Okay.
6          A.  To the extent that we know what the actions
7    of the driver were, the testimony is that there was
8    no time for him to act.
9          If that is true, and ignoring the fact
10   that he's responsible for the modifications to the
11   vehicle and the restraint of the occupants and
12   everything else -- if it is true that the vehicle
13   moved spontaneously and there was no time for the
14   driver to react, well, if there was no time for him
15   to do it, then it almost didn't matter what he did.
16         If there was no opportunity for him to
17   act, then his actions wouldn't have mattered because
18   there was no opportunity for him to implement them,
19   if the testimony is correct.
20         Q.  Now, as I understand what you've tried to say
21   here, you feel that the front axle was not properly
22   located or affixed in space?
23         MR. FEIN:  Object to the form of the

Page 94

1    question.
2          A.  Restrained.
3          Q.  Restrained?
4          A.  I think --
5          Q.  Is that right?
6          A.  The driver referred to the condition as
7    allowing the axle to flop about.  In modifying the
8    vehicle he removed a restraining link that was
9    essential to the proper restraint of the axle.
10         And he also changed the arcing of the
11   springs that would have increased their flexibility,
12   the result being that the axle was not properly
13   restrained to allow for proper steering action after
14   he modified it.
15         Q.  You said increased their flexibility.
16         A.  Yes.
17         Q.  I asked you earlier what the spring rates
18   were.  What do you mean by flexibility?
19         A.  Laterally.  The springs are held in place by
20   bushings, rubber bushings, and the more you arc the
21   springs, the more curved they are, the easier it is
22   to twist the rubber bushings that allowed the axle to
23   move sideways.

Page 95

1          As designed, the axle required a steel
2    link to prevent it from moving from side to side
3    underneath the vehicle.  It's referred to as a
4    Panhard rod.
5          He deleted that and put in springs with
6    a greater arc in order to raise the front of the
7    vehicle, and the greater arc would also necessarily
8    have made the springs easier to flex from side to
9    side.
10         Q.  And the support for the statement that the
11   springs would be easier to deflect from side to side,
12   even though we don't know their spring rate --
13         A.  Their vertical rate --
14         Q.  -- yes -- how do we know their horizontal
15   rate.
16         A.  It's not --
17         MR. FEIN:  Object to the form of the
18   question.
19         A.  It's not the horizontal rate per se.  It's
20   the geometry of the installation.  The axle is held
21   in place from side to side by the Panhard rod and
22   also the resistance of the springs themselves to
23   sideways movement.

Page 96

1          When the springs are relatively flat,
2    attempting to move them from side to side does not
3    twist the rubber bushings at the mounts.
4          As you make the springs more curved, then
5    it's easier to twist the bushings and flex the
6    springs from side to side, which was the effect the
7    Panhard rod was meant to cancel out in the original
8    design.
9          Q.  Well, so if the Panhard rod were there would
10   these after-market springs make the axle easier to
11   move from side to side as you say?
12         A.  If the Panhard rod were properly reinstalled,
13   no.  The Panhard rod would limit the side-to-side
14   movement of the axle.  That is its purpose.
15         Q.  So the springs wouldn't matter if the Panhard
16   rod were properly installed --
17         MR. FEIN:  Object to the form of the
18   question.
19         Q.  -- right?  The change in springs wouldn't
20   matter.
21         A.  The change in flexibility of the springs
22   would not have been an issue if the Panhard rod had
23   been properly installed.

24  (Pages 93 to 96)

1    Q.  Now, where is a photograph of the Panhard
2  rod?
3    A.  Since it's not there, there is no photograph
4  of the Panhard rod.
5    Q.  Where is the photograph of a Panhard rod as
6  the vehicle leaves the factory?
7    A.  I don't have a picture of the Panhard rod as
8  installed.
9    Q.  How do we know it had one?
10    A.  Because the mounts for the Panhard rod had
11  been used but they're now empty.  There are brackets
12  where the original Panhard rod was installed.  You
13  can see it's been used and there is no longer a
14  Panhard rod in there.
15    Q.  Okay.  And you have a photograph that
16  identifies where these mounts supposedly are?
17    A.  Yes, there are photographs of it.
18    Q.  Why don't you show us?
19    A.  They're on this disk.
20    Q.  Okay.  On the disk.  Let's see if we have
21  them.  Those are your photographs?
22    A.  Yes.
23    Q.  Here's the photographs.  Okay.  Is there any

