1          UNITED STATES DISTRICT COURT
            MIDDLE DISTRICT OF FLORIDA
2              JACKSONVILLE DIVISION

3                    CASE NO. 3:08-ev-37-J-32HTS

4    WILLIAM BEAUREGARD, as
     personal representative of
5    the ESTATE of DAWN BEAUREGARD,

6          Plaintiff,

7    vs

8    CONTINENTAL TIRE NORTH AMERICA,
     a foreign corporation,
9
           Defendant.
10    _____/

11

12

13                    80 Southwest 8th Street
                      Suite 2900
14                    Miami, Florida
                      April 9, 2009
15                    11:45 a.m. - 2:25 p.m.

16

17        *DEPOSITION OF JEFFREY B. WHEELER, M.S.*

18

19          Taken before Alan J Levine, Court

20   Reporter and Notary Public in and for the State of

21   Florida at Large, pursuant to Notice of Taking

22   Deposition filed in the above cause.

23                    ___  ___  ___

24

25

1

2                    A P P E A R A N C E S

3

4              WILNER BLOCK, P.A.
               BY:   AARON METCALF, ESQUIRE
5              on behalf of the Plaintiff.

6              THORNTON, DAVIS & FEIN, P.A.
               BY:   FREDERICK FEIN, ESQUIRE
7              BY:   DANIEL LEVER, ESQUIRE
               on behalf of the Defendant.

8

9

10                      I N D E X

11   Witness                                  Page

12   Jeffrey Wheeler, M.S.

13   Direct Examination by Aaron Metcalf, Esq.     3
     Cross Examination by Frederick Fein, Esq.     --
14                               Redirect          --

15

16

17

18

19

20                   E X H I B I T S

21

22    Plaintiff's Exhibit No. 1 through No. 4 for I.D.

23

24

25

1    Thereupon,

2                   Jeffrey B. Wheeler, M.S.,

3    was called as a witness on behalf of the Plaintiffs,

4    and having been first duly sworn, was examined and

5    testified on his oath as follows:

6                   DIRECT EXAMINATION

7    BY MR. METCALF:

8        Q    Would you state your name, please?

9        A    Jeffrey Bruce Wheeler.

10       Q    And is it Mr. Wheeler?

11       A    Yes.

12       Q    Not doctor or --

13       A    Correct.

14       Q    Okay.  What is your address?

15       A    The business address?

16       Q    Business address.

17       A    It is 3064 Whitman Drive, Suite 100,

18   Evergreen, Colorado, 80439.

19       Q    Is that a new address for you?

20       A    No.

21       Q    It just seemed like you had some trouble

22   recalling where it was.

23       A    I know.  I know where it is.  I don't have

24   to look it up on --

25       Q    I understand.  And you have been disclosed

1    by the Defendant in this case, Continental Tire

2    North America, as an expert witness; are you aware

3    of that?

4         A    Yes.

5         Q    Okay.  Before we went on the record we

6    talked a little bit about your file and you brought

7    a copy of your entire file with you; is that

8    correct?

9         A    Yes.

10        Q    And we agreed that you would copy the

11   parts that haven't already been mutually exchanged

12   between the parties, meaning everything that is not

13   a deposition transcript or medical record --

14        A    (Nodding yes).

15        Q    -- unless those contain some notes that

16   you made.

17        A    Correct.  I will copy it and forward it to

18   you.

19        Q    And we have marked your file as

20   Plaintiff's Exhibit 1.

21             (Whereupon, Plaintiff's Exhibit No. 1 was

22   marked.)

23   BY MR. METCALF:

24        Q    And you are going to forward the copy

25   directly to my office?

1       A       Yes.

2       Q       I will give you my card when we leave.

3       A       (Nodding yes).

4       Q       All right.  Mr. Wheeler, what is it that

5   you do?

6       A       I do research and consulting in the field

7   of biomechanics, specifically impact injury

8   biomechanics.

9       Q       Does your business primarily involve

10  consulting with people in litigation?

11      A       Yes.

12      Q       How much of your business would you say is

13  related to litigation?

14      A       In terms of time or --

15      Q       Yes, time.  That is fine.

16      A       Well, the company is a research and

17  forensic consulting firm and so our business is

18  primarily working on litigation-related matters.

19  Even the research we do is related to our science

20  and questions that we have and that we see in our

21  consulting.  So I guess it is all related to

22  litigation, but there is a subset of research that

23  we are not paid for out of litigation.

24      Q       Understood.  So you do some research that

25  is independent of anybody asking you to do it, but

1    it is in furtherance of the testimony that you're

2    going toward the testimony of the work that you are

3    going to do in some litigation at some point?

4        A    In a way.  It is not necessarily directly

5    related to specific cases, but it is related to our

6    ongoing, I guess, knowledge and --

7        Q    It is like CLE for lawyers; right?

8        A    Continuing legal education.  You are

9    trying to get up to speed and learn as much as you

10   can about the issues that come up and the kind of

11   cases that you are asked to work on.  That is a fair

12   comparison, yes.

13       Q    Okay.  And your opinions in this case are

14   going to primarily be about biomechanics?

15       A    Yes.

16       Q    Let me just go right to what I see as your

17   primary opinion.  If I am not correct that it is

18   your primary opinion, please correct me.  But it

19   seems as far as matters that are at issue between

20   the parties in this case, your primary opinion is

21   that Sarah Beauregard was never buckled in whether

22   it is the shoulder harness or the lap belt or both

23   in this collision sequence?

24           MR. FEIN:  Object to the form of the

25       question.

```
 1              THE WITNESS:  I am not sure if that is my
 2         primary opinion; that it is one of my opinions.
 3         I think some of the primary opinions are
 4         looking at the fatal injury and the mechanics
 5         and how she sustained those injuries and what
 6         the alternative scenario would have been had
 7         she been properly restrained and contained.
 8              I think one of my subopinions is that the
 9         most likely scenario was that she was not
10         belted at all.
11    BY MR. METCALF:
12         Q    Are your opinions in this case addressed
13    in the conclusions into your report?
14         A    Actually I can get a copy out.
15         Q .  And it looks like your copy is the same is
16    as mine.  It is dated January 16th, 2009.
17         A    (Nodding yes).
18         Q    Have there been any changes to your
19    opinions since you created that report?
20         A    No, there has not been any changes.  There
21    have been some new material that I have reviewed and
22    considered and made comment on, but there haven't
23    been any changes to the conclusions on page eight of
24    my report.
25         Q    Okay.  You sort of anticipated my next
```

1    question as to whether you have done any work, any

2    additional work, since you created this report?

3         A    Yes.

4         Q    And would that just be reading the

5    depositions that have been taken since you have made

6    that report?

7         A    Primarily, yes.  There have been half a

8    dozen deposition transcripts that have been

9    produced, the surviving occupants of the vehicles

10   and witnesses, police officer and couple of experts.

11             One expert in particular that has some

12   opinions on seat belt use that are kind of related

13   to what I am covering, so I read that.

14        Q    Okay.  Is there, other than reading the

15   deposition, is there anything else that you have

16   done since you produced your report?

17        A    No, I don't think so.

18        Q    Okay.  In reading the depositions, was

19   there anything in any of that testimony that came

20   out that impacts your opinions in any way?

21        A    The testimony by Adam and Jessica place

22   them on different sides of the vehicle and the rear

23   seat than the Florida Highway Patrol noted.  So, I

24   will change the diagram that was an exhibit to my

25   report.

1      Q      Right.

2      A      But it doesn't change any opinion.   It is

3    irrelevant to my opinions on Sarah.

4      Q      Right.

5      A      It was clarified in the deposition

6    transcript testimony the condition of the belt and

7    the alleged use of the belt, so I have obviously had

8    to consider that scenario, and that is pretty much

9    it.

10     Q      Okay.   Tell me how the condition and the

11   alleged use of the belt was clarified in the

12   deposition testimony.

13     A      It was somewhat evident from the physical

14   inspection as well as the indication of the police

15   report, and the police report photographs, that the

16   front passenger belt was around the seatback.

17   Particularly the shoulder belt was behind the

18   seatback and the lap belt in front of it at the time

19   of the accident and it was clarified by

20   Mr. Beauregard that indeed that was how he used it

21   and how he placed it purposely.

22            And then he further gave testimony that he

23   did put the lap belt around Sarah and that he

24   latched or buckled it.

25     Q      Okay.   Did any of that change or impact

1   your opinions?

2       A   (Shakes head in the negative).

3       Q   Let me just make an observation.  That is

4   consistent basically with the information that you

5   had, at least as far as what Mr. Beauregard said he

6   did before the deposition.

7       A   Not necessarily.  It was consistent with

8   the physical evidence that the belt was around the

9   seat, but the physical evidence also suggested that

10  the latch was not buckled.  So, that was different.

11      Q   Uh-huh.  Okay.  Well, I guess what I was

12  getting at is, you know, from the homicide report

13  that Mr. Beauregard told the investigating officer

14  that he had latched the buckle --

15      A   So that --

16      Q   -- in that same manner and that is what he

17  testified to in his deposition.

18      A   Yes.

19      Q   Okay.  So that wouldn't change anything

20  one way or the other?

21      A   It doesn't change the physical evidence

22  and it doesn't change the initial understanding of

23  how it was for the status of the belt and the use of

24  the belt.

25      Q   Okay.  Let me go back to these conclusions

1   for just a second.  Your first conclusion is that

2   the front passenger, Sarah Beauregard, was ejected

3   from the Jeep Grand Wagoneer during the rollover

4   collision and sustained -- pardon me -- a fatal head

5   impact on to the ground.

6        A    (Nodding yes).

7        Q    Okay.  You know, you would agree that,

8   that is not a contested issue in this case?

9        A    I don't know.  I wouldn't think it would

10  be.

11       Q    Okay.  Well, you read Doctor Benedict's

12  deposition --

13       A    (Nodding yes).

14       Q    -- and that pretty much agrees with that?

15       A    I am not sure he gave an opinion

16  specifically about that, but you are correct, I

17  don't understand that to be a contested issue.

