**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ADAM B. BEAUREGARD,
as personal representative of the
ESTATE of SARAH DAWN
BEAUREGARD,

        Plaintiff,

vs.                           Case No. 3:08-cv-37-J-32TEM

CONTINENTAL TIRE NORTH AMERICA,
INC., etc.,

        Defendant.

_____

<u>**ORDER**</u>

On April 30, 2006, seven year old Sarah Dawn Beauregard died in an auto accident

when she was thrown from her father's 1987 Jeep Grand Wagoneer after the Jeep struck

a guardrail[1] and overturned.  Adam B. Beauregard (the decedent's brother, hereinafter

"plaintiff"), as the personal representative of Sarah Dawn Beauregard's estate, brings this

action under the Court's diversity jurisdiction against defendant Continental Tire North

America, Inc. ("Continental"[2]), alleging that the accident occurred because Sarah's father,

_____

[1]Although the amended complaint states that the Jeep hit a guardrail and overturned, other record evidence indicates that the Jeep ran into a vehicle in the adjacent highway lane and then overturned.  <u>See, e.g.</u>, Florida Highway Patrol Traffic Homicide Report (Doc. 68-4). There is also a dispute as to whether Sarah was wearing a seat belt at the time of the accident or whether the seat belt failed.  However, because of the Court's decision, this dispute need not be resolved.

[2]Because the distinctions are not material to this decision, references by the parties and witnesses to Continental, Continental Tire Corporation, The General Tire & Rubber Company, General Tire, Continental General Tire, Inc., and any other entities affiliated now or in the past with the defendant are referred to here as "Continental."

William Beauregard ("Mr. Beauregard"), lost control of the Jeep when the vehicle's right front tire, manufactured by Continental, "experienced a catastrophic tread and belt separation." Doc. 88 (Amended Complaint). Plaintiff's amended complaint alleges Continental was negligent in the design, manufacture, testing, marketing, and/or selling of the tire and that Continental should be held strictly liable for manufacturing and/or distributing a tire that was defective in its design and manufacture. Plaintiff further alleges that the survivors of Sarah Dawn Beauregard have sustained damages from her premature death and that her estate has sustained various damages as well.

Continental has filed a motion for summary judgment (Doc. 68), which incorporates arguments from an earlier unresolved motion for partial judgment on the pleadings (Doc. 22). Plaintiff filed responses (Docs. 29, 82), Continental was permitted to file a reply (Doc. 89), and both parties filed numerous exhibits (see Docs. 69 & 92, attachments to Docs. 68 & 82, Docs. 94, 95, 96, 97, 98, 99, and Docs. 100 and 101 (except as stricken, see Doc. 103)). The Court heard oral argument on the motion on October 6, 2009, the record of which is incorporated by reference. See hearing minutes, Doc. 102.

## I.    Standard of Review

Summary judgment is proper where "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The burden of demonstrating the satisfaction of this standard lies with the movant, who must present pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that establish the absence of any genuine material, factual dispute." Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003) (internal

quotations omitted). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986). In determining whether summary judgment is appropriate, a court must draw inferences from the evidence in the light most favorable to the nonmovant and resolve all reasonable doubts in that party's favor. <u>Centurion Air Cargo, Inc. v. United Parcel Serv. Co.</u>, 420 F.3d 1146, 1149 (11th Cir. 2005). However, "Rule 56 mandates the entry of summary judgment, upon motion, against a party who fails to make a showing sufficient to establish an element essential to his case on which he bears the burden of proof at trial." <u>Schechter v. Ga. State Univ.</u>, 341 Fed. Appx. 560, 562, 2009 WL 2448254, at *1 (11th Cir. Aug. 12, 2009) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)).

The parties agree Florida law governs in this diversity action.

## II. Analysis

In its moving papers, Continental argues that plaintiff cannot demonstrate that the alleged failure of the tire was the proximate cause of either the loss of control of the Jeep or of Sarah's death; plaintiff has no admissible evidence to support a claim that Continental is liable under theories of negligence or strict liability related to any defect in the design of the tire or with regard to the testing, marketing and/or sale of the tire; plaintiff's expert's opinions with regard to the alleged manufacturing defects fail to support that any defect was present when the tire left the manufacturer; plaintiff has no evidence to support claims under theories of negligence or strict liability for failure to warn or recall; Sarah's mother, Pamela Kane, cannot claim damages under Florida's wrongful death statute; and plaintiff has no evidence to support recovery of damages for the estate or for Sarah's survivors under the wrongful

3

death statute for loss of earnings, net accumulations, support and services or any other unspecified "damages permitted by law." Plaintiff disputes every one of these arguments.