1  way that we would know how to identify it?
2    A.  What?
3    Q.  The photograph.  I mean --
4    A.  Well, I'd recognize it if you've got it.
5    Q.  Well, I don't know if these are yours or not.
6  Those look like Florida Highway Patrol photographs so
7  I don't think -- so we'll have to look on the disk
8  because I don't know if I -- unless you have a set
9  that's --
10    A.  No, I don't --
11    Q.  Wait a minute.  What is this?  No.  That's
12  Florida Highway Patrol I'm pretty sure.  That's what
13  that is.  Okay.
14        Let me see if I can find your pictures
15  because I don't know that I have them.  How many are
16  there roughly?
17    A.  30, 40 or so.
18    Q.  Here it is.  These look like yours because
19  they've got Fred Fein on it.  Could that be yours?
20    A.  No.
21    Q.  That's somebody else's.
22    MR. FEIN:  That's Wheeler.
23    MR. WILNER:  Okay.

1    Q.  Why don't we just put the disk in and have a
2  look, okay?
3    MR. FEIN:  You brought that for him.
4    MR. WILNER:  Maybe we don't have them
5  because we hadn't gotten them yet.  That's possible.
6    Q.  Am I to keep this disk?
7    A.  If it works.
8    Q.  Okay.
9    A.  It's from me.  I hope it does work.
10    Q.  Well, they sometimes do and sometimes don't.
11  Let's see.  For a while we thought that would be the
12  future of storing things but I don't think it really
13  is.
14        Here are your photos.  Is there a way
15  that we would have an idea where to start or do you
16  want me to just --
17    A.  Go to thumbnail and we can look at them.
18  Change the view to thumbnail.  It's hard to tell from
19  the thumbnail.  We could start looking about here.
20    Q.  Let's start here.
21    A.  Okay.
22    Q.  Okay.  So what are we looking at here?
23    A.  That's the steering gearbox output shaft.

1  That I believe is the original equipment.  Normally
2  when you raise vehicles you change that to preserve
3  the steering geometry.  Can we go to the next one?
4    Q.  Yes.  It allows you to do that.  Okay.
5    A.  This is the front suspension.  Here's a
6  bracket.  Over here is the other one.  There was
7  meant to be a steel link between those two.  That's
8  where the Panhard rod goes.
9        There were some close-ups that you could
10  see that this actually has been used.  You can see
11  where there have been washers.  This is obviously,
12  you know, a functioning part of the original design
13  of the vehicle.
14        The link that would join them would be
15  called the Panhard rod.  And you can see from the
16  placement of it, obviously it prevents the axle from
17  flopping from side to side underneath the vehicle.
18        You can also see from the fact that it's
19  dirty, that the Panhard rod has been absent for some
20  time.
21        The area where the bolt should be is as
22  dirty as the rest of the axle, so the Panhard rod was
23  missing while the vehicle was in service.

1    Go forward.  That just shows the -- the
2  spring has been scraping on the frame.  It just shows
3  the extent to which the spring has been free to move
4  sideways.
5    And, again, these are spacer blocks at
6  the back of the vehicle.  There is an old block --
7  Actually, that way is up.  Doesn't really matter.
8    Q.  Okay.
9    A.  The very dirty one that's as dirty as the
10  axle I believe to be the original spacer block and
11  you can see it's got an extension.  This is where the
12  rebound rubber would contact down here.  And this is
13  to raise the height of the vehicle.  The back.
14    Q.  That's the rear?
15    A.  That's the rear, yuh.  This is a picture --
16  See this thing here, this is a frame mount.  I
17  forget -- We have to go through them to work it out,
18  but in his testimony he described inserting
19  additional tall blocks between the frame.  These are
20  missing.  I think I can tell you which ones they are.
21    He didn't put them all in, so the thing
22  is -- the body is just sort of bouncing around on the
23  chassis.  I have photographs of most of them.