18       Q    Okay.  And your second conclusion that

19  Sarah was ejected early in the rollover sequence,

20  probably during the first roll through the passenger

21  window, that is pretty much what Doctor Benedict

22  testified to?

23       A    And all the evidence and the information

24  that I have seen agrees with that, yes.

25       Q    Now, your next conclusion is that Sarah

1    was not properly restrained by the available lap and

2    shoulder seatbelt.  That one is a little ambiguous.

3    I will want to come back to that one.  It is

4    unlikely that the seatbelt buckle was properly or

5    improperly around Sarah.  That is what I think is

6    probably your primary opinion, but you disagree with

7    that, but we will come back to that.

8        A    (No response).

9        Q    The next one in the evidence was that the

10   most likely scenario is the front-passenger seatbelt

11   was improperly placed the seat and it wasn't

12   buckled; right?

13       A    Correct.

14       Q    I am going to summarize it.

15       A    (Nodding yes).

16       Q    That is sort of ties in with the one

17   before it.  The second to last one, that Sarah

18   Beauregard was properly restrained and she would

19   have been contained within the passenger compartment

20   and she would not have sustained an ejection

21   relating to a fatal head impact injuries with the

22   ground, and that one is not seriously contested.

23   Would you agree with that?

24       A    From what I have seen, correct.

25       Q    And had she been properly restrained then

```
 1    that she would have survived or had mild-to-moderate

 2    injuries; that one is not contested, is it?

 3         A    Not that I know of.

 4         Q    Okay.  So would you agree with me that as

 5    far as contested issues the opinions that you have

 6    are primarily that Sarah was never buckled?

 7         A    Right.

 8              MR. FEIN:  Object to the form of the

 9         question.

10    BY MR. METCALF:

11         Q    Okay.

12         A    That is the one that you have labeled as

13    primary because it is contested.

14         Q    Right.  Well, I said as far as contested

15    issues --

16         A    Perfect.

17         Q    -- that is the primary one.

18         A    (Nodding yes).

19         Q    Okay.  I am just trying to get at what,

20    you know, where we are in disagreement.

21              Now, somewhere in here -- and I apologize

22    because I made these notes on the plane -- I have

23    some notes about the basis for your opinion that she

24    was never buckled.

25              Well, why don't you tell me the basis for
```

1    your opinion that Sarah was never buckled.

2         A    One of the bases is that she was ejected

3    from the vehicle and it is extremely rare to have

4    belted passengers sustain or undergo complete

5    ejection.

6              Other reason is the timing of the

7    ejection, which we agreed, and I believe you said

8    was not contested, that Sarah was ejected very early

9    in the sequence of the rollover event and probably

10   early, meaning during the first roll, even during

11   the first half roll on the passenger side was

12   exposed, to a high throw trajectory.

13             So the early and complete ejection of a

14   passenger is indicative of not being belted.  And in

15   the case where it is alleged or suspected or

16   considered that a passenger was partially belted or

17   belted, and the belt inadvertently released, then it

18   would be not consistent that the person would be

19   completely ejected and completely ejected so early

20   in a rollover when there are dynamics involving

21   partial restraint or a inadvertent release of the

22   belt there is a delayed timing of the person's

23   ejection because they are entangled and interact

24   with the belt to some degree.

25             First, there needs to be a time and event

1    during the rollover that results in some type of

2    release of the belt.

3              And then second, even after it is

4    released, there is interaction and entanglement with

5    the belt delays their ejection.  So, it would be a

6    consistent with the ejection during the first roll.

7              And it also results typically in a partial

8    ejection before there is a full eviction as they

9    work their way out of the belt and actually drag and

10   pull the belt with them to some degree.

11             So, the fact that she is ejected, the

12   timing of the ejection being early, is not

13   consistent with entanglement.

14             Another basis related to entanglements is

15   her injuries are not consistent with

16   entanglement-type injuries.  That relates to her

17   injuries being primarily a high velocity ground

18   impact from a trajectory throw and ejection.

19             Again, a complete ejection and release

20   from the vehicle as opposed to entanglement, partial

21   roll and crushing injuries, for example, that happen

22   during the process of ejection as one is entangled.

23             Other types of entanglement-related

24   injuries are related to the belt itself; not just

25   the position of the partial ejection, but the

```
 1    partial belt restraint.  When there is a shoulder

 2    belt involved it often involves the outboard

 3    shoulder and arm, and in particular, distinct

 4    abrasions and those type of injuries and I have a

 5    paper here.

 6        Q    Well, we know there was no shoulder belt

 7    involved.  Everyone agrees with that.

 8        A    Correct.  But with Sarah's case being just

 9    a belt around her lap, those entanglement-type

10    injuries would be abdominal trauma or lumbar-spine

11    trauma, perhaps similar to a chance-type fractures

12    that occur with the belt riding up into the abdomen

13    and causing hyperflexion of the lumber spine and

14    flexion distraction injuries.

15             There were no injuries that I believed to

16    be indicative of entanglement-related injuries.

17        Q    Well, let me just, and I apologize for

18    interrupting, but let me just interrupt --

19        A    Okay.

20        Q    -- there.  Didn't Sarah have injuries

21    indicative of abdomen trauma.

22        A    She did have some abdominal trauma.  There

23    was a laparotomy that was done to explore some

24    hemorrhaging in her abdomen and a spleen laceration.

25        Q    So wouldn't that be consistent with having
```

1   a partially restrained by a lap belt?

2        A    I don't think so in this case.

3        Q    Well, in this case, I mean, you just said

4   that abdominal trauma is an injury that would be

5   consistent with being entangled in a lap belt.  Are

6   you saying that, that is not consistent with being

7   entangled with a lap belt?

8        A    The spleen injury is more indicative of a

9   high velocity impact and the spleen is at the left

10  side and I believe her lap belt entanglement in the

11  abdomen would be right side and interior as she goes

12  out to the right.  And there are no abrasions or

13  external evidence to her abdomen that would be a the

14  indicative of a belt load.

15           So the belt load-type of abrasions and the

16  belt load-type of abdominal trauma I don't believe

17  is what she had.

18       Q    So, her spleen injury was more indicative

19  of -- I maybe messing up the terminology -- more

20  indicative of an impact?

21       A    Blunt impact.

22       Q    Blunt impact injury.  What about her

23  spleen injury makes it indicative of blunt impact as

24  opposed to the kind of injury that you get from

25  being restrained?

1      A     A spleen injuries, in general, it is a

2    meniscus-type of organ that responds to high

3    velocity or blunt impact with kind of a compression

4    phenomena and meniscus part of the organ and it

5    splits tension.  So, it is not the type of organ

6    that you get from an abdominal intrusion of the

7    belt.

8           That type of abdominal intrusion

9    belt-related injuries you get are tears of the

10   mesentery and complete compression where there is

11   flexion of the lumbar spine over a developed accent

12   fulcrum, but the blunt impact of the spleen is

13   like -- especially without evidence of any abrasion

14   to the belt, or related of the belt -- is more

15   indicative of just a blunt high-velocity impact of

16   the compression-related injuries.

17     Q     Well, you are not saying that you can't

18   have this kind of spleen laceration from a belt

19   injury?

20     A     At these velocities that are involved

21   between the person and the belt, I have never seen

22   spleen injuries.

23          The type of abdominal trauma injuries you

24   get from belt load would be high velocity impacts of

25   the frontal nature, with, you know, 20 to 30 miles

1   an hour delta V's and the delta V's in this rollover

2   are not the delta V's and velocities that you would

3   see as a cause of kind of abdominal belt trauma

4   injury.

5          The kind of abdominal belt trauma that you

6   would see from entanglement would be more abrasions

7   or a flexion over the belt as it acts like a fulcrum

8   as you bend over it.

9      Q    Is there some literature or something of

10   that nature that you are relying on to say that

11   Sarah's spleen injury is indicative of an impact

12   injury as opposed to a restrained injury?

13     A    I was a co-author on a paper on abdominal

14   belt-related injuries to children published in, I

15   believe it was, 1989.  The title is on my CV

16   somewhere, but it is lap belt-related injuries to

17   children.

18          So that work that I did and co-authored

19   has a decent review of the type of abdominal

20   injuries that you see from lap belt loading and the

21   type of forces involving high speed in nature.

22          And that in contrast I would also rely on

23   the type of forces that we know happen in rollovers

24   are not 20, 30 miles per hour delta V's.  So that

25   would be something I would rely on, the literature I

1    would rely on as well as the articles that I

2    referenced to put that paper together.

3              There is also data on just general spleen

4    injuries that talk about the high velocity of blunt

5    impact that is typically sourced.

6        Q    Where is that data?

7        A    I mean, it is kind of a common knowledge

8    in the biomechanics community to look at specific

9    papers.  I would have to look them up.  I don't know

10   them off the top of my head.

11       Q    All right.  And you didn't consult any

12   particular papers for that purpose in this case?

13       A    No.

14       Q    The article that you wrote in 1989, that

15   article, was that published?

16       A    Yes.

17       Q    Where was it published?

18       A    The National Academy of Forensic

19   Engineers.

20       Q    I assume you have a copy of it somewhere?

21       A    Yes.

22       Q    You could provide that to us?

23       A    Sure.

24       Q    I would appreciate that.  You can send it

25   with your file and if Mr. Fein doesn't have a copy

1    already, will you send a copy of it to him?

2         A    Okay.  I think I was asked to give all the

3    bases regarding --

4         Q    Uh-huh.

5         A    -- why I think she was not belted.

6         Q    Right.  Let me stick with this injury --

7         A    Okay.

8         Q    -- issue for just one more minute.

9         A    Okay.

10        Q    Now, according to the diagram that you

11   prepared as part of your report, page 36, she has

12   also got a number of abrasions on her what you call

13   her upper torso, chest, shirt/chest area?