It is undisputed that the Continental tire that allegedly caused this tragic accident was manufactured by Continental in its Mayfield, Kentucky plant in September 1994 and had functioned for eleven years and seven months before the accident. Mr. Beauregard bought four used tires (the subject tire and three others) from a friend in 2004 or 2005. The tire's ownership, maintenance, use and storage history are entirely unknown for the ten year period between its manufacture and Mr. Beauregard's purchase of the tire. The tire had between 30,000 and 40,000 miles on it at the time of the accident. Mr. Beauregard mounted the tires on his Jeep even though Jeep recommends installation of smaller size tires. Mr. Beauregard modified the Jeep to accommodate larger tires by installing after-market "lift kits" which raise the body off the frame. Experts who examined the tire following the accident found evidence of a previous puncture in the tire; evidence that it had bead damage, possibly from having been mounted and remounted on different rims; and evidence of improper inflation (though the experts disagreed as to whether the tire had a history of being overinflated or underinflated). The parties dispute nearly everything about how the accident occurred, including whether Mr. Beauregard hit something that caused the tire tread to separate, whether the modifications he made to the Jeep caused him to be unable to steer following the tread separation, whether a piece of the tire tread hit or became lodged in the underside of the vehicle, and whether Sarah was properly fastened by her seatbelt. Plaintiff has sued only Continental, the tire manufacturer, on theories of negligence and strict liability for design defect and/or manufacturing defect, as well as claims for failure to recall and

4

failure to warn. A threshold issue, therefore, is whether there is any evidence of a design or manufacturing defect present at the time the tire left Continental's manufacturing plant back in 1994. The only evidence plaintiff has put forward on this point is from its tire failure expert. The question here, therefore, is whether his opinion is sufficient to create a triable issue of fact as to the existence of a defect.

### A. Design Defect

To prove his design defect claim under theories of negligence or strict liability, plaintiff must first demonstrate that the design of the tire was defective. See generally, West v. Caterpillar Tractor Co., Inc., 336 So. 2d 80, 86 (Fla. 1976) (adopting strict liability as a tort theory under Florida law and explaining that manufacturer may be liable under either theory if product "proves to have a defect that causes injury to a human being"); see also, Rink v. Cheminova, Inc., 400 F.3d 1286, 1295 (11th Cir. 2005) (explaining that negligence and strict product liability both require a plaintiff to establish the presence of a defect before presenting evidence regarding causation) (citations omitted). Plaintiff's expert, Robert C. Ochs, examined the tire, prepared a Rule 26(a)(2)(B) expert report and gave a deposition in this case.[3] Ochs is a well-qualified tire engineer who worked for Michelin Tire Corporation for

---

[3]Ochs' report is based on an assumption that the tire was approximately fourteen years old at the time of the accident. See Doc. 82, Ex. 4 at 7, 18. During his deposition, he realized that he had misread a faxed copy of a document and that the tire was actually not quite twelve years old at the time of the accident. Doc. 92 at 21-22. No party has suggested that this error affected Ochs' opinions. Ochs did not examine the Jeep or any of the other three tires. Doc. 92 at 71, 87.

twenty-five years before becoming a consulting engineer.[4]  During his career, Ochs has examined and analyzed over 1000 tires to determine the causes of their failures.  Continental has not challenged his credentials in this case.  Ochs determined that the tire here (a Vagabond Radial all terrain steel belted radial ply light truck tire manufactured by Continental in 1994) failed when the upper and lower belts began to separate at approximately the 190 degree location on the non-serial number side of the tire, with the belts continuing to separate and detach across the crown in that region of the tire.[5]  See Doc. 82, Ex. 4 at 1, 9, 16-17; Doc. 92 at 47-48.  In his deposition, Ochs agreed that "the mere fact that a tire sustained a tread belt separation in and of itself does not mean that [the] tire was defectively designed or manufactured."  Doc. 92 at 192-93.

---

[4]In evaluating an expert's credentials in a tire failure case, the Texas Supreme Court offered the following informative discussion about tire components:  "Tire chemistry and design and the adhesion properties of tire components is a highly specialized field. . . . [S]kim stock formulas are closely guarded secrets in the tire industry.  The 'recipes' used in tires cannot be reverse engineered because the vulcanization process chemically alters the ingredients, nor can the physical properties be determined from an examination of the ingredients.  Instead, testing is required. [As explained in a videotape played for the jury] a tire is one of the most complex components of an automobile, and . . . a radial tire 'is a composite of 200 different chemicals and raw materials combined by physics, chemistry, and craftsmanship."  Cooper Tire & Rubber Co. v. Mendez, 204 S.W.3d 797, 806-07 (Tex. 2006) (citations omitted).

[5]Ochs explained that a tire is described in degrees like any circle, with the tire's imprinted serial number placed in the zero degree position, facing the viewer (the serial number side, or SNS), and relevant points being described as a number of degrees between zero and three hundred and sixty.  (So the 190-degree point of failure would be slightly past 6:00 p.m. if the compass were a clock face.)  Tire reference points on the non-serial number side are described as NSNS and reported counter-clockwise (so NSNS 190 is the same tire location as SNS 190 but on the opposite side of the tire).  See Doc. 82, Ex. 4 at 8.