1    This would be of the mount on the frame
2  just behind the front wheels.  He left both of them
3  out.  He left out the left and the right side one.
4    So at this point this is the body of the
5  vehicle.  This is the frame.  There should be
6  something connecting the body to the frame.  There
7  isn't.  Okay?
8    This just shows that, if you look at it,
9  if you do a close-up, there's very little marking in
10  here.  Whatever it was that did this, I would assume
11  it's some fraction of the tire, because you can see
12  the individual lines and marks.
13    Zooming in might be a bit tricky, but it
14  indicates that whatever it was that did it only
15  touched it probably once.  It doesn't show, you know,
16  numerous contacts in the same area.
17    If you went through here several times
18  with the piece of tire, you wouldn't see the
19  individual lines.  It would just be a big smudge.
20    Q.  And this is 103040.  That will keep us
21  indexed here --
22    A.  This is --
23    MR. FEIN:  I'm sorry.  I thought the

1  original question was for the photograph of the
2  missing Panhard rod area.
3    MR. WILNER:  Now I've asked him to go
4  through his --
5    MR. FEIN:  I'm sorry.  That's fine.
6    MR. WILNER:  We'll dispense with the
7  formalities since we're in the middle of --
8    A.  This is -- I believe this is the Panhard rod
9  mount on the rear axle.  Other photographs will help
10  us to pinpoint exactly which one this is.
11    I believe this is the Panhard rod mount
12  on the axle at the rear of the vehicle.  I think as
13  we go through it will become more apparent.
14    Q.  Let's explore this for a minute.  So this is
15  undercoating, isn't it.
16    A.  No.  It's road dirt, a mixture of oil and
17  dirt.  And if you put your finger on it, you can wipe
18  it off.  It's crud.  I think --
19    Q.  Where is the evidence that there was ever a
20  rod there?
21    A.  Well, I think we're going to have to look at
22  the other one, the companion.
23    Q.  Okay.

1    A.  Here's the companion.  You can see that there
2  has been something in here.
3    Q.  That looks different.  This looks like a --
4    A.  It's got a slot so you can adjust it.
5    Q.  This one doesn't.
6    A.  Correct.  You only need to adjust one end of
7  it.  If the rod is too long or --
8    Q.  This is the other end?
9    A.  Yuh, here's the frame and here's the pivot on
10  the frame.  The one with the slot -- See, there it
11  is.  It's got a slot and there's the one up here.  Go
12  back.
13    Q.  There's the slot.
14    A.  That's the exhaust pipe.  If you go forward
15  again -- Go forward two.  Okay.  Here's the rear
16  axle.  Here's the exhaust pipe.  There's the mount
17  with the slot in it.  There's the one on the frame.
18    Q.  That's the back.
19    A.  This is the rear end.  And when we looked at
20  the close-up of the one on the frame, you could see
21  that there has been a device installed and you can
22  tell from the --
23    Q.  Go ahead.

26 (Pages 101 to 104)

1      A. -- the position left, right, that the purpose
2  of that rod is to prevent the rear axle as well from
3  moving from side to side.
4      Q. And we're now on 1030399.  Okay.  And that
5  is --
6      A. It's a different view.
7      Q. It's a different view.
8      A. Now we're back at the front end.  Here's the
9  steering link.  Steering is input by moving this bar
10 from side to side.  The extent to which you steer it
11 depends on how much the bar moves versus the axle.
12      You can steer it by moving the bar,
13 steering mechanism, or by moving the axle.  The
14 Panhard rod is intended to prevent movement of the
15 axle so you can steer it.
16      This is the front end again.  There's
17 the axle mount.  There's the other one.
18      Q. Looks like there's a damper on this.
19      A. Yes.  There is a steering damper, yuh.
20      Q. Okay.  That's a shock?
21      A. Yes.  It's a shock with -- Somewhat of a
22 close-up.  This is the spacer block that was
23 installed to raise the body.