14        A    Sure (nodding yes).

15        Q    And I assume you don't attribute those to

16   any kind of restraint injury?

17        A    No.  There was no restraint across the

18   chest.

19        Q    Okay.  Well --

20        A    The abrasions she has to her front and

21   back and upper and lower extremities, in my opinion,

22   are all ground contact where she had a significant

23   high-velocity ground impact and then probably a

24   tumble and a roll, a typical road rash.

25        Q    Is that based on having the pictures of

```
 1    the injuries or just the description in the medical

 2    records or how do you make that determination?

 3         A    There are a couple of pictures of her face

 4    attached to the autopsy report as far as the -- And

 5    they show some abrasions and bruises.

 6         Q    Uh-huh.

 7         A    But, as far as the rest of the

 8    descriptions of the abrasions and contusion, it is

 9    part of the medical records and the autopsy report.

10    And there was nothing noted in any of the medical

11    records or autopsy report that there was any belt

12    or-type bruise, which are pretty characteristic and

13    would be recognized and noted in medical records.

14         Q    What would be the notation or what would

15    you look for in the medical records to see that?

16         A    First of all, an anatomical location

17    consistent with where a belt would be.  In this case

18    the lap buckle went across the pelvis, or lower

19    abdomen.  It might ride up into the abdomen in this

20    case.  And you would see a belt bruise across, and a

21    description typically in the medical records, a

22    bruise consistent with a belt.

23         Q    Does the fact that Sarah was only

24    70 pounds impact at all where you might -- the

25    location of where you might see those kind of
```

1   injuries?

2            I mean, let me add some things to that as

3   well.  This is a rollover.  Forces are different

4   than in a frontal collision like you mentioned

5   before, or side impact.

6        A    (Nodding yes).

7        Q    Isn't it possible that she could

8   under-ride the seat belt or maybe submarine maybe is

9   a better term --

10       A    (Nodding yes).

11       Q    -- so the belted would ride up higher on

12   her than it might otherwise?

13       A    Yes.  And there were no bruises or seat

14   belt markings noted in any of the lower or upper

15   abdomen or anywhere on her torso where we might look

16   for it.

17       Q    I want to get back to my other questions

18   just to make sure I understand.  The abrasions on

19   the upper torso area, it is your opinion they are

20   from contact with the road; correct?

21       A    Ground road, yes.

22       Q    And you said that the descriptions were a

23   in the medical records but is there something in

24   particular about the descriptions that makes you

25   believe that, that it is from ground impact as

1    opposed to some other kind of abrasion that you

2    might get from being restrained?

3         A    I don't think so.  Other than they were

4    just general abrasions and the anatomical locations

5    are all over her body, were not in a specific area

6    or pattern or shape or any notation that they were

7    possibly belted-related.  I don't think there is

8    anything specific about a descriptions other than

9    they were just general abrasions.

10        Q    Do you have any medical training?

11        A    Medical school anatomy but I am not

12   trained to treat.  Obviously I am not a medical

13   doctor --

14        Q    Right.

15        A    -- to make diagnoses or treat.  But as

16   part of biomedical training, particular in my case,

17   both an undergrad and graduate school, I have taken

18   anatomy and physiology and in particular, grad

19   school, medical school anatomy.

20        Q    Obviously not everybody is familiar with

21   biomechanics.  How would you describe what

22   biomechanics?

23        A    Biomechanics is a science that examines

24   forces acting upon and within the human body and the

25   effects produced by those forces.

1              There is roles of biomechanical

2    applications to studying human performance, human

3    movement, optimizing performance in athletics and

4    things of that nature, minimizing injury, preventing

5    injury.

6              My specialty is, you know,

7    muscular/skeletal injury biomechanics and impact

8    mechanics, meaning most of my training and

9    application of biomechanics has been studying those

10   factors acting on the human body and within the

11   human body, in terms of the effects they produce,

12   how they produce injury.

13             So, what kind of force does it take to

14   cause injury, what are the mechanisms of injury

15   essentially.

16        Q    Uh-huh.

17        A    And then when you learn something about

18   how they are caused and what is the mechanisms of

19   the injury is with a car, then you can hopefully do

20   some application to prevent injuries and safety and

21   things of that nature.

22        Q    Okay.  Well, I want to go back to what you

23   said about becoming entangled with the lap belt.  Is

24   it your opinion that -- Well, let me strike that.

25   Let me back up.

1       You testified a minute ago that it was not

2   consistent with and inertial release to have a

3   complete early ejection because you would expect a

4   delay primarily because the person who had the belt

5   on at one time would become entangled with the belt.

6       Is it your testimony that a person who has

7   got a belt on, and has it inertially released, is

8   going to become entangled in the belt every time in

9   a rollover situation.

10      MR. FEIN:  Object to the form of the

11      question.

12      THE WITNESS:  If we assume they had a belt

13      on, and it somehow unlatched --

14  BY MR. METCALF:

15      Q    Right.

16      A    -- there are patterns of injuries and

17  there are patterns of seat belt evidence on the belt

18  system that are typical of entanglement dynamics.   .

19      So, it does happen, and it happens enough

20  to recognize it and there is some works that have

21  been published on entanglement-related injuries and

22  entanglement seat belt markings.

23      It doesn't mean that every there is going

24  to be evidence of entanglement to the belt and to

25  the person in terms of injuries, but it is something

1    that commonly happens when there is a belt around

2    someone, and if we assume it releases somehow, then

3    entanglement is a phenomenon that does occur.   When

4         When you have a belt around the seat back,

5    like in this case, then I am thinking entanglement

6    is more likely to happen.  I think it happens to a

7    different part of the body then the typical outboard

8    upper-extremity and shoulder entanglement that

9    happens when you have a lap and shoulder belt on.

10        But with a shoulder belt behind the seat

11   back, and the lap belt in front of the person as

12   alleged in this case, I think that increases the

13   propensity and likelihood of the person becoming

14   entangled in the belt.

15       Q    Okay.  But you are not saying that every

16   time there is an accidental release or a inertial

17   release that a person is necessarily going to be

18   entangled with the belt?

19       A    I don't of any statistics on the

20   percentage of entanglement.  It is just something

21   that you would expect to happen, especially in a

22   rollover where the forces are primarily lateral.

23        And as the person becomes ejected, as in

24   this case, they have to get through the belt system

25   even though -- if you assume it has become unlatched

1    at some point.

2        Q    Does it matter to your opinion that --

3    Assuming that Sarah's lap belt was latched and

4    became unlatched, it is your opinion that she would

5    have become entangled.  Does it matter to that

6    opinion how she was oriented or, in other words, how

7    she was sitting in the seat?

8            MR. FEIN:  Object to the form of the

9        question.

10           MR. METCALF:  What is wrong with the form?

11           MR. FEIN:  It was confusing, vague and

12       compound.

13           MR. METCALF:  Okay.

14           THE WITNESS:  I am sorry.  Could you

15       repeat it.

16           MR. METCALF:  Sure.  I will rephrase it.

17   BY MR. METCALF:

18       Q    You have expressed an opinion that, even

19   if you assume for the sake of argument that Sarah

20   was belted at one time and that the belt became

21   unlatched, that she would have become entangled in

22   the belt.  My question to you is, as far as that

23   opinion goes, does it matter to you how Sarah was

24   oriented in her seat?

25           MR. FEIN:  Same objection.

```
 1              THE WITNESS:  I think she would be
 2      entangled in almost in any reasonable body
 3      position, seated position, that I can think of.
 4              It may alter her interaction with the belt
 5      in terms of what portion of the body it becomes
 6      entangled and interacts and applies force,
 7      depending of if she is seated and facing
 8      forward or turned inboard or left shoulder
 9      against the seat back.  It would change her
10      interaction with the belt, but I don't think it
11      wold ultimately change that she would have
12      interaction with the belt and have entanglement
13      of some kind.  It might change the body surface
14      that the belt would load if she was turned in
15      an out-of-position posture.
16      Q    Well, let's assume, for the sake of my
17   question, that she is turned like you described
18   inboard with her left shoulder against the seat
19   back, how if at all would that change your opinion
20   about entanglement?
21      A    Well, I think that first presents problems
22   with your inertial release because based on the
23   theory proposed by Doctor Benedict it was the hip
24   that contacted the belt that caused the inertial
25   release and that posture may not fit that theory.
```

1     Q    Well, that is his opinion.  That is not

2   your opinion thought.  My question was, how would it

3   impact your entanglement?

4     A    I am trying to answer your question.  And

5   if you still assume the belt releases then her

6   entanglement would be with her more on the right

7   side, her right hip and right abdomen, and perhaps

8   even her back as she went out.  So you might see

9   belt bruises to the right side or even wrapping

10  around the back.

11    Q    Okay.  But it doesn't change your opinion,

12  as I understand it, that she would be entangled in

13  some way, shape or form?

14    A    Correct.  You basically have half of her

15  body below the lap belt and half of her body above

16  the lap belt.  And with the lap belt secured around

17  the seat, by the shoulder belt behind, that is even

18  more tightly secured to the seat, even if it is

19  unlatched.

20         So, there is, I think, some difficulty in

21  understanding how she could be entangled and her

22  dynamics would have had to include some entanglement

23  and some time and some delay and some interaction

24  with the belt and some partial ejection before just

25  a complete clear ejection in the first rollover.

1    Q    In doing what you have done in this case,

2    did you analyze at all what the dynamics of the belt

3    itself, the lap belt and the shoulder belt, what

4    they would be doing in this rollover sequence?

5    A    Under belted or latched or unlatched

6    scenario?

7    Q    Well, either one.

8    A    Either one?

9    Q    (Nodding yes).

10   A    In a latched scenario, she basically is

11   lap belted and that would restrain her and contain

12   her inside the vehicle.  And, although it is not the

13   right way to use that particular seatbelt on an

14   occupant, it would have been an effective way to

15   restrain her.  And it would have been an effective

16   way to prevent ejection and her fatal injuries.  So.