In his report, Ochs stated that because he did not have documentation regarding the field service history of the tire or durability studies regarding the tire's belt, he could not evaluate the design parameters of the tire structure beyond his own observations and, therefore, it was "not possible to comment on the design of the tire in this report." Doc. 82, Ex. 4 at 19. When questioned further on this topic during his deposition, Ochs testified that he "lack[ed] sufficient information to evaluate the design of the tire" so he held "no opinions" with regard to the tire design. Doc. 92 at 129-30. Ochs also testified that he had never visited the Continental tire manufacturing plant. Id. at 153.

The only possible defect with the design that Ochs identified was the presence of two short sections (each less than an inch long) of cord or string that he found between the upper and lower belts of the tire, although not in the specific area of the tire where he determined the upper and lower belts separated. In his expert report, Ochs identified the presence of the cord as a "foreign material" which increased the stress between the belts in an area of the tire already subject to "high stress," thus further reducing the fatigue life of the rubber skim stock interface between the upper and lower belts. See Doc. 82, Ex. 4 at 10, 17-18. In his deposition, Ochs explained that the presence of the cord (which he repeatedly identified as being a red cord but then recalled was actually white), was likely a contaminant indicative of a manufacturing process which is "either out of control or which has had introduced into it materials that shouldn't be there." Doc. 92 at 56. In considering the latter possibility, Ochs testified that perhaps the cord was "bleeder cord" or "marker cord," used as a quality control measure by some tire manufacturers to mark particular gauges of belt material to aid the tire builder in ensuring the correct gauge material is being used. Id. at 58-

7

59. Ochs explained that when marker cords are used, they are placed below the belts or on the upper surface of the upper belt, but not between the belts. Id. at 58. Ochs therefore determined that because the cords he found in this tire were between the belts, it meant one of two things-- either the manufacturing process was defective in that it permitted stray cords to contaminate the sensitive high stress area between the upper and lower belts or the design was defective in that it intentionally included marker cord in this area. Id.

While Ochs testified that the literature would generally support his point that the placement of any material between the belts would be a stress riser in that location because it creates a void in the tire structure, he was unable to point to any literature, studies or evaluations that have concluded that the placement of marker cord between the belts constitutes a defect in the design or manufacturing process of tires. Doc. 92 at 60-62. At oral argument, Continental's counsel stated that Continental intentionally builds marker cord (or "marker yarn") into millions of its tires as part of the manufacturing process. See also Doc. 89 at 8; Doc. 68 at n.13; Doc. 42 at ¶ 9. Thus, the presence of marker cord is apparently an intentional part of the design of this tire. However, regardless of what process led to the presence of the cord, it is undisputed that Ochs did not find the cord in or even near the area of the tire where the failure originated. In fact, the cords were found 50 to 100 degrees away from where Ochs believed the separation began. Id. at 56-57; Doc. 82, Ex. 4 at 10, 16. The mere presence of the marker cord elsewhere in the tire does not mean that the design was defective. Ochs testified that the presence of the marker cord was only significant if it was in the area of the tire that failed, explaining the marker cord "locally would reduce the strength of the tire structure in that location." Doc. 92 at 56 (emphasis added).

8

Even apart from this, Ochs testified that he did not perform any tests to measure the stress at the belt edge or between the belts of this or any other Continental tire, he had not done any tear strength testing of the tire, he did not know what compounds had been used to manufacture the tire, and he had not performed any durability testing on the tire. Doc. 92 at 107-08. Thus, Ochs has no evidence to support his supposition that there was reduced strength in the area where he found the cord (let alone that reduced strength in that area translates to reduced strength at the site where the separation and detachment originated). Although plaintiff was denied the ability to perform additional destructive testing on the tire after Ochs prepared his report, other, non-destructive testing which might have revealed more about the tire was not performed. <u>See</u> Doc. 42 (affidavit of Jerry J. Leyden, a rubber industry expert specializing in tire failure analysis hired by Continental) at ¶ 5 (describing microscopic, shearographic, x-ray and UV-light as non-destructive testing methods that could have been used to reveal the cause of this tire failure). <u>See also</u> <u>Williams v. Michelin N. Am., Inc.</u>, 381 F.Supp. 2d 1351, 1355 (M.D. Fla. 2005) (describing tire failure expert's non-destructive methods of analysis which included visual, tactile, fractographic, microscopic and x-radiographic procedures). Additionally, Ochs did not examine any of the other three tires that were on the Jeep, one of which was the same "make and model" as the tire that failed-- a Vagabond Radial all terrain steel belted radial ply light truck tire manufactured by Continental in September 1994 in its Mayfield plant.[6]

---

[6]Joseph L. Grant, a former Continental engineer and Continental's tire expert in this case, did examine all four of the tires that were on the Jeep. Doc. 44, Ex. 5 at 6-8. Nothing prevented Ochs from doing likewise.