1      This is the one just behind the bumper.
2  You can see it's not attached.  Neither of the two
3  front-most spacer blocks were properly attached.
4      There was no washer used, the result
5  being that the front end of the body was merely
6  sitting on the frame.  It wasn't properly attached.
7  It was just floating around.
8      Q. Where do you say the washer goes?
9      A. The washer should be under this nut to attach
10 it to a hole that's drilled in the top of the frame
11 here.
12      Q. Where is the hole?
13      A. (Indicating.)  You can't see the hole in this
14 view.
15      Q. Do you think it pulled through?
16      A. No, I don't think it was ever a washer.
17      Q. Well, the nut --
18      A. There should be a washer under the nut to
19 prevent it from coming out of the hole I think.
20      Q. Well, how big is the hole?
21      A. I don't know.  I can't see it.
22      Q. Well, couldn't the nut itself be -- have been
23 -- have been contacting the edge of the hole when it

1  was put in --
2      A. You mean --
3      Q. -- and it got pulled out?
4      A. If the hole was small enough, you might get
5  away without a washer, but I'd be surprised if this
6  thing was strong enough to pull itself -- pull the
7  nut through the frame.  I'd be surprised.
8      Q. Well, you can't really see, though, what's
9  going on there.  Doesn't that look a little deformed,
10 too?
11      A. That might be because it's been in service
12 like that.  He may be driving on the road like that
13 for some time.  If it's not properly secured at this
14 time --
15      Q. This whole thing is bent, isn't it?  It looks
16 like there's a -- this whole thing is deformed.
17      A. I'm not sure it's deformed.  We don't know
18 exactly what the shape was as manufactured.  This
19 clearly is not properly secured to the frame.
20      Q. Well -- After the accident?
21      A. After the accident.
22      Q. All right.  Now, you say a washer is designed
23 to go under that nut?

1      A. I would expect there to be a big enough
2  washer to prevent it from coming loose from the
3  frame.
4      Q. Although that depends on your knowledge of
5  what the size of the hole is in the frame which we
6  don't know.
7      A. Regardless of the size of the hole, I would
8  still expect, you know, good practice to be to use a
9  washer in that situation.
10      Q. And this is an aftermarket piece?
11      A. Yes.  Those are the -- I forget what he said
12 they were -- some sort of plastic spacer.  Those are
13 the spacers he put in to raise the body an additional
14 three inches.
15      Q. Okay.  That's a close-up.
16      A. That's a close-up, yuh.  There's the other
17 side.
18      Q. Now, where are you saying that this is
19 supposed to fit and where?
20      A. There's a hole in the top of this thing.
21 We'd have to pull it down.
22      Q. But it's in the plane that we --
23      A. Correct.  It's in the concealed plane of the

1  frame.
2      Q. So we don't have a picture of that edge.
3      A. Correct. This one is installed. You can
4  see -- Here's the floor of the vehicle. Here's the
5  frame. There's the original spacer. There's the new
6  spacer.
7      Q. And it is flush up against whatever's there,
8  right?
9      A. Yuh, it's bolted to it.
10     Q. It's bolted to it. So that one's properly
11 attached?
12     A. Well, it was secure enough to stay attached,
13 yuh.
14     Q. All right. And let me get the number. This
15 is number 1030391. Okay.
16     A. Here's the body mount bracket. This is the
17 front of the vehicle. This is beyond the left side
18 of the rear of the left front wheel opening.
19         You can see the bracket. You can see the
20 body. There's nothing in here. There should be a
21 spacer here. It's missing.
22         That spacer is missing, as is the one
23 in the same position on the other side. I found no

1  evidence that it had ever been installed.
2      Q. Well, now, this is the same type of spacer as
3  this?
4      A. I would expect it to be like that, yes.
5      Q. In 391?
6      A. There'd be two spacers, yuh. The original
7  and the extension spacer. Yuh.
8      Q. So what's the body resting on here?
9      A. Nothing.
10     Q. Well --
11     A. Just bouncing.
12     Q. It has to rest somewhere.
13     A. Well, it's attached further back. The body
14 is a big shell and it's not attached here, nor, in my
15 opinion, is it properly attached behind the bumper.
16 It's just sort of bouncing around.
17     Q. What is this hole here?
18     A. Some sort of hole in the --
19     Q. Happened in the accident?
20     A. It looks like it was a fastener. See the
21 circular imprint? This is the plastic inner liner.
22 And it looks like a fastener came loose in that hole.
23     Q. So the mating service is right there --