17        And so the lap belt would had a synching

18   plate as it passes through the shoulder belt, and in

19   this case the shoulder belt wrapped around the seat

20   back.  Even in that scenario, had it been belted, it

21   would have restrained her because the emergency

22   locking retractor would have been engaged and locked

23   the belt under these crash conditions.

24   Q    Let me just stop you for one second

25   because I think you misspoke.  If you didn't

1    misspeak then I misheard.  I think you said even if

2    it was latched --

3        A    Was latched and stayed latched.

4        Q    Okay.

5        A    There are two scenarios I am addressing.

6    Number one --

7        Q    Okay.  I am sorry.

8        A    Number one, the shoulder belt is behind

9    the seat back in all cases.  The lap belt is front

10   of the seat back in all cases.

11            The first case we are addressing is that

12   it is latched and it stays latched.  Effectively

13   what you have a lap belt restraint and effective

14   containment and prevention over these injuries.

15       Q    Uh-huh.

16       A    In the second scenario, again the shoulder

17   behind the seat back, lap belt in front.  If

18   initially latched and then releases, then there is

19   somewhat of a retention of that lap belt around the

20   seat because the shoulder belt is behind.

21            And, again that occupant is, you know, 50

22   percent south of the lap belt and 50 percent north

23   of the lap belt, and has to somehow work their way

24   out to be ejected, which I don't understand or

25   believe is a reasonable outcome.

1      Q      Well --

2      A      I think that is even more so because a

3  shoulder belt is behind the seat back, the seat

4  back -- excuse me -- and the belt is still going to

5  lock in the retractor.  And I believe it may even

6  contain the person or result in working their way

7  out but maybe not entirely their way out.

8           And I think that is supported by the

9  pictures we see at the scene and the pictures we see

10  the next day where the belt is essentially somewhat

11  snugly wrapped around the seat back.

12           There is no spooling out at all or

13  excessive looseness of the belt and there is no

14  indication of the belt system itself, which gets

15  into another basis of support which we haven't

16  gotten to, is lack of evidence on the belt webbing

17  that she dragged the belt out with her or pulled the

18  belted and in the entanglement interaction the belt

19  wasn't supposed to the ground or other evidence,

20  witness markings, suggestive of entanglement and her

21  working her way out.

22      Q      Let's talk about the belt webbing and what

23  evidence you would expect to see if Sarah had in

24  fact been wearing that belt in this rollover

25  conclusion.  What evidence would you expect to see?

1    I mean, this is a rollover and, like you said, you

2    are not going to have a high delta V impacts.   What

3    evidence, if any, would you expect to see on it?

4        A     I see a collision-induced marking and is

5    what mismarked on latch-plate hardwares and D-rings

6    and belts all of the time in rollovers.

7              Unfortunately, in examining this vehicle,

8    it has like a metal D-ring and a metal syncing latch

9    plate and bar, so there aren't any plastic

10   components that would lead to the typical

11   collision-induced markings or witness markings.

12             So, in that sense, you almost wouldn't

13   expect to see markings under use in a rollover or

14   almost any accident.

15             I did not notice any stretching or cupping

16   or stiffness of the belt webbing, but it was a

17   rather old belt and I think it would be difficult to

18   discern between age, normal wear and tear and

19   markings in a rollover in this case.

20             So, in this case I don't think there is

21   anything that would be distinct in a rollover under

22   restraining conditions.

23             Under a normal -- I guess there is no such

24   thing as a normal inadvertent release, but when the

25   belt, the shoulder belt is front of the seat back

1    and there is a release, often much of the webbing

2    ends up outside the vehicle and leave distinct

3    witness markings on the belt usually in two places

4    because two portions of the belt get caught between

5    the vehicle and the ground.

6           In this case with the shoulder belt behind

7    the back of the seat, I almost wouldn't expect the

8    belt to get outside the vehicle.  So I am not sure

9    that there is anything that I could say that would

10   be definitive that you would expect to see on the

11   belt, and in this case belted, latched or belted and

12   inadvertent release of the latch.

13   Q    All right.  So it is fair to say that

14   absence of any markings is no more indicative of her

15   not wearing the belt as wearing the belt?

16   A    It is inconclusive, I think.

17   Q    Okay.  I planned to do this in a little

18   bit more orderly fashion, and I apologize.  I just

19   want to go back to the start of the beginning of

20   your report, okay --

21   A    (Indicating).

22   Q    -- to speed things along.  I just want to

23   take you through it.  Somebody did a reconstruction

24   in this case, somebody from your office, I am

25   assuming?

1      A    Yes.

2      Q    Okay.  You didn't do the reconstruction;

3    did you?

4      A    Correct.

5      Q    Who did the reconstruction?

6      A    Mr. Teddy Vaughan, V-a-u-g-h-a-n.

7      Q    And what is Teddy Vaughan?  What does he

8    do?

9      A    He is a forensic engineer with our firm,

10   who specializes in vehicle dynamics and accident

11   reconstruction.

12     Q    Okay.  Is it fair to say that if I want to

13   ask questions about the reconstruction that I should

14   ask him?

15     A    As far as the detail of it, much of have

16   his analysis, probably.  I mean, I can do my best.

17     Q    You can testify about what the conclusions

18   are --

19     A    Right.

20     Q    -- but you don't know how he arrived at

21   the conclusions and that sort of thing?

22     A    Other than working with him, you know, for

23   seven years, and obviously working with him on this

24   case, knowing certain physical evidence he used and

25   the methods he used.  But I would agree that your

1   best bet would be asking him for any detail.

2       Q    Uh-huh.

3       A    But the general rollover dynamics I don't

4   think are really contended and that was just a

5   normal process of doing the occupant dynamics, so we

6   put it in there.

7       Q    Okay.  Do you know how -- He didn't go to

8   the scene; did he?

9       A    No.

10      Q    So, he did the reconstruction relying on

11  the FHP Traffic Homicide Report and the photographs

12  that they took and looking at the vehicle?

13      A    And also in addition to things that you

14  just mentioned, I believe he had a scaled aerial

15  photographs, so --

16      Q    Right.

17      A    -- he was able to do a plot of the vehicle

18  dynamics on the roadway and match up with the FHP

19  measurements.

20      Q    Okay.  Do you know -- Now, FHP estimated a

21  speed at the beginning of this accident sequence to

22  be 60 miles per hour.  That is what it says in the

23  Traffic Homicide Report.  But mr. Vaughan has come

24  up with a speed of 68 miles an hour, it says, plus

25  or minus, 12 miles an hour.  Do you know the basis

1   for that difference, why he is coming up with a

2   different number?

3        A    Well, I don't know what the FHP did to

4   estimate that.  His typical method is doing a

5   reconstruction from the point of rest in reverse to

6   some degree, but also in both directions along all

7   the evidence, from tire marks to gouge marks to, you

8   know, roof contacts to point of rest.  So there is

9   certain speed loss that can be calculated and

10   estimated, which is why I thought the estimates were

11   fair, plus or minus, to each one of his numbers.

12        Q    All right.

13        A    But you can estimate the loss of speed,

14   during, you know, the two and a half rolls or

15   whatever it was in any particular case.  And then

16   the scuffing and the side scuffing, you know, and

17   yawing effect.  So, you can work your way backwards

18   and that is typically what he does.

19        Q    Okay.  Well, I am really curious though is

20   how he came up with 68 miles an hour and made his

21   range, which goes from 56 miles an hour to 80 miles

22   an hour.  That is a pretty big range.  Is it fair to

23   say that if I wanted to get to the bottom of that I

24   need to talk to him?

25        A    Yes.

1      Q     Okay.

2      A     There are ranges in each stage.

3      Q     Uh-huh.

4      A     There is kind of a segmental analysis to

5  rollovers.  During each segment they will be

6  arranged and that is why when you get back to the

7  beginning they can appear to be a wide range.  But I

8  don't believe that the 69 is significant or ended up

9  being significant to my final mechanical analysis.

10  So I think we put it in there just to show you what

11  the results were.

12     Q     You know, I skipped something.  Right in

13  here, in your introduction, it says that the chief

14  experience was to the right front tire, disablement,

15  lost control and veered to its right.  Do you have

16  any opinions about that or you haven't been asked to

17  offer opinions about why the Jeep lost control, did

18  you?

19     A     Correct.

20     Q     Do you have an opinion why the Jeep lost

21  control?

22     A     No.  That is not my area of specialty.

23     Q     Is there anything significant to your

24  opinions about the distance that the Jeep travel or

25  how many rolls it made, anything else in the

1    reconstruction?

2         A    The primary thing that I look at from the

3    reconstruction is not necessary so much the speed of

4    travel or tire mark or a trip, but the quarter-turn

5    roll dynamics.

6         Q    Uh-huh.

7         A    That is what I think this, whatever figure

8    it was --

9         Q    Right.

10        A    -- laid out.  And I am looking at whether

11   it is a driver's side or passenger side, leading

12   trip, whether it was more of a barrel-type roll or

13   is there some unique end-to-end dynamics where there

14   is some significant roof impacts occurred?  Just

15   generally a quarter-turn roll dynamics and, so taste

16   it is that figure that I don't know what to figure

17   what that is, but that I primarily relied on not so

18   much the speeds.

19        Q    The two-and-a-quarter rolls, is that the

20   figure you mean?

21        A    Yes.

22        Q    Okay.  And do you know how much

23   Mr. Vaughan came up with after the two-and-a-quarter

24   rolls?