Where Ochs stated in his expert report and at deposition that he could not comment on the design of the tire; where the only anomaly he identified with the design is not in the area of the tire Ochs identified as the site of the failure; where Continental's expert, who is familiar with the design process of this tire, reports there is no defect[7]; and where plaintiff has no other witness who can testify as to design defect of any kind, the Court finds plaintiff has failed as a matter of law to create a disputed issue of fact as to the presence of a design defect in this tire such as would permit the design defect claims (sounding in negligence or strict liability) to be presented to a jury.

## B.     Manufacturing Defect

In addition to the design defect claims, plaintiff's negligence and strict liability theories also raise claims that the Continental tire suffered from a manufacturing defect.  In his expert report, Ochs explained that the separation in the tire belt is a "fatigue failure" which could be caused by using aged chemical compounds to create the belts, improper bonding between the belts, and/or from contamination which would cause a stress riser between the belts. Doc. 82, Ex. 4 at 18.

As to the aging of the chemical compounds, Ochs stated in his report that the cracks in the tire belt "resulted from inadequate aged mechanical properties of the belt skim stock." Doc. 82, Ex. 4 at 16.  However, when questioned during his deposition, Ochs testified that he did not know what skim stock had been used and was not familiar with the stock's properties including tear strength, modulus or resistance to crack propagation.  Doc. 92 at

---

[7]In a detailed report, Grant found no defect in either the design or manufacture of the subject tire.  Doc. 44, Ex. 5.

182.   As noted above, additional non-destructive testing of the tire was not performed. Moreover, a second Continental tire, which might have revealed information about the manufacturing process in the Mayfield, Kentucky plant in September 1994, was not examined by plaintiff's expert.  Ochs explained that the reason he believed the belt stock was inadequate was because the tire, which did not otherwise exhibit signs of abuse from underinflation or overloading, came apart.  Id.  Yet Ochs also agreed with the statement that "all tires suffer some loss of adhesion during their lifetime."  Id. at 190.  He further admitted that he could not say within a reasonable degree of engineering probability that the tire was built with out-of-age stock.  Id. at 162-63.  Mr. Beauregard testified that he saw the tire with three others outside a friend's house in late 2004 or early 2005.  Doc. 82, Ex. 2 at 88-99. He purchased the four tires, all of which were used, from the friend and mounted them on his Jeep.  Id.[8]  By the time of the accident in 2006, the Continental tire was over eleven and a half years old and Ochs estimated that it had traveled somewhere between 30,000 to 40,000 miles.  Doc. 92 at 32-38.  On this record, the Court finds plaintiff has failed to produce more than a scintilla of evidence that the skim stock or chemical compounds in the belts were aged or otherwise defective when the tire left the hands of the manufacturer, as is required to support a products liability claim.  See West, 336 So.2d at 86 (explaining that products liability claim under Florida law requires finding that product was defective in design or manufacture "when it left the plant of the manufacturer"); see also, Florida Standard Jury

_____

[8]Mr. Beauregard was unable to provide an address for his friend (whose last name he did not know) and he testified that he believed she no longer lived in Florida.  Doc. 82, Ex. 2 at 88-89.

Instructions (Civ) (2007), PL Product Liability (jury to determine (inter alia) whether product was defective "when it left the possession of" the defendant).

As to improper bonding, Ochs explained in his report that the tire suffered from a manufacturing defect known as a "high-cycle fatigue failure," which is evidenced by "liner pattern marks"- - marks showing separate sheets of rubber that should have fused together at the interface of the upper belt and the lower belt had the manufacturing process worked properly. Doc. 82, Ex. 4 at 19. Ochs reports that it is well known in the industry that "liner pattern marks on the failed surface of one or both steel belts, as are present on the subject tire, are evidence of manufacturing defects." Id. In his deposition, however, Ochs agreed that although there are liner pattern marks in some locations on the tire, many locations had no liner pattern marks and there are not liner pattern marks at the "failed surface," which Ochs identified as being between the 160 degree and 200 degree location, likely originating at the 190 degree location on the non-serial number side of the tire. Doc. 92 at 47-51. Ochs testified that it is "more probable than not" that liner pattern marks existed at the 190 degree mark on the tire, but that the "burnishing and polishing of the tire" (presumably caused by continuing wear on that area as a bulge developed which was then exacerbated by the accident) have left the tire without markings at the 190 degree point. Id. at 51-52, 64-65. When questioned as to whether there was any physical evidence to support his opinion that liner pattern marks likely existed at the point where the tread separation began, Ochs responded that there was not, which is why he had recommended that additional testing be