1      A. Mating surface --
2      Q. -- where I have my finger.
3      A. I think you're right.
4      Q. But I don't see a hole in that at all.
5      A. We may have a better view.
6      Q. Okay. There's one. It's attached, right?
7      A. It appears to be. May have come loose but
8  it's still present on the vehicle.
9      Q. That's 389.
10     A. When you tear it out, if you do, in the
11 accident, obviously since it's attached at both ends,
12 once you've separated one end, there's no tendency to
13 remove the other, which is why I believe the front
14 ones were never installed. I don't see how you
15 separate it at both ends.
16     Q. What is this?
17     A. This is -- Here we are -- This is the rear
18 wheel on the right-hand side.
19     Q. This is 388.
20     A. And there's the extension spacer visible and
21 there's the original spacer underneath it. Once
22 again, it shows the extent to which the axle can move
23 from side to side because it's flexible enough that

1  it contacted the frame.
2      Q. In the rear.
3      A. In the rear, yes. Well, the rear Panhard rod
4  was also missing.
5      Q. Right. Okay. And this is what? This is
6  387.
7      A. This -- You can see the chrome bumper. This
8  is a view looking forward on the right side up into
9  the front fender well.
10         And it's hard -- There's almost no
11 evidence of anything having contacted inside the
12 fender well. There's no evidence of any significant
13 sort of rubbing, dragging, call it what you will, in
14 the fender well.
15     Q. Okay.
16     A. Same with the back. You can see the dirt and
17 stuff is still stuck on the fender. There's this
18 curling of the sheet metal which we saw earlier, but
19 there's no evidence of contact between the tire
20 fragments and the inner fender.
21     Q. This is 385.
22     A. That's one of the front brakes showing it's
23 been sitting in the dirt.

Page 113

```
 1     Q. 384.
 2     A. There's a side view of the right front.  You
 3  can see that you have six bolts holding the wheel on.
 4  You were asking earlier.  You can see the curvature
 5  of the spring.
 6         This is how the vehicle was raised.
 7  This curvature is now greater than the original
 8  spring would have been.
 9     Q. It's dropped.
10     A. It's dropped.
11     Q. This is 383.
12     A. That's the right rear.
13     Q. The right rear.  This is 382 which is the --
14     A. Right side.
15     Q. This is 381.
16     A. Which is the left side.
17     Q. 380, just a longer view of everything.
18  That's it.  Well, no.  Trailer hitch.  That's --
19     A. The crease in the driver's door.  That's out
20  of focus I'm afraid.
21     Q. There's the --
22     A. Odometer.
23     Q. That's the --
```

Page 114

```
 1     A. A label that was on it.
 2     Q. This we can -- I think we're back around to
 3  the beginning.  Okay.  I'm almost done so let me -- I
 4  can keep this disk?  Good.  All right.
 5         I'd like to see your file if I could and
 6  I'll let you take a look through that.  Let's do
 7  one -- Since we didn't get a chance to do our
 8  calculation earlier, we'll give you a chance to do
 9  one, all right?
10         Why don't we do the centrifugal force
11  of a 10-pound tread at 60 miles an hour.
12     A. At what radius?
13     Q. The radius of this tire of course.
14     A. What size -- This tire is actually -- Is it a
15  33?
16         MR. FEIN:  Double-check on that.
17     A. I need a piece of paper.  33-inch diameter
18  tire.  Forward speed?
19     Q. 60.
20     A. 60 miles per hour.  You want to know how many
21  g's it's pulling.
22     Q. Sure.  You can use a hundred feet a second.
23     A. I'll call it 90.
```

Page 115

```
 1         (Brief recess.)
 2     Q. Have you got it?
 3     A. I need to do it again.  We'll call it 90 feet
 4  per second and we'll call it 33 inches diameter, and
 5  we'll say 1 g is 32.  33 over 12 times 2 and we also
 6  want to multiply that by 32.  That's 44.  I'd
 7  estimate that to be about 180.
 8     Q. 180 g's.
 9     A. About.
10     Q. So --
11     A. Pencil and paper.
12     Q. So total force then on that 10-pound object
13  is --
14     A. The force necessary to --
15     Q. Cumulative force.
16     A. We've got to be careful.  If it's a point
17  mass, then to keep it going at that radius at that
18  speed, you're going to require a force of ten times
19  that.
20     Q. A thousand.  Over a thousand pounds.
21     A. In order to keep a 10-pound mass on a
22  16-and-a-half-inch radius with a speed of 60 miles an
23  hour, you're going to need 1800 pounds.
```