25        A    Again, applying the physical evidence in a

```
 1    segmental base you have --

 2         Q    I mean, as far as the --

 3         A    -- trip point.

 4         Q    -- calculations, you don't know do those,

 5    he does those?

 6         A    Right.

 7         Q    Okay.

 8         A    But I didn't think that was --

 9         Q    Okay.  Well, what kind of roll was this?

10    You talked about barrel rolls versus some kind of

11    end-over-end rolls or -- How would you describe this

12    rollover?

13         A    It was a driver's side leading,

14    essentially somewhat classical barrel roll,

15    side-over-side.

16         Q    Do you (indicating).  Do you -- Excuse

17    me -- do you have any information from Mr. Vaughan

18    or anywhere else that, I guess, "amplitude" would be

19    the right word, the height of the --

20         A    How high --

21         Q    -- how high it is getting, whether this is

22    an airborne flipping-type of situation or does the

23    vehicle maintain contact with the ground at all

24    times?

25         A    Well, rollover inherently has ground
```

1   contract and the airborne phases.  This was not one

2   where it just slid and had entire ground contact.

3   Obviously it rolled two and a quarter times for nine

4   quarter turns.  So, it had a combination of ground

5   contacts and airborne phases typical of a rollover..

6         The amplitude of vertical displacement of

7   the vehicle can go from, you know, two, three feet

8   change to six or seven feet of vertical

9   displacement.  I didn't ask him for this.

10     Q   Okay.

11     A   Again, in this case, given the damage or

12   the lack of damage to the roof in this case, I don't

13   believe there to be any significant or unusual

14   vertical displacements and high velocity vertical

15   ground contacts or ground impacts.

16     Q   It is not important to your analysis?

17     A   It might be important if the roof crushed

18   all the way down to the windowsill to look at those

19   things, but as you probably know and as the

20   photographs demonstrate, there was no significant

21   roof crush to really any area or to any of the

22   occupants in this case.

23     Q   Now, you mentioned the statement from this

24   witness, Shakyna Hathorn, who was mentioned a couple

25   of times in your report.  How if at all was her

 1    statement significant to your analysis?

 2         A    I am sorry.  What page are you looking on?

 3         Q    I am sorry.  I am on page three of your

 4    report.  It is the first paragraph under the heading

 5    "occupant of vehicle configuration."  Let's go to

 6    the second to the last sentence.

 7         A    I don't think it is physical evidence

 8    necessarily, but it is, as we discussed before,

 9    evidence that somebody has offered, at least in a

10    statement, that there perception or their

11    recollection was seeing the little girl come out

12    early during the first flip.

13              I think it is the point of rest kind of

14    tells you that she was out during the first roll.  I

15    think the statements or the statement or statements,

16    plural, attributed to this witness are consistent

17    with that.

18         Q    Is that consistency something that you

19    relied on in forming your opinions?

20         A    Sure.  I mean, when there is this witness

21    statement that is consistent with the analysis and

22    physical evidence I think, you know, it is a

23    corroborating statement.  So, I think it is

24    reinforcing.

25         Q    All right.

1     A     I don't think it is something that I

2  relied on as a primary piece of evidence.  I just

3  mention it that it is supportive and kind of

4  buttresses what the physical suggests or our

5  analysis of the physical evidence.

6     Q     On that same page, the next paragraph,

7  last sentence there, you note that the officer

8  concluded that Sarah was not belted.  Was that

9  significant to your analysis?

10    A     Again, it is not something that I

11 primarily relied upon because I worked from the

12 physical evidence and do an independent analysis.

13 But it is mentioned again like a witness statement,

14 and in this case, the officer came to a similar

15 conclusion.

16    Q     Okay.  Now, you have read Sergeant

17 Napoli's testimony.

18    A     Yes, I have.  That is one of the depos

19 that came after my report.

20    Q     Okay.  So, having read that deposition you

21 know it was his conclusion that she was not belted

22 at the end of the sequence; right?  In other words,

23 he did not an opinion whether she was belted or not

24 at the start of the accident sequence?

25          MR. FEIN:  Object to the form of the

1       question.

2               THE WITNESS:   I am not sure he had an and

3       independent opinion, at least I am not sure

4       that he did an analysis to reach any kind of

5       conclusion.

6               His impression was that she was not belted

7       because the belt was not latched at the end and

8       she was ejected, and his depo speaks for

9       itself.

10              But, again, it is something that I read

11      since my report.  It doesn't change my

12      opinions.  It doesn't change the independent

13      analysis that I did.

14   BY MR. METCALF:

15      Q    Uh-huh.  You got some photographs and some

16   statements in here.  The photographs document we

17   talked about a little bit already, the wear pattern

18   from the belt being wrapped around the back of the

19   seat.  Then the top of page four, second to last or

20   third to last sentence, you say, "The contact wear

21   pattern also appears to indicate the seat belt was

22   not buckled when wrapped around the seat back."

23      A    Uh-huh.

24      Q    Now, you can use the photographs if you

25   need to, but explain to me how the wear pattern

1   indicated the belt was not buckled when wrapped

2   around the seat back.

3       A    Based upon the wear pattern, which.

4   Appears. to be indicative of habitually wrapping the

5   shoulder belt behind the seat back and the lap belt

6   in front.

7           We see this wear pattern and marking on

8   the inboard portion of the passenger seat back.  For

9   example, I am looking at figure 49, and it just

10  appears to me that if you had that the latch buckled

11  that the position of the shoulder belt would be

12  altered and not at that exact wear pattern position.

13      Q    How can you tell that from that

14  photograph?

15      A    I think it was a combination of me

16  inspecting the vehicle and looking at it and I don't

17  believe I took a picture.

18      Q    Well, let me just clarify what I am

19  getting at here; okay?

20      A    Okay.

21      Q    I mean, I can look at the photograph.

22      A    Uh-huh.

23      Q    I think anybody can look at the photograph

24  and see the mark that is indicative of the belt, the

25  shoulder part of the belt, being wrapped around the

1    seat, at least frequently.

2         A    Uh-huh.

3         Q    But I don't understand, and I am asking

4    you to explain, how you come to the conclusion that

5    when it is in that orientation it is unbuckled?

6         A    Because where the lap and shoulder belt

7    come together at the latch is the point where you

8    would see the origination of that marking up of the

9    inboard edge of the seat back.

10            And I don't think you can put the latch in

11   the buckle at that point that is blow the seat bite

12   that would result in that geometry of pattern up the

13   inboard.

14            You can see there that the latch buckled,

15   in that photograph anyway, is inside the seat

16   inboard edge.

17        Q    Yes, but that is with the shoulder harness

18   in front of us.

19        A    Yes.  And if you took the shoulder belt

20   and put it behind the seat back from that position,

21   the shoulder belt would be up higher on the inboard

22   edge of that seat back.

23        Q    Well, what if you put the shoulder harness

24   behind the seat first and then latched it?

25        A    What I am saying is, I don't think the

1   buckle, as you can see, the length of his sleeve and

2   buckle coming up from the anchor, can meet the latch

3   plate at the seat by down low or that would have to

4   originate the shoulder belt contact along the

5   inboard edge.  Geometrically I don't think it works.

6        And, unfortunately, you know, we don't

7   have three dimensional seat here to demonstrate that

8   or a good photograph to demonstrate that, but that

9   was my impression from inspecting the vehicle and

10  latching and unlatching.  And I think it is somewhat

11  evident if you have a 3D perspective, even looking

12  at this photograph.

13       Q    Okay.  Well, let's assume that you are

14  right that the belt was habitually wrapped that way

15  without being latched.

16       A    Right.

17       Q    What if anything is that indicative of?

18       A    It doesn't mean it was latched or

19  unlatched in that manner at the time of the

20  accident.  It is just an indication of there appears

21  to be some habit of wrapping it around the seat back

22  and, in my opinion, in an unlatched position.  It

23  would just go to a, I guess, related evidence of

24  habitual use of the belt in that position or lack of

25  use of the belt in that position rather.

1      Q    Well, we are talking about the passenger

2  seat.

3      A    (Nodding yes).

4      Q    So there is not always someone in the

5  passenger seat; right?

6      A    Right.

7      Q    So, wouldn't you agree that it is very

8  likely that you could wrap the belt like that all

9  the time when there is not a passenger there?

10     A    Right.

11     Q    It is not indicative of what happens when

12  there is a passenger there?

13     A    Yes.  I don't have a good explanation as

14  to why somebody would do that but, that is true --

15     Q    Okay.

16     A    -- it appears that, that evidence suggests

17  that was indeed the case.

18     Q    (Nodding yes).  Did you look at this belt

19  yourself?

20     A    Yes.  I took these photographs.

21     Q    You took the photographs.  Okay.  Did you

22  look to see if there is any kind of wear evidence on

23  the lap belt from somebody sitting on it?

24     A    I don't think I can distinguish wear

25  evidence from someone sitting on it, but I did look

1    at the belt.  So, the answer is, yes, I inspected

2    the belt and I think we covered it a little bit

3    earlier the age of the belt, the condition of the

4    belt.  It was not conclusive.  I don't think you can

5    distinguish between someone --

6         Q    You didn't see --

7         A    -- sitting on it, you know.

8         Q    I didn't mean to talk over you.  I

9    apologize.

10        A    That is okay.

11        Q    Let's get into your injury file,

12   biomechanics discussion, which starts on page four.

13   There is a separate heading for that.  I am going to

14   skip down about halfway into the long paragraph that

15   is there on page four.

16             You say, "There is no evidence of

17   secondary head impact inside the vehicle."  Is the

18   fact that there is no secondary -- or evidence of

19   secondary head impact, assuming that to be true,

20   wouldn't that be just as consistent with being

21   unbelted as coming unbelted during this accident

22   sequence?

23             MR. FEIN:  Object to the form of the

24        question.

25             THE WITNESS:  I think I can answer it

1       though.  I don't think it is just as

2       consistent.  I think it is more consistent with

3       being unbelted and having a early and complete

4       ejection when --

5            Again, it gets back to the opinion that if

6       somebody has a belt around them, and it

7       releases, there is some entanglement and delay

8       and they are inside the vehicle longer.

9            So, I don't think it is just as

10      consistent, but yet it is possible whether you

11      are completely unbelted or partially belted or

12      belted and it becomes released, that all of

13      your injuries could have happened outside the

14      car.  It doesn't mean it is conclusion by

15      itself, but I don't think it is just as

16      consistent.