performed on the tire at that location.[9] Id. at 52. However, Ochs agreed that no test would reveal whether liner pattern marks were present at the time the tire left the Continental plant. Id. Ochs further explained that "liner pattern marks are not in and of themselves contaminants but they may be indication of contamination in that region, because what the liner pattern marks do represent is a failure of the tire structure at the interface of the upper belt and the lower belt, that in those locations there was not a complete intermingling of the rubber to eliminate the interface between the belts. And the contaminants will lead to that condition preventing the interlocking of the molecules getting proper vulcanization, getting . . . an adhesive level that is as high as the strength of the rubber itself." Id. at 54. However, Ochs conceded that he was not visually aware of any physical evidence of contaminant in the area of the separation that could have led to the liner pattern marks, that the only possible contaminant he found in his examination of the tire was the red cord, and that the red cord was not found in the specific location of the separation. Id. at 55. As discussed above, the red (or white) cord was located at the 250 to 255 degree location on the tire. Id. at 56-57. Ochs further testified that in the area where the liner pattern marks were present, the belts of the tread still retained their adhesion, at least to some unquantifiable degree and

_____

[9]The proposed destructive testing involved excising sections of the tire where Ochs noted the presence of liner pattern marks as well as sections where no liner pattern marks were present to compare the material composition of the rubber samples. See Doc. 44 at 3. For a variety of good reasons, the Court did not allow the proposed testing. See Doc. 54 (Order granting motion for protective order). In its response to the motion for protective order, plaintiff never offered a reason as to why the alternative non-destructive testing methods (such as x-rays) suggested by defendant would be insufficient. See Doc. 44. Although defendant's expert also referenced the use of "facsimile products, simulations and controlled experiments" as other possible alternatives, it is not clear whether anyone contemplated testing the other Continental tire that was on the vehicle.

the tread had not separated prior to the detachment in those places. Id. at 160-61. Thus, even in the area where Ochs observed the liner pattern marks, the tread belts were still intact nearly twelve years after manufacturing. On this record, the Court finds plaintiff has failed to put forth more than a scintilla of evidence upon which a jury could find that the presence of liner pattern marks in an area different from where the tire failed was a manufacturing defect which caused the tread separation.[10]

As for the possible contamination with the manufacturing process, Ochs was only able to identify the red (or white) cord that he found in the tire. The presence and effect of that cord is discussed above and for those same reasons, the Court finds plaintiff has failed to put forward more than a scintilla of evidence that contamination caused a manufacturing defect with this tire.

No other witness for plaintiff offered a theory as to a manufacturing defect; thus, the case hinges on whether Ochs' opinions create a triable issue. While Ochs is qualified as an expert on tire failure, his ability to render a reliable opinion as to a defect in this tire was significantly handicapped by several factors. Because of the tire's age, there are no records from Continental regarding the manufacturing of the tire; the one other tire manufactured by Continental in the same plant the same week that apparently was readily available was not

_____

[10]If the case went to trial, Grant (Continental's tire expert), would dispute Ochs' opinions as to the significance of liner pattern marks. He would have testified that the boundaries between the various layers do not disappear or homogenize during the curing process and that sometimes what appear to be liner pattern marks are actually a cross-hatching pattern in the rubber. See Doc. 44-5 at 11. On summary judgment, of course, the Court does not consider the validity of Grant's opinion but notes it for the purpose of showing that the jury would have heard an explanation from Continental regarding the presence of the marks and their meaning.

examined by plaintiff; other possible testing on the subject tire was not performed; and the subject tire has a ten year gap in its history of ownership, maintenance, usage and storage, all factors which can affect a tire's durability. Moreover, Ochs agreed that "all tires suffer some loss of adhesion during their lifetime" and loss of adhesion is "an expected condition" because tires "are not designed and manufactured to [last] forever . . . [or to be] indestructible." Doc. 92 at 190-91. Ochs has attempted to identify defects in the tire based on what he can see- - liner pattern marks here and there and a few stray cords- - items that his experience tells him <u>can</u> signify manufacturing defects resulting in tread detachment and separation.[11] The problem is that the liner pattern marks and cords are not present at the location on the tire where it failed and where they were present, the tread did not separate and the tire retained an unquantifiable degree of adhesion for over eleven years and 30,000 miles. Thus, Ochs' identification of these findings as "defects" that originated at the point of manufacturing and are now the source of the tire failure amounts to impermissible speculation and conjecture. The Court therefore finds as a matter of law that plaintiff has failed to produce evidence of a disputed issue of fact as to the presence of a manufacturing defect. <u>See, e.g.</u>, <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 157 (1999) (finding trial court did not abuse discretion in excluding tire failure expert's testimony because "nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the <u>ipse</u> <u>dixit</u> of the expert") (citation

_____

[11]Although Ochs listed aged chemical compounds as another source of possible defect, his examination did not reveal whether aged chemical compounds had been used- - it was just a theory that might explain the presence of liner pattern marks.

omitted).  See also Goodyear Tire & Rubber Co. v. Rios, 143 S.W.3d 107, 113-15 (Tex. App. 2004) (rejecting expert testimony of Ochs where his attempt to rule out other possible causes of tread separation was not substantiated because his visual/tactile testing methods were not demonstrated to be generally accepted methodologies used by other experts in the field to rule out mere use and abuse of tire over time).