Page 116

```
 1     Q. And a tire weight that's used to balance
 2  tires, what's their typical weight?  How much do they
 3  use?
 4     A. It depends on the size and the outer balance
 5  of the --
 6     Q. What's the range?
 7     A. I don't know how the biggest ones are.  I've
 8  seen wheels with lots and lots of weight on it.  I'd
 9  be speculating if I knew what the most tire weight
10  that --
11     Q. I didn't ask for the most.  I asked what is a
12  typical -- If you go to the balance shop and you
13  say -- or a tire shop and they start putting weights
14  on your tire, how big are they?  Are they 10 pounds?
15  Are they two pounds?  Are they one ounce?
16         MR. FEIN:  Object to the form of the
17  question.
18     A. Hopefully they're very small.  I mean, if I
19  just bought a new set of tires I'd be very upset if
20  they had big weights on them.
21     Q. Okay.  Wheel weights.  You buy wheel weights
22  in the store.
23     A. I don't, no.
```

29  (Pages 113 to 116)

1    Q. Well, somebody does. So you don't know how
2  much they weigh.
3    A. It varies on the -- depends on the correction
4  you're trying to achieve. I would hope, especially
5  if a new tire, it would be quite small.
6    Q. Well, let's put it this way. What's the most
7  that you would say you should put on a tire before
8  you realize there's some problem?
9        MR. FEIN: Object to the form of the
10  question.
11    A. So many variables. It depends on the type of
12  rim. It could be the rim that's out around. It
13  could be a truck tire. I don't think there is a
14  simple guide for that. It would be guesswork.
15    Q. I'll find out here. Okay. Well, let me ask
16  you -- I'll show you this if you want. It's not very
17  controversial.
18        The ultimate wheel weight kit for the
19  tire professional with free shipping -- it actually
20  costs $999 believe it or not -- but it says the FNS
21  series is 10 grams through 55 grams.
22    A. Per weight.
23    Q. Per weight.

1    A. Okay.
2    Q. So the smallest weight is like 10 grams. The
3  biggest weight is 55 grams according to this series.
4    A. And --
5    Q. Well, I'm just -- we're just trying to work
6  this out a step at a time. Does that sound
7  reasonable to you?
8        MR. FEIN: Object to the form of the
9  question.
10    A. I'm sure that's the size they make weights
11  in.
12    Q. Okay.
13    A. I accept that you can buy weights in that
14  range.
15    Q. Okay. And 10 grams is what fraction of a
16  pound --
17    A. Oh, God.
18    Q. -- for the jury that follows --
19    A. There are 28 grams to the ounce, so 10 grams
20  is about a third of an ounce. There are 16 ounces in
21  a pound, so it's about a 50th of a pound.
22    Q. So the 10-gram weight is a 50th of a pound.
23    A. About.

1    Q. So then when that 10-gram weight is spun at
2  60 miles an hour, with a tangential speed of 60,
3  since we know that -- from your earlier calculation
4  it's about 180 g's -- is that what you said?
5    A. That's at the tread. This would be at the
6  rim so this would be about half that.
7    Q. A little less.
8    A. It would be half that. V squared over i.
9  You just halve the radius.
10    Q. Well, is this really half the way in to
11  the --
12    A. Approximately.
13    Q. Okay, very good. So since it's linear
14  inverse with the radius, then it's half. So it's 90
15  g's, right?
16    A. Okay.
17    Q. Okay. And 90 g's -- So then if we're talking
18  about if it's point mass, which is fairly small, and
19  we're talking about 90 g's times 50 -- 1/50th of a
20  pound, we're talking about an imbalance or a balance
21  force that's added by this thing at 60 miles an hour
22  of 90 over 50 of about a little less than two pounds.
23    A. That sounds about right.

1    Q. Okay. Now, if a tire were to let's say be
2  half detreaded so that the treaded end or the missing
3  tread were -- or so that half the tread was connected
4  and half was not, how would you relate the imbalance
5  force to the tire weight?
6        MR. FEIN: Object to the form of the
7  question.
8    A. If the axle did not move, if the axle were
9  mounted on a concrete block, you could simply say
10  that the mass on one side is greater than the mass
11  on the other. So we have this out-of-balance force.
12        The problem you have is that because it's
13  out of balance, the axle now moves and the actual
14  out-of-balance is diminished by the ability of the
15  wheel to move up and down. The out-of-balance force
16  is diminished by the fact that the axle is free to
17  move.
18        If it were perfectly free to move, you
19  know, like your washing machine, that can be out of
20  balance, but the drum spins eccentrically and the
21  result, if you don't overdo it, is there is no net
22  out-of-balance transmitted outside the washing
23  machine.