17  BY MR. METCALF:

18      Q    Okay.  But it is only more consistent with

19  being unbelted to the extent that if you became

20  unbelted you would expect some entanglement?

21      A    Some entanglement and a longer period of

22  time which the occupant spends inside the vehicle

23  and, therefore, the increase propensity to have

24  secondary contacts inside the vehicle and her head

25  injuries, I think I described, were consistent with

1    a broad base, you know, flatter impact as opposed to

2    something focal like the roof rail or a pillar, for

3    example, and I didn't see any evidence of the

4    secondary contact, meaning hair or blood, head

5    pocketing, abrasions, a smear to the inside.

6        Q    Uh-huh.  Now, you note that there was some

7    blood evidence inside the right and left-rear doors,

8    but essentially you discount that as any evidence of

9    that?

10       A    I don't believe Sarah was in the rear at

11   any point in time.  So, any blood in the rear would

12   be from the rear occupants.

13       Q    Why is it that you think that Sarah was

14   never in the rear of the vehicle?

15       A    The indication is that she was initially

16   in the front seat.  And the dynamics of that would

17   have ejected her out her immediately adjacent to the

18   passenger window.  There were no significant

19   rear-end dynamics, for example, that would have

20   thrown her to the rear seat first.

21       Q    Is your opinion that she was never in the

22   rear dependent on your other opinion that she was

23   ejected on the initial quarters turn or half-turn

24   roll?

25       A    It is not entirely dependent on that.  I

1    don't think there are any rear-end dynamics,

2    specifically left-rear, that would throw her inboard

3    and then between the two front seats towards the

4    back.

5           So, there were no dynamics that I know

6    were consistent necessarily to that and I think

7    would necessarily dovetail with the fact that we see

8    her ejected very early and, therefore, to a strong

9    degree of probability, the most likely port of

10   ejection is right outside the window, which we

11   understand was open at the time.

12       Q    Once this thing gets started rolling, you

13   know, when you are sort of beyond the first

14   quarter-turn, or whatever, throw, isn't it pretty

15   much impossible to figure out which way the objects

16   in the vehicle are going to go?

17       A    No, not necessarily.

18       Q    Okay.

19       A    In rollovers you have, the primarily a

20   centrifugal acceleration or centrifugal forces that

21   result in the occupants going outward around the,

22   you know, away from of the axis and rotation, which

23   can change and certainly is not a static thing.  It

24   is not like it is just a spit down the middle of the

25   vehicle.  But, in general, your occupants are going

1    to go upward and outward relative to their seated

2    positions.

3         And so you consider the passenger side

4    leading to the underside and the leading dynamics.

5    You consider impacts that occur before, like in this

6    case, the sideswipe, which would throw to her right

7    and somewhat forward into her passenger door --

8         Q    Uh-huh.

9         A    -- to her outboard.

10        Q    (Nodding yes).

11        A    And you can consider all of that but, once

12   it starts rolling, you generally looking at

13   rotational dynamics and occupants going upward and

14   outward.

15        At each ground contact there is movement

16   in general towards the ground impact.  So, you can

17   move out and in and out and in and up and down, but

18   in this case, and in most cases, if it is primarily

19   a barrel-type classic role, the primary motions are

20   up and out and out the ports of the ejection.

21        After the window breaks and the port is

22   created, where in this case indications were the

23   window was down, so there was already an available

24   port early.

25        Q    (Nodding yes).  But now all you really

1    have to go on to get those dynamics once that roll

2    starts is a couple of marks on the ground, right

3    and, and some scrapes on the vehicle?

4        A    Sure.  There is contact points and scrapes

5    to the vehicle, indicated ground contact, and there

6    is evidence in the photographs that we see and

7    marked by the police of clearly the initial big roof

8    impact, right at what I call it the gore area.  It

9    is that grassy median between the highway and the

10   entrance ramp and the edge of the entrance ramp

11   where there is contact with the dirt and the

12   pavement.  And then some other marks.

13           So, it is like any reconstruction or

14   analysis of a roll.  There is ground contact

15   evidence in the vehicle to ground contact evidence

16   that you match.

17       Q    Are you an engineer?

18       A    No.

19       Q    Okay.  Let's jump back to the biomechanics

20   just for a second.

21       A    (Nodding yes).

22       Q    And obviously -- Well, I shouldn't say

23   obviously.  Strike that.  There are different

24   disciplines involved in biomechanics, right?  There

25   is -- Well, let me just ask that.  Are there

1    different disciplines involved in biomechanics?

2        A    Sure.  It is a science that draws upon the

3    fundamentals of both engineering and mathematical,

4    physical science --

5        Q    (Nodding yes).

6        A    -- as well as the biological end of

7    anatomy and biology, physiology.  But it is a

8    special science unto itself that integrates those

9    two and -- By itself, just because you have and -- I

10   took a lot of engineering classes, was an

11   engineering major, but we have -- Just because you

12   have a lot of engineering and math and physics, and

13   just because you take an anatomy class or a biology

14   class, doesn't make you a biomechanical expert.  It

15   is the integration of those two sciences in a

16   specialized academic program that integrates those

17   fundamental bases of biological and physical

18   sciences that makes a good biomechanics program.

19           So, there are special courses after you

20   take the fundamentals of engineering and the

21   fundamentals of the medical end, that are

22   specialized biomechanics, like cellular biomechanics

23   tissue biomechanics, muscular/skeletal injury

24   biomechanics, muscle dynamics.  These are all actual

25   course names that I've had.

1       Q       Uh-huh.

2       A       So, it does have disciplines that you draw

3   upon, but it is a specialized discipline that

4   integrates them.

5       Q       Okay.  All right.  So you are not an

6   engineer and you are not a medical doctor --

7       A       (Nodding yes).

8       Q       -- or a doctor -- I guess a medical doctor

9   is the right term.

10      A       Yes.

11      Q       You are something --

12      A       A bio-mechanist.

13      Q       Okay.  Which is an entity unto itself?

14      A       Correct.

15      Q       Okay.  All right.  Just an aside, my

16   experience has always been with either an engineer

17   or an M.D. --

18      A       Right.

19      Q       -- who has gone and gotten trained in that

20   other discipline --

21      A       Yes.

22      Q       -- and that is how they become a

23   bio-mechanist.

24      A       Well, there are actually over 50 graduate

25   programs in the U.S. alone with graduate degrees in

1    biomechanics.

2           Some of the people in our office, their

3    biomechanical degrees are actually in the

4    engineering school:  Biomechanical engineering,

5    biomedical engineering.

6           Other programs are not in the engineering

7    schools and, although I took the engineering

8    classes, the programs I studied at U. Con. and UCLA

9    were not housed in the engineering program.

10          But there are actually some biomechanical

11   experts that have quote/unquote engineering degrees

12   because the biomechanical program was in the

13   engineering school.

14      Q    Uh-huh.

15      A    That is not always the case.

16      Q    All right.  So we got off on that tangent

17   there.  Now you also note, because I am in the same

18   part of your reports now, the injury biomechanics

19   discussion, that there was a contact to the inside

20   of the passenger door consistent with undertrained

21   body contact from outward projection of the

22   passenger during rollouts.  And there is a

23   photograph that you reference, or a couple of them,

24   page 45 through 47.

25      A    (Reviewing).

1    Q    Isn't that contact that is consistent with

2    unrestrained body contact, wouldn't that also be

3    consistent with restrained by a lap belt only body

4    contact or previously restrained but now

5    unrestrained body contact?

6    A    It could be.

7    Q    Is there any reason why it is more

8    consistent with the theory that Sarah was

9    unrestrained than either of those other two

10   possibilities?

11   A    It is just typical of what I see in

12   unrestrained occupant dynamics leading out the port

13   of ejection and leaving a dent in the window.

14        So, without any particular matching

15   injury, if you -- But, otherwise, no, I don't think

16   it is by itself conclusive that it was completely

17   unrestrained, partially restrained or restrained and

18   then released.

19   Q    In other words, she is going to go

20   into that --

21   A    She was ejected.

22   Q    She is going to hit that part of the

23   vehicle regardless of which of those scenarios is

24   the truth?

25   A    Yes.

1      Q     I assume you are not an expert in seat

2    belt design or mechanics?

3      A     True.

4      Q     Okay.  And you are not going to offer any

5    opinions in this case about the functioning of the

6    buckle mechanism?

7      A     Correct.

8      Q     Okay.  You haven't tested the buckle that

9    is at issue in this case?

10     A     (Shakes head in the negative).

11     Q     Or taken it apart to see how if works?

12     A     I buckled it to see that it does latch and

13   work.

14     Q     Okay.

15     A     And the emergency locking retractors still

16   lock on the tap test, but I didn't do any --

17     Q     It is a bad question.  It is a bad

18   question.  Do you know how the inside of the buckle

19   that is at issue in this case works?

20     A     Generally, yes.

21     Q     Okay.

22     A     But I am not going to testify or do I hold

23   myself out to be a design expert.

24     Q     Do you know how much force it would take

25   to, or what forces it would take, to unlatch the

1    buckle that is at issue in this case?

2        A    You mean, to push the button to purposely

3    unlatch it or inadvertently --

4        Q    Purposely, inadvertently inertially.

5        A    It doesn't take much force to press the

6    button in the manner in which it was intended to be

7    used.

8        Q    Uh-huh.

9        A    It could be five pounds of force or it

10   could be ten pounds of force, but it depends on the

11   spring strength and stiffness.

12            And, as far as the alleged inertial

13   release of force, I will leave that to the seat belt

14   experts.

15            I am familiar with the performance of

16   belts and the allegations of how it allegedly

17   releases, but I am not going to testify as to the

18   function of the mechanism.

19            (Whereupon, Daniel Lever entered the

20        deposition room).

21            THE WITNESS:  Do you mind if I take a

22        quick rest room break?

23            MR. METCALF:  Not at all.

24            THE WITNESS:  Great.

25            (Whereupon, a brief recess was taken.)