### C.    An Inference of Defect

Plaintiff argues that even without evidence upon which a jury could find the presence of an actual manufacturing or design defect, summary judgment is still due to be denied because the jury should be permitted to rely on an inference of defect.    In certain circumstances, Florida law does permit an inference of defect where an injured party is unable to come forward with evidence to prove the existence of a manufacturing or design defect.  Cassisi v. Maytag Co., 396 So. 2d 1140, 1143, 1148 (Fla. 1st DCA 1981) (finding inference of defect to support defect in clothes dryer that inexplicably caught fire after less than two years of normal household use).  Importantly, however, this inference is only applicable when plaintiff can demonstrate the following two "essential" facts:  (1) "proof of the malfunction," (2) that occurs "during normal operation."  Id. at 1151.  As explained by the Eleventh Circuit, Cassisi stands "for the proposition that when a product malfunctions that would not malfunction but for the defect, a plaintiff is entitled to an inference of a defect." Worsham v. A.H. Robins Co., 734 F.2d 676, 683 (11th Cir. 1984) (emphasis added) (finding inference supported claim of defect in medical device where company had history of defects with the product and where expert ruled out other causes of plaintiff's infection).  To support the proof of product malfunction, a plaintiff "can include facts that negate other causes of the

accident and at the same time point to the product as the most logical cause." Id. See also Rink v. Cheminova, Inc., 400 F.3d 1286, 1295 (11th Cir. 2005) (explaining that under Florida's products liability law, the Cassisi inference may be available to infer a defect if the product malfunctions during normal operation, although the plaintiff must still show causation). The Cassisi inference has been used to permit a defect claim to go to the jury in tire failure cases. See, e.g., Derosier v. Cooper Tire & Rubber Co., 819 So. 2d 143 (Fla. 4th DCA 2002) (reversing trial court's summary judgment in favor of tire manufacturer where plaintiffs claimed three month old tire suffered blowout; finding defendant would not be prejudiced by inference of defect because defense could be mounted based on evidence gleaned from remaining portion of tire and photographs of accident, even though tread itself was missing); Gencorp, Inc. v. Wolfe, 481 So. 2d 109 (Fla. 1st DCA 1985) (reversing and remanding for new trial where trial court correctly found inference of defect to be sufficient to put case to jury where truck tire installed on tractor trailer blew out after nine days and 2,500 miles of usage but where jury was improperly instructed regarding inference such that language of instruction was tantamount to directing verdict in plaintiff's favor).

In this case, however, the Cassisi inference is inapplicable because plaintiff has failed to put forward more than a scintilla of evidence that there is "proof of a malfunction" or that, if there was a malfunction, that it happened "during normal operation." Cassisi, 396 So. 2d at 1151. While plaintiff points to Ochs' testimony that absent evidence of impact damage or signs of underinflation, a tread belt detachment "would be the result of a problem in the tire itself [meaning] a manufacturing or design defect," his testimony included the appropriate caveat that this would be true absent any abuse of the tire. Doc. 92 at 236-38. While Ochs

17

stated he did not see evidence of underinflation or impact damage which would signal abuse in this tire, he agreed that "the mere fact that a tire sustained a tread belt separation in and of itself does not mean that the tire was defectively designed or manufactured." Doc. 92 at 192-93. Thus, unlike the malfunctioning clothes dryer that caught fire in Cassisi, or the medical device identified as the only remaining possible cause of the plaintiff's infection in Worsham, the product here, an eleven year old tire, could suffer a tread belt separation without there being a malfunction at all.[12]

According to plaintiff's expert and/or unrebutted testimony from Continental's experts, at the time of the accident, this tire was eleven years and seven months old; it had been driven for over 30,000 and maybe 40,000 miles; the first ten years' ownership and maintenance history for the tire is unknown; the storage history for the tire is unavailable other than Mr. Beauregard's testimony that he first saw the tire outside a friend's house in Florida (likely subjecting the tire to heat and direct sunlight, storage conditions which Ochs testified are "not prudent"); Ochs found the tire showed signs of having been overinflated, which can make a tire stiffer (or, according to defendant's expert, Grant, the tire showed signs of being overdeflected which may mean it was underinflated and susceptible to tread

_____

[12] Ochs agreed that tires wear out over time and as they do, their rubber treads lose adhesion. Doc. 92 at 190. He explained that a tire's belts should remain intact through the life of the tire, meaning until its treads wear out. Id. at 236. However, Ochs testified that tread wear is a factor of mileage, while the belts' adhesion capacity can be affected by variables not involving mileage, such as storage conditions and temperature exposure. See id. at 32-38 (explaining tread wear and mileage calculations) and 145-47 (explaining that heat accelerates aging of tire's rubber components). Thus, that the belts detached while 10% of the tread remained on the tire does not necessarily mean that the tire was defectively manufactured or designed.