30  (Pages 117 to 120)

Page 121

1   So you can have something that's out of
2   balance but if, like the drum in your washing machine
3   or the rear wheel of the car, it has some ability to
4   move, the actual forces generated could be
5   significantly less, potentially, in the case of the
6   washing machine, zero.
7       Q. And then when -- of course when an axle on
8   your car moves, then -- if it moves up and down
9   enough, it leaves the road.
10      A. Eventually, if it moves up enough, it will
11  leave the pavement, yes.
12      Q. And while it's off the pavement, then that
13  wheel cannot contribute to the steering of the car,
14  can it.
15      A. While it's in the air it doesn't have any
16  ability to grip the pavement.
17      MR. WILNER: Okay. Let's have a moment
18  and then I think we're done. Okay? We'll go over
19  this in a second. Why don't you guys stay here if
20  you'd like.
21  (Whereupon at 12:24 p.m. the deposition recessed and
22  reconvened at 12:26 p.m.)
23      Q. What would you expect, if any, effects on

Page 122

1   handling in a non-emergency situation would occur
2   from the things that you've noted here, the Panhard
3   rod and the spacers?
4       MR. FEIN: Object to the form of the
5   question.
6       A. You would expect greater compliance from the
7   front end. You'd see more movement laterally of the
8   axle and this would lead -- subjectively you'd
9   probably get the sense that the steering is not as
10  precise, is somewhat more uncertain than it was
11  before you took the Panhard rod off.
12      Q. Would it tend towards either understeer or
13  oversteer necessarily?
14      A. You're taking both of them off --
15      MR. FEIN: Same objection.
16      A. The change in understeer, you're going to
17  have some change in understeer due to the front, but
18  there may also be a change to understeer due to the
19  rear, and without further study it's not clear what
20  the balance would be.
21      You could cancel out the changes at the
22  front by the changes at the rear for non-emergency
23  driving.

Page 123

1       Q. So then -- I mean, what does that mean? You
2   couldn't tell or what?
3       A. You'd have to think -- It's probably going --
4   Let's think. If the front axle flexes more, it's
5   probably -- let me think a minute -- it's -- at least
6   initially it's probably going to appear somewhat more
7   understeering just due to the loss of the front
8   Panhard rod.
9       Q. Okay. So could a normal person tell the
10  difference driving the car?
11      MR. FEIN: Object to the form of the
12  question.
13      A. In ordinary driving if that was the only
14  change you made -- If the only thing you did was to
15  remove the Panhard rods without changing the springs
16  and the tires and everything else, you might notice
17  it driving around, you know, things like traffic
18  circles.
19      You know, you might observe that you had
20  to use a different amount of steering. Would you
21  notice it if you made all the other changes at the
22  same time? That's not as clear.
23      Q. If you made all these changes that you

Page 124

1   observed, would you expect that an average driver
2   would notice a difference and, if so, what
3   difference?
4       MR. FEIN: Object to the form of the
5   question.
6       A. There are three changes. There's the removal
7   of the Panhard rods. There's the change in the
8   spring shape and a change in the placement of the
9   tires.
10      Each of these individually would have
11  some changes associated with it. It may be that,
12  from the perspective of the driver's experience,
13  upping the size of the tire may mask the flexibility
14  due to the loss of the Panhard rod for what you
15  describe as, you know, ordinary driving.
16      The change in spring shape would
17  introduce other changes in vehicle property. Once
18  again, the extent to which they would be apparent or
19  masked by the other changes is not clear for
20  non-emergency driving.
21      Q. Okay. All right. Well, let's find a way to
22  attach this minus the -- I don't need depositions or
23  anything or notices. I just want your calculations.