1    BY MR. METCALF:

2        Q    Mr. Wheeler, let's see, I should be better

3    prepared now that we are back on the record.   But I

4    assume you are not going to have any -- excuse me --

5    any opinions about whether Sarah could have worn the

6    belt properly with the shoulder harness without it

7    interfering with it riding up on her neck, upper

8    chest?

9        A    Well, I think the optimal retained

10   position and posture would probably be a lap

11   shoulder belt, booster seat, for someone her age and

12   size.   So, it is possible that the shoulder belt

13   without a booster seat elevating her might ride up

14   to her chest or the back of her neck.   I don't think

15   that, that would have been a bad thing to her.

16       Q    Have you done any kind of analysis or

17   testing or anything to determine whether or how the

18   shoulder harness would be oriented on somebody of

19   Sarah's size?

20       A    No, just other than with the experience

21   with having done the child safety seat and booster

22   seat, particular booster seats I studied before,

23   wherein I did an analysis of -- I think it was about

24   four dozen children at various booster seat ages to

25   look at booster seat and shoulder belt fit.

1        And clearly in the age ranges of older

2    than four years old, 40 pounds, where you get out of

3    the child safety seat, and up to, you know, five,

4    six, seven, even, even eight years old, a booster

5    seat is a good thing.  It helps the belt fit.  In

6    fact, I did a study on that.

7        So that is the general understanding that

8    a better fit for the shoulder belt for someone her

9    age and size, and she had a normal size for her age,

10   would be better off in the booster seat.

11       Q    That is a general opinion now but, what I

12   am asking is, whether you did any analysis with

13   respect to the seat belt that was in the vehicle

14   that is at issue in this case that would relate to

15   Sarah?

16       A    No.

17       Q    How it would fit with or without a booster

18   seat?

19       A    No, I did not.

20       Q    There is a -- The last part of your

21   report, the seat belt effectiveness and it looks

22   like basically you compiled a lot of statistics

23   about injuries with and without seat belts,

24   injections, with them and without seat belts.  I

25   assume you are not going to give a statistic-based

1    opinion that -- or you are not going to opine based

2    on these statistics that Sarah was unbelted at the

3    start of this accident sequence?  Do you understand

4    my question?

5         A    I don't think so.  Except for one of the

6    first things I mentioned, that it is a very small

7    percentage of people who are completely ejected and

8    belted, that is included in some of this.

9         Q    Uh-huh.

10        A    So I think in that sense, sure, I can use

11   the field data and statistical data to say that not

12   only with adults but with children that there is an

13   extremely small percentage of properly restrained

14   occupants are ejected.

15             But I think the field data and statistics

16   are more applicable to look at the probability of

17   fatality or probability of injuries, severity and

18   the alternative scenario had she been properly

19   restrained and contained in the vehicle.

20             I think you said that those were opinion

21   were not really contested.

22        Q    Well, I mean you've read Doctor Benedicts'

23   deposition.  I mean, I am not going to say --

24        A    Uh-huh.

25        Q    -- what is contested and what is not

1    contested but -- I guess what I am getting at is,

2    how if at all are you going to try to use any of

3    these statistics to prove any fact that is an issue

4    in this case?

5        A    I think one of the ways that these data

6    are applicable in this case is to -- during the

7    discussion of, you know, what is the likely outcome

8    of somebody who is restrained and contained with a

9    rollover.

10            I mean, setting aside the whether she is

11   unbelted completely, ejected and killed, or belted

12   and then there is an inadvertent release and ejected

13   and killed.

14            One of the other layers of opinions, or

15   one of the other issues, is what would have been the

16   likely outcome had she been properly restrained in

17   the vehicle and contained in the vehicle.  I think

18   the field data goes towards that by saying to a

19   strong degree of probability occupants, and in

20   particular some of the data I referenced with regard

21   to children, have a survivable outcome and, more so

22   than that, survivable with relative minor injuries.

23   And it gets into the data and statistics that I

24   think speak for themselves.

25        Q    Okay.  Do you have -- I don't have a copy

```
 1   of it with me, but you have got a testimony list
 2   that you gave us before.  Do you have a copy of that
 3   with you?
 4          And also, I guess while you are in there,
 5   copy of your CV, if you have that.
 6      A   Yes.  I brought all -- I brought most of
 7   the stuff that was asked for in the Notice --
 8      Q   Okay.
 9      A   -- and that includes a CV.
10      Q   Terrific.
11      A   A couple of copies actually.
12          MR. METCALF:  We will go ahead and make it
13      Exhibit 2.
14          THE WITNESS:  If anybody else wants one.
15          MR. METCALF:  The court reporter can
16      eliminate the drama.
17          THE WITNESS:  Further stull.  You were
18      asking me about trial depo list?
19          MR. METCALF:  Yes.
20          (Whereupon, Plaintiff's Exhibit No. 2 was
21      marked for Identification).
22          THE WITNESS:  Here is a set.
23   BY MR. METCALF:
24      Q   Okay.  I will give you a copy of that
25   back.  I will work from this one.
```

1          Do you have another copy of the trial and

2     depo --

3          A    Yes.

4          Q    -- that the court reporter can have?

5          A    Yes.

6               MR. METCALF:  We will mark that as Exhibit

7          3.

8               (Whereupon, Plaintiff's Exhibit No. 3 was

9          marked.)

10    BY MR. METCALF:

11         Q    What is your rate in this case?  What are

12    you charging in this case?

13         A    My hourly rate is $350.00 an hour.

14         Q    Okay.  And I think when I was going

15    through your file before the depo I saw some

16    invoices in there.  Is that --

17         A    That is one of the things your requested

18    in the Notice.

19         Q    Right.  It is something that I can look at

20    later, but are the invoices that are in there up to

21    date?

22         A    Yes.  We bill monthly.  So the last bill

23    on this case would have gone out -- I don't think --

24    I don't know if it stays the March 1 went out.

25    Actually, the last bill is January 30th, 2009.

1      Q     Okay.  I will just take a look at it.

2      A     (Handing).

3      Q     Let me just ask you:  Do you know

4   approximately what the cumulative total that you

5   billed in this case is to this point?

6      A     I don't know.

7      Q     Okay.  We can recreate it from these

8   invoices?

9      A     Yes.

10      Q     Okay.

11      A     But it is all in there.

12            MR. FEIN:  I will go ahead and mark it

13      Exhibit 4.

14            (Whereupon, Plaintiff's Exhibit No. 4 was

15      marked for Identification).

16            THE WITNESS:  You want another set?

17   BY MR. METCALF:

18      Q     Yes, please.  Well, I don't really need

19   one.  I just need this set for the court reporter.

20      A     (Handing).

21      Q     Have you done any work for this law firm

22   before?  Well, have you done any work for Mr. Fein's

23   law firm before?

24      A     I am working with cases with their firm,

25   yes.  This is the first time that -- I think the

1      first report that I have written and the first

2      testimony that I given in deposition.

3          Q    Okay.  In the other matters that you

4      worked with them has been that you have been a

5      consultant who ultimately did testify or they are

6      just ongoing and you didn't have to testify yet or

7      what was is the --

8          A    I think the latter.  I am consulting and

9      barely taken on case that haven't either required a

10     report, because it is not a federal case, or it just

11     doesn't hasn't gotten to the testimony level yet.

12         Q    Okay.  So you may or may not testify in

13     this case?

14         A    Right.

15         Q    How many other matters are there that you

16     worked with Mr. Fein's firm?

17         A    Total that I have ever worked on or are

18     working on?

19         Q    Yes.

20         A    Somewhere probably between eight and ten;

21     somewhere in there.

22         Q    Okay.  But this is the first one that you

23     ever had to give testimony in?

24         A    Yes.

25         Q    How many other matters are ongoing?

```
 1      A    Probably half dozen or so, six or seven or

 2  eight, seven or eight, or ten.

 3      Q    Are they all tire cases?

 4      A    No.

 5      Q    How many of them are tire cases?  I mean

 6  of the total that you worked on from Mr. Fein's

 7  firm.

 8      A    Eighty percent of them.  All but two of

 9  them, I think.

10      Q    And those would all be on the defense

11  side?

12      A    Yes.

13      Q    Are any of those cases, other cases that

14  you worked on with Mr. Fein's firm, cases for

15  Continental Tire of North America, the Defendant in

16  this case?

17      A    Yes.

18      Q    How many of those?

19      A    A couple.

20      Q    Two of them?

21      A    I don't remember all of them but probably

22  two or three of them.

23      Q    Okay.  Other than this case?

24      A    Yes.  That is my best estimate.

25      Q    Okay.  Have you done work on behalf of
```

1     Continental Tire of North America aside from working

2     for Mr. Fein's firm?

3          A     Yes.

4          Q     How many times?

5          A     I don't know.  It maybe a dozen.  It may

6     be less.

7          Q     Okay.  Would those be reflected on your

8     testimony list you got here?

9          A     I don't think I testified.

10         Q     Okay.  So, if you just consulted it would

11    be on here.

12         A     In fact, I don't think I ever testified

13    for Continental Tire before.  If you look at the

14    trial and depo list, that is for the last four

15    years --

16         Q     Correct.

17         A     I don't believe I ever testified for

18    Continental before.

19         Q     When I looked before I didn't see

20    Continental on here.

21         A     Then that would be the case.

22         Q     All right.  I did see that you testified,

23    at least in deposition, for Cooper Tire a number of

24    times.  I think it was six or seven times.

25         A     That sounds about right.

1    Q    Okay.  How many other times would you say

2    you have done work for Cooper Tire?

3    A    A couple of dozen.

4    Q    Okay.  Are those all cases where there is

5    an allegation that a tire failed and somebody was

6    injured as a result?

7    A    Presumably if there is a tire company

8    involved there is some tire issue.

9    Q    And if it is biomechanics it means

10   somebody probably got injured, right?

11   A    That is usually why there is a lawsuit,

12   right.