separation and puncture[13]); the tire (described by Ochs as a light truck offroad floatation tire) was not the right size or type for the vehicle on which it was mounted (not only did the Jeep as manufactured call for smaller passenger model tires, but Mr. Beauregard, who is not a licensed mechanic, modified the vehicle by installing after market "lift kits" which raise the body off the frame so that larger tires could be mounted on the Jeep); the tire interior contained residue of puncture sealant, indicating a history of puncture or a slow leak (the condition of the tire following the accident prevented the experts from determining which); the tire appeared to have been demounted from its original rim and then remounted, possibly onto a different rim, which can damage the tire and lead to tread belt separations and detachments if not done properly (Grant noted the presence of "bead damage" to the rim consistent with improper mounting; it is not clear if Ochs' report contains a similar finding[14]); the tire showed signs of "bluing" which Ochs testified accelerates the aging of rubber and, while the bluing could have occurred during the accident or could signal an inferior manufacturing process, it could also mean that at some time in the tire's history, it was subjected to excessive heat; and finally, Continental had not been advised of any problem with any of the other tires of this model coming out its Mayfield factory at that time.  See Doc. 44, Ex. 5 at 4, 10; Doc. 82, Ex. 2 at 41, 62-68, 74-75, 88-93, 99, 101; Doc. 82, Ex. 4 at 9; Doc. 92 at 8-9, 16, 18-20, 32-38, 44, 83-84, 130-36; Doc. 97 at 17-18; Doc. 98 at 93-113,

---

[13]Of course the Court does not have occasion when ruling on a motion for summary judgment to determine which expert is correct.  Rather, the point is that they both found evidence of improper inflation that could affect the tire's durability in some way.

[14]See Doc. 82, Ex. 4 at 11 (describing fracture and abrading extending to bead area of wheel exterior).

124.

Both tire experts (Ochs and Grant) agree that a tire's durability and resistance to tread separation may be affected by a variety of service related conditions including the maintenance history, storage history, weather, exposure, usage, and misuse. None of these factors are controlled by Continental and, given the age of the tire and the lack of information about the tire's history, all of them and others could easily be at play here. Thus, while under a different set of facts, the <u>Cassisi</u> inference could support an inference of defect in a tire failure case, this is not one of those cases. While Ochs did not see signs of underinflation or impact damage, which he identified as the two most important signs of misuse or failure, Ochs did not perform any testing on the compounds of the tire and did not measure the level of stress, strength or durability of the tire belts, he was unable to offer an opinion as to the strength of the portions of the belt that retained their adhesion, and the possible symptoms which indicate a defect are not present in the area where he believed the tire separation originated. Doc. 92 at 47-57, 107-08, 160-61, 236-38. Thus, the facts marshaled by plaintiff fail to "negate other causes" of the tread separation and further fail to point to a manufacturing or design defect "as the most logical cause" of the tread separation. <u>Worsham</u>, 734 F.2d at 683. <u>See also</u> <u>Smith v. Goodyear Tire & Rubber Co.</u>, 495 F.3d 224, 228 (5th Cir. 2007) (holding that plaintiff could not prove products liability claim for tire failure under Mississippi law where seven year old tire showed extensive wear and plaintiff "had no knowledge of whether or how the subject tire had been driven on or used during the six years before he purchased it"); <u>Prince v. Michelin N. Am. Inc.</u>, No. 01-0654-CV-W-FJG, 2003 WL 1090158, at *4 (W.D. Mo. Jan. 29, 2003) (granting summary judgment under Missouri

law where plaintiff failed to put forth admissible evidence that the alleged aging and embrittlement of ten year old tire and resulting tread separation was caused by manufacturing or design defect present when tire left hands of defendant; thus, "analytical leap or supposition [was] too great" to permit jury to infer existence of defect); Mendez, 204 S.W.3d at 807-08 (reversing judgment of court of appeals and rendering judgment for tire manufacturer where "universe of possible causes for the tire failure [was] simply too large and uncertain" to permit proof by inference under Texas law where tire had 30,000 miles on it and puncture, noting tire failures "ordinarily occur for all sorts of reasons"); Rios, 143 S.W.3d at 111-12 (declining to permit inference of defect under Texas law based on circumstantial evidence of tire separation in middle of tire's life where age and condition of tire defeated any weight carried by inference as proof of malfunction); Parra v. Pirelli Tire, LLC, No. Civ. A. 98-3727, 1999 WL 796213, at *1-2 (E.D. La. Oct. 1, 1999) (granting summary judgment under Louisiana law on products liability claim because plaintiff's evidence was too weak to find defect based on tire failure and inference of defect was not permitted because "failure of a tire is not such an unusual event that a defect can be inferred solely from the fact that the accident occurred"); Woelfel v. Murphy Ford Co., 487 A.2d 23, 24 (Pa. Super. Ct. 1985) (finding inference of manufacturing defect not permitted where tire ran for 37,000 miles without any problem).