Gwendolyn Parker and Associates, Inc.
214-747-8007

Page 125

1    I don't need the homicide report.
2        I would like the manual. Is that all
3    there is to it? Can we do that without disrupting
4    your file too much? In other words, pull out your
5    calculations, pull out the --
6        A. The things I did.
7        Q. Yes. I do want the manual but I don't care
8    about the highway patrol?
9        A. You don't want the depositions or the
10   deposition notice and things.
11       Q. No.
12       A. But you wanted the highway --
13       Q. I don't want the highway patrol. I do want
14   the manual because I'm not sure how -- and your
15   calculations. Did I leave anything out?
16       MR. PLOTKIN: There's some correspondence
17   in there. I think we've got that, but he can throw
18   that in as well.
19       MR. WILNER: Okay.
20       A. This is the owner's manual. You don't want
21   anything to do with my being at depositions.
22       Q. No.
23       A. You don't want the police report. Do you

Page 126

1    want the notes I made when I went to look at it?
2        Q. Yes. Anything you wrote.
3        A. Okay. You don't want the list of prior
4    testimony or my --
5        Q. Well, I think I have that.
6        MR. FEIN: You do.
7        A. You've got that. And you want the resume?
8        Q. Got it.
9        A. You don't want Wessman's report.
10       Q. Did you give me back the pages that you took
11   out? Are they all back?
12       A. I don't know if I put them in. I didn't keep
13   them.
14       Q. Good. That's all.
15       A. Do you want these blow-ups of pictures that
16   show the tire didn't touch anything?
17       Q. No. Are they pictures we already looked at?
18       A. These are from the FHP. We looked at them
19   briefly.
20       Q. What are your observations?
21       A. On here?
22       Q. Yes.
23       A. The tread is not touching the tire, that it's

Page 127

1    merely sort of tucked in around --
2        Q. We talked about the tuck-in.
3        A. Yes. Thus preventing it from falling out.
4    And that you can see -- Between the two views you can
5    see that there's significant clearance between the
6    tire and the tread.
7        Because having raised the body so much,
8    there's lots of space in there and there's nowhere
9    that you can see that the tread is coming even close
10   to the tire, so it's not rubbing. These are FHP
11   pictures I just printed. You don't want them?
12       Q. No, I don't need them.
13       A. Okay. So you've got my photographs, you've
14   got the Jeep manual, and you've got the notes I made
15   when I inspected the vehicle. Okay?
16       MR. FEIN: And the CD.
17       Q. I've got the CD and acknowledge receipt.
18       MR. WILNER: We don't have anything
19   further. Thank you. Do you want the opportunity to
20   read it?
21       MR. FEIN: We'll read it.
22       MR. WILNER: Good enough.
23   (Whereupon at 12:42 p.m. the deposition concluded.)

Page 128

1            WITNESS CERTIFICATE
2
3
4        I, Christopher Guy Shapley, do hereby certify
5    that I have read the foregoing 127 pages of my
6    deposition transcript, and I further certify that
7    said transcript is a true and accurate record of said
8    testimony.
9
10   SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS
11       DAY OF        , 2009.
12
13       Christopher Guy Shapley, Deponent
14
15
16
17
18
19
20
21
22
23



1
2   COMMONWEALTH OF MASSACHUSETTS)
                    ) Ss.
3   COUNTY OF PLYMOUTH        )
4       I, Linda J. Modano, Certified Shorthand Reporter
    and Notary Public duly appointed and qualified in and
5   for the Commonwealth of Massachusetts do hereby
    certify there came before me the deponent in the
6   foregoing deposition, who was by me satisfactorily
    identified according to the Laws of the Commonwealth
7   of Massachusetts, and duly sworn to testify to the
    truth and nothing but the truth concerning the
8   matters in this cause.
9       I further certify that the foregoing transcript is
    a true and correct transcript of my original
10  stenographic notes.
11      I further certify that I am neither attorney or
    counsel for, nor related to or employed by any of the
12  parties to the action in which this deposition is
    taken; and furthermore, that I am not a relative or
13  employee of any attorney or counsel employed by the
    parties hereto or financially interested in the
14  action.
15      IN WITNESS WHEREOF, I have hereunto set my hand
    and affixed my Certification Seal this 31st day of
16  March, 2009.
17
18           LINDA J. MODANO
             NOTARY PUBLIC
             My commission expires
19           June 2, 2011
20  PLEASE NOTE:
        THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
21  DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY
    MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
22  DIRECTION OF THE CERTIFYING REPORTER.
23

**Gwendolyn Parker and Associates, Inc.**
**214-747-8007**