13   Q    Now, in general, in your business as a

14   consulting or testifying expert, how is the ratio

15   between you being hired by plaintiffs versus hired

16   by defendants?

17   A    It is more by defense, but it is actually

18   not that much more.  At timed it has been 50/50,

19   60/40, two thirds, one third.  I would say 60 to 70

20   percent of the time I am hired by the defense.

21   Q    Okay.  Have you ever been hired by a

22   plaintiff in a tire case?

23   A    (Shakes head in the negative).  Not that I

24   know of.

25   Q    Okay.  Would you work on a tire case for a

1   plaintiff?

2       A    Probably not against the clients that I

3   currently work for, which would be Cooper and

4   Continental.  I think that would be a conflict.

5       Q    Okay.  Even if you didn't have something

6   currently going for one of those clients?

7       A    I don't know.  I currently do so I don't

8   know.

9       Q    Okay.  Now, this is just your for your

10  testimony list.  You have been testifying as an

11  expert before that, right?

12      A    I think the first time was about 20 years

13  ago.

14      Q    Okay.

15      A    So, about 20 years of either trial or --

16  There are some years where I haven't testified at

17  all in trial.

18      Q    Right.

19      A    Just nothing has gone to trial that I have

20  been involved in, but there would be more than one

21  depo probably every year for at least the last 20.

22      Q    How long would you say that your primary

23  business has been acting as a consulting or

24  testifying expert?

25      A    Well, I started applying biomechanics to

1    forensic question in about 1988 and that is when I

2    was first asked to testify.

3            There was a period where I was a full-time

4    in graduate school and a teaching assistant and

5    research assistant, and a research associate in

6    orthopedics at UCLA during my grad school.  There

7    was about a three-year period where I was primarily

8    student doing research and other jobs related to my

9    experiences at UCLA.  But, other than those three

10   years, since 1988.

11       Q    Have you ever testified before in a case

12   where there was, like this one, where there was an

13   allegation that somebody was ejected because a seat

14   belt unlatched?

15       A    No.

16       Q    Have you testified in any other rollover

17   ejection cases?

18       A    Yes.

19       Q    Okay.  How many times?

20       A    Without going through my list --

21       Q    (Nodding yes).

22       A    -- I would say that probably 90 percent of

23   the Cooper cases that I have given depo in, where I

24   said there was six or seven.

25       Q    (Nodding yes).

1       A    So there may be one that -- I think one

2   was an auto rollover.  The others probably were.  So

3   half a dozen times.

4       Q    Uh-huh.

5       A    On those types of cases for Cooper Tire.

6   And probably had another half dozen rollover cases

7   with ejection and injuries and seat belt issues that

8   were not tires cases which were just rollovers.

9       Q    Have you testified on behalf of -- I

10  should say consulted or testified -- on behalf of

11  any other tire manufacturers other than Cooper or C

12  CT and A?

13      A    Unless they are on the list, I don't --

14      Q    I didn't notice any others.

15      A    I don't think there were.

16      Q    Goodyear?

17      A    Goodyear.

18      Q    I see a couple of times?

19      A    Yes.  Goodyear is a client that I worked

20  for and if there was a depo they would be on the

21  list.

22      Q    Okay.  That is the only one that I

23  recognized as a tire maker.  How about any auto

24  makers?

25      A    No, not directly.  No.

```
 1        Q      How did you get involved in doing tire
 2   cases?
 3        A      Well, biomechanical issues.  I am not a
 4   tire expert --
 5        Q      Uh-huh.
 6        A      -- but there are biomechanical issues and
 7   seat belt issues and all kinds of accidents.  I
 8   think I did a mechanical seat belt accident
 9   investigation and testimony regarding a rollover
10   that wasn't a tire company for a law office that
11   also did tire companies.
12        Q      (Nodding yes).
13        A      And so that kind of -- I think after I did
14   that one they started to hire me on additional cases
15   that they had, which happened to be tire companies.
16        Q      (Nodding yes).
17        A      But, I guess, just getting through it
18   through biomechanics, and being called as an expert
19   witness on seat belts and injury biomechanics, it
20   was applicable to all kinds of cases whether it
21   would be tire case or not.
22        Q      Right.  Give me one second.  I think I am
23   just about done.  I just want to run through these
24   notes real quick.
25        A      (No response).
```

1    Q    You mention in your report you have a

2    figure for the odometer reading.  You talked about

3    the condition of the interior and you mention that

4    there was an after-market steering wheel on the

5    vehicle.  Did any of those observations have

6    anything to do with your opinions?

7    A    Not directly.  I think there are just

8    general observations during my inspection and

9    reporting and my report of the condition of the

10   vehicle.  It being an older vehicle, 1989, almost 20

11   years old, a lot of mileage, with some alterations.

12   There were some alterations to the steering wheel,

13   the center seat in the front.  The center front seat

14   belts were cut and removed.

15   Q    The center front seat?

16   A    There is a actually normally a center seat

17   between the two seats in the front of the you have

18   the driver's seat and the passenger seat.

19   Q    There is three, a third bucket seat?

20   A    Not a bucket seat but kind of a bench seat

21   that goes across.  There has been some alterations

22   to that vehicle and the middle seat belt was cut in

23   the center seat because that center portion was

24   removed.

25        There were custom tires and wheels and

1    things of that nature, but I don't think any of that

2    directly related to my specific analysis.

3        Q    You are not going to testify that the

4    condition of the vehicle had been in some way

5    indicates whether or not Sarah was buckled or the

6    unbuckled?

7            MR. FEIN:  Just object to the form of the

8        question.

9            THE WITNESS:  Well, I think there is some

10       history.  I think it show some history and

11       evidence of manipulation of the belt and safety

12       systems, which to me is relevant.

13           If there has been a belt that was cut be

14   and removed, there has been a belt --

15   BY MR. METCALF:

16       Q    Correct.

17       A    -- there has been a belt that has been

18   habitually used --

19       Q    Hold on.  Hold on.  A belt that is cut and

20   removed is for a seat that doesn't exist; right?

21       A    The seat has been removed.

22       Q    The seat is gone; right?

23       A    Yes.

24       Q    How much would you say that you billed

25   Continental over the last five years for your

1    testimony, not just in this case, but in all cases

2    that you worked for them?

3         A    Zero, because I never testified for

4    Continental.

5         Q    (Nodding yes).

6         A    To limit it to testimony?

7         Q    Okay.  Well, for the work that you have

8    done for Continental in the last five years, how

9    much would you say that you billed?

10        A    I don't know.  Without looking at billings

11   for Continental, I wouldn't have any idea.

12        Q    Well, is it more than a $100,000.00?

13        A    For a total company service for

14   Continental, probably, yes.

15        Q    Okay.  More than a million dollars?

16        A    No.

17        Q    Somewhere in between those two, obviously?

18        A    Yeah, it is closer to the smaller number.

19        Q    Okay.  Well, I mean, I just glanced at

20   this.  You have at least 40 thousand dollars just in

21   this case.

22        A    Right.

23        Q    And I think you said we totaled up almost

24   twelve different matters that you did work on, on

25   behalf of Continental on.

```
 1       A     (Nodding yes).

 2       Q     So, without looking at the data --

 3       A     Like you said, more than one hundred

 4   thousand dollars, probably less than a million.

 5       Q     Okay.  What about for Cooper?

 6       A     Again, I wouldn't know without looking at

 7   data.

 8       Q     Uh-huh.

 9       A     I probably worked on more Cooper cases

10   than Continental.

11       Q     Uh-huh.  You mentioned at least a couple

12   of dozen?

13       A     It sounds about right.  One to two dozen,

14   probably.

15       Q     I would assume though then those cases

16   that you testified in that the amount of work that

17   you did was comparable to what you have done in this

18   case?

19            MR. FEIN:  Object to the form of the

20            question.

21            THE WITNESS:  It may or may not be.  I

22            mean, sometimes we will consult on cases and it

23            is a couple of hours a day and it is a couple

24            of thousand dollars.  And sometimes it gets to

25            a testifying level like this, it involves more
```

1       work and, you know, inspections, reports,

2       things of that nature, and it can add up to 40

3       to $50,000.00 on a case.

4            MR. METCALF:  Uh-huh.  All right.  I don't

5       think I have anything else.

6            MR. FEIN:  Okay.  We will read.

7            MR. METCALF:  All right.

8            THE COURT:  Do you have an address you

9       want me to send copies to?

10           (Thereupon, the formalities having been

11      waived, the deposition was concluded)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          CERTIFICATE OF OATH

3    STATE OF FLORIDA)
               SS.
4    COUNTY OF MIAMI-DADE)

5

6            I, Alan J Levine, the undersigned
     authority, certify that the witness, Jeffrey
7    Wheeler, M.S., personally appeared before me
     and duly sworn.

8

9            Witness my hand and official seal this
     23rd day of April, 2009.

10

11          _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4    STATE OF FLORIDA) SS.

5    COUNTY OF MIAMI DADE)

6             I, Alan J Levine, being a court reporter
     and a Notary Public in and for the State of Florida
7    at Large, do hereby certify that I was authorized to
     and did stenographically report the foregoing
8    deposition of Jeffrey Wheeler, M.S., the witness
     herein; that a review of the transcript was not
9    requested; that the said witness was first duly
     sworn, and that the foregoing pages, numbered one to
10   82, inclusive, constitute a true record of the
     testimony given by the witness.
11            I further certify that I am not a
     relative, employee, attorney or counsel of any of
12   the parties, nor am I a relative or employee of any
     of the parties' attorney or counsel connected with
13   this suit, nor am I financially interested in the
     outcome thereof.
14            The foregoing certification does not apply
     to any reproduction of this transcript by any means
15   unless under the direct control and/or direction of
     the certifying court reporter.
16            Dated at Miami-Dade County, this 21st day
     of April, 2009.

17

18

19   _____
     Alan J. Levine, Court Reporter
20   Notary Public  State of Florida
     Commission No. DD 576685
21   Expires:   October 11, 2010

22

23

24

25