The law does not require a manufacturer to be a lifetime guarantor of its product and absent a defect, the manufacturer cannot be held liable. West, 336 So.2d at 86-87. See also Jennings v. BIC Corp., 181 F.3d 1250, 1256 (11th Cir. 1999) (explaining that Florida law does not hold a manufacturer strictly liable for all injuries caused by its product, however it

21

is used); Perez v. Nat'l Presto Indus., Inc., 431 So. 2d 667, 669 (Fla. 3d DCA 1983) (explaining that "a manufacturer is not an insurer of its product" because "[a] manufacturer cannot be expected to design products with component parts which will never wear out, regardless of the nature of use or maintenance") (citations and quotations omitted). Without benefit of the Cassisi inference, plaintiff would be unable to prove to a jury, as it must, that the tire was defective or that, if it was, that such failure was due to a manufacturing or design defect.

### D. Remaining Claims

Because plaintiff has failed to demonstrate a genuine issue of fact as to the existence of a design or manufacturing defect, Continental had no duty to warn anyone about such a defect. (Even putting aside plaintiff's failure to create a triable issue as to the existence of a defect, the Court would be hard-pressed to find a duty to warn where Continental's unrebutted position is that it has had no other litigation involving this type of tire and only one claim for adjustment in 1999 of a tire manufactured in 1997. See Doc. 59, Ex. B at ¶ 6; Doc. 97 at 17-21). While a defect that surfaces after manufacture can sometimes create a duty to warn, Moorman v. Am. Safety Equip., 594 So. 2d 795, 801 (Fla. 4th DCA 1992), such a duty can only be triggered if plaintiff proves the existence of a defect, something the evidence here does not support. As to a duty to warn consumers that Continental's tire was too old to be left in service, again, plaintiff has not put forward more than a scintilla of evidence to prove that the tire here failed because it was too old. Additionally, Ochs testified that the National Highway Traffic Safety Administration is "still studying the issue of tire aging" and he confirmed that the information imprinted on the tire complied with federal law.

22

Doc. 92 at 25, 247-48, 258. Further, plaintiff put forward no expert to testify as to what a warning would have said.[15] See Williams, 381 F.Supp. 2d at 1362-63 (granting motion in limine to exclude testimony regarding tire expiration date from tire failure expert who had done no studies on warnings or expiration date for specific tire); Rios, 143 S.W.3d at 118 ("Given the limited amount of space on a tire's sidewall and the many warnings and instructions pertinent to the operation, mounting, maintenance, and repair of a tire, we conclude that expert testimony was required;" thus, "[t]he jury could not have determined, without the benefit of expert testimony, which, among many, warnings and instructions should be printed on a sidewall."). Thus, although Continental and other tire manufacturers may now be recommending that tires be removed from service after ten years, without evidence that the tire failure in this case was due to its age, the Court finds as a matter of law that Continental had no duty to warn Mr. Beauregard about the age of the tire.[16] Similarly, without a design or manufacturing defect, there is no basis to find Continental had a duty to recall the subject tire (assuming, without deciding, that such a duty even exists under Florida law).

As to plaintiff's further claims of negligence related to Continental's testing, marketing and/or selling of the tire, Continental states that plaintiff has failed to put forward any evidence to support them and plaintiff does not dispute that. See Doc. 68 at 15-16; Doc. 82,

_____

[15]Although Ochs gave general testimony regarding the effects of tire aging and legal requirements for tire warnings, he agreed that he is not serving as a warnings expert in this case. Doc. 92 at 27-28.

[16]It has never been Continental's position that this tire was too old to be in service, a point Continental's counsel emphatically asserted at oral argument.

Doc. 89 at n.7. Summary judgment is therefore due to be granted as to these claims as well.

## III. Conclusion

While recognizing the difficulty in proving a products liability case involving the improper design or manufacture of a tire after that tire has been in service for a lengthy period of time, the Court is not saying it can never be done. However, the Court must focus solely on this case and the evidence before it and has an obligation to grant summary judgment when a plaintiff is unable to adduce admissible evidence of a defect sufficient to create a triable issue of fact for the jury. Here, plaintiff's tire expert is forced to make key concessions and otherwise has constituted a theory of liability which is unsupported by any evidence and which devolves into speculation and conjecture. While the death of seven year old Sarah was a tragedy, the Court holds as a matter of law that no reasonable jury could find that the design or manufacture of the Continental tire was to blame for this accident. Accordingly, it is hereby

**ORDERED**:

Defendant's Motion for Summary Judgment (Doc. 68) is **GRANTED**. The Clerk shall enter judgment in favor of defendant Continental Tire North America, Inc. and against plaintiff Adam B. Beauregard, as personal representative of the Estate of Sarah Dawn Beauregard, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida this 16th day of March, 2010.

TIMOTHY J. CORRIGAN
United States District Judge

s.
Copies:

counsel